# EXHIBIT 3

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| PERRY CLINE, on behalf of himself and all others similarly situated, | § § § | |
| Plaintiff, | § § | |
| v. | § § | Case No. 17-cv-00313-JHP |
| SUNOCO, INC. (R&M) and SUNOCO PARTNERS MARKETING & TERMINALS, L.P., | § § § § | |
| Defendants. | § | |

SUPPLEMENTAL EXPERT REPORT

ERIC R. KRAUSE, MBA

_____

ERIC R. KRAUSE

12/2/2019

DATE

*CONFIDENTIAL – Pursuant to Protective Order*

## I. INTRODUCTION AND NATURE OF INVOLVEMENT

1.  My name is Eric R. Krause.  I have been retained by Sunoco, Inc. (R&M) and Sunoco Partners Marketing & Terminals L.P. (individually or collectively, "Sunoco" or "Defendants") in the matter of *Perry Cline, on behalf of himself and all others similarly situated, v. Sunoco, Inc. (R&M) and Sunoco Partners Marketing & Terminals L.P.* I have been asked to assess the facts and circumstances related to Sunoco's potential obligations under the Oklahoma Production Revenue Standards Act, OKLA. STAT. tit. 52, Section 570, *et seq.* with respect to the quantification of any alleged damages the Plaintiff contends are due to the class.  Specifically, I have been asked to quantify the potential effect of adjusting any damages claimed by expert Barbara Ley to account for unmarketable title suspense history for the defined class certified by the Court in this matter.  I have also been asked to respond and to render opinions related to the Rebuttal Expert Report of Barbara A. Ley dated November 8, 2019 ("the Ley Report") after the material changes in the number of class members and the value of damages since her October 25, 2019 initial report.[1]

2.  I previously filed Expert Reports in this matter related to the questions of class certification dated March 29, 2019 and related to my damages opinions dated November 1, 2019.  I also filed two Declarations in this matter on August 14, 2019 and November 14, 2019.  To the extent relevant and unless otherwise noted in this report, I hereby incorporate my opinions from my previous Expert Reports and Declarations herein.

---

[1] Ms. Ley's damages were reduced by $7.1 million and the number of class members in her damages was reduced by more than 20,000 owners.  It is currently unclear to me whether or not the Plaintiff sent class notice to the approximately 74,000 owners in Ms. Ley's original calculation and class member list or to the approximately 53,000 owners in her November 8th report.

*CONFIDENTIAL – Pursuant to Protective Order*

## II. CREDENTIALS AND COMPENSATION

3.    My credentials and compensation remain unchanged since my previous report filed on November 1, 2019.  Applied Economics' compensation is not dependent in any way upon the outcome of this litigation or upon reaching any particular opinion or conclusion.

## III. INFORMATION REVIEWED

4.    In the course of my work in this matter, Applied Economics staff and I have reviewed documents and materials produced by the parties, including depositions of the parties.  I have also procured and reviewed information from public sources.   A listing of the materials considered in forming my opinions is attached to this report as Appendix C-Supplemental.  If any additional relevant or supplemental information or data becomes available to me, I will supplement this report as may be required.

## IV. UPDATED UNMARKETABLE TITLE ANALYSIS

5.    In my Expert Report dated November 1, 2019, I reserved the right to update and supplement my opinions related to the effects of a more in-depth analysis of Defendants' internal suspense data relating to unmarketable title issues in the presently certified class.[2]  Due to the complex nature of the data and because I received the data one day prior to my report being due, I did not have sufficient time by November 1 to perform a quantification of the effects to any damages resulting from a full analysis and evaluation of this data.  It remains my opinion after a full review of the suspense history data that it is insufficient alone to fully ascertain the underlying reason for an apparent "Untimely Payment" actually being untimely – and if it is indeed an Untimely Payment, whether or not it would require a payment of interest on the basis of a 6% compounding rate or a 12% compounding rate.

---

[2] This data was produced one day prior to the filing of my report.

*CONFIDENTIAL – Pursuant to Protective Order*

6.   As was discussed at length in my previous reports, Sunoco establishes suspense codes for their internal, corporate purposes.  As was testified to by Sunoco corporate representatives, one cannot simply look at the name of a suspense code and reach a full understanding of why any particular interest was placed under that code.[3]  The types of unmarketable title issues contemplated by the statute may exist across a number of codes.  The internal suspense codes established by Sunoco are not intended to facilitate the identification of the amount of interest that is due under the PRSA in Oklahoma – it is a far broader mechanism for internal purposes and cannot be relied upon exclusively for understanding the underlying facts.  Thus, one cannot rely exclusively on this suspense code data to make any definitive determination of what the underlying cause for an alleged Untimely Payment was as Ms. Ley believes is possible.

7.   Moreover, as I stated in my previous reports, it would be necessary on a case-by-case basis to determine precisely *when* title became marketable (assuming it ever did) and the associated timing of when the funds were actually released from suspense and paid.  It is possible that, assuming liability, a specific release may have varying interest rates depending on the timing of those two events.  Moreover, this can be further obscured by changes in the suspense codes for any particular owner or property assigned over the life of the suspended funds.  In fact, after reviewing the data provided by Sunoco, I note that changes in suspense codes occurs in hundreds of thousands of instances where suspense codes change over time for a single owner, or when ownership changes from  a single owner to multiple owners or from multiple owners to multiple owners.[4]  The suspense codes change numerous times, and

---

[3] See, for example, Deposition of Eric Koelling, September 20, 2018, pages 219, 265 and Declaration of Eric Koelling, dated August 14, 2019, pages 6-7, 15-16.
[4] Further complicating these issues is that in Sunoco's system, the owner's suspense codes are not the single consideration in understanding what, in fact, occurred.  Sunoco has both property level suspense codes and owner level suspense codes, further adding to the complexity of any analysis of a particular transaction.

*CONFIDENTIAL – Pursuant to Protective Order*

in thousands of the transactions, the changes include an unmarketable title suspense code for at least some part of the suspense period (but not necessarily all of it).[5] This highlights the need to investigate the underlying reason for an alleged Untimely Payment for each record, and then allocate the interest rate percentage across those periods based on what the underlying reason for the suspense was in each period.  Ms. Ley has not, to date, performed any type of analysis that cures any of these issues.

8.   However, I have been asked by Defendants' counsel to perform an estimated allocation of Ms. Ley's damages to the suspense codes included in the historical suspense records.  As I did in my previous report, I rely on Defendants' title expert Kraettli Epperson review of the suspense codes included in the Sunoco systems and his opinions as to which codes likely relate to unmarketable title issues.[6]

9.   I have refined my preliminary allocation of Ms. Ley's principal statutory interest damages (and applied it to her updated damages of approximately $48.2 million) to the extent possible using Mr. Epperson's matrix of suspense codes. With the additional time since my original report, I have developed a more in-depth linkage of damages records in Ms. Ley's damages model to the suspense code histories provided by Sunoco in order to more accurately ascertain the effects of taking unmarketable title issues into account in Ms. Ley's damages model – something she has not performed to my knowledge as of the filing of this report.  In my updated analysis, I have established a timeline of different codes and the dates of their respective changes for each of the owner number-property combinations for which Ms. Ley calculates damages over the period at issue.  In doing this, I have made it possible to more

---

[5] SUN-CL-00021529 – 21532

[6] As noted in my previous report, I reiterate that that there are a number of categories that Mr. Epperson states it is difficult to determine from merely the code whether or not the possible underlying reason for the suspense was unmarketable title related or not.  This further highlights that reliance on the historic suspense codes exclusively to determine liability and what interest rate to apply may be insufficient without a more in-depth review of division order and other files to determine the individual circumstances that existed for that owner and suspense.

*CONFIDENTIAL – Pursuant to Protective Order*

accurately allocate the damages for any record over the course of that record accruing principal interest damages.

10.   For example, in reviewing the data, there are number of owners who are in suspense for one reason (e.g. "T3" which is an unmarketable title code) for part of the period on which damages have accrued but then, in the middle of the damages accruing, the suspense code is changed by Sunoco to another code such as N4 which reflects an unsigned division order for internal purposes.  Thus, it is necessary to allocate the different periods in which the damages accrue for any record to apply the appropriate rate to the appropriate time period. Hypothetically, if an owner was placed into suspense in 2013 for unmarketable title issues on a well that was producing in 2013 but, after having their title issues resolved in 2015, was changed to another suspense code that did not relates to unmarketable title issues in Sunoco's internal system for six months, it would be necessary to properly allocate those codes so that the damages calculation applied a 6% interest rate to the 2013 to 2015 period and then a 12% interest rate from the 2015 period to the date of payment.

11.   This is effectively what my analysis has performed to the extent possible and which Ms. Ley failed to do.  It is worth reiterating that there are substantial records on which Ms. Ley is calculating damages in which there is no associated suspense code history which serves to add extensive uncertainty as to how those calculations should be performed.  Moreover, there are a number of instances in which there are numerous codes applied to a property-owner combination at the same time due to the property being suspended for one reason and the owner for another.  Owner changes happen regularly and there are many examples of those suspense codes changing frequently that have to be tracked.  There also exists some ambiguity within the changes as there are a number of owners who are changed to "blank" codes intermittently adding another layer of complication to performing this analysis.

*CONFIDENTIAL – Pursuant to Protective Order*

12. For example, if an owner passed away and the funds became associated with a D6 suspense code for death of owner, it could stay in that code for years until the owner's heirs contact Sunoco to demonstrate that they are the new rightful owners. Sunoco would then send division orders for those owners to sign under new owner numbers and they would be temporarily suspended as N4 for the time period it takes to receive those division orders from the new owners. Ms. Ley's current methodology would simply apply a 12% interest rate to those owners for years of payments as she makes no effort to link up or associate those payments with the preceding owner and associated suspense code that demonstrated it would have been suspended for unmarketable title issues.

13. Further complicating the quantification is the existence of codes for which Mr. Epperson states are not determinable based solely on the code as to whether or not they are unmarketable title, codes that Mr. Epperson classifies as "indeterminate." This means that Ms. Ley's damages which apply a 12% interest rate are potentially overstated and it would be necessary, according to Mr. Epperson, to investigate individually to determine for each transaction in which those codes were relevant whether the actual reason for the delayed payment was unmarketable title to determine the proper interest rate. Additionally, as stated above, there exist a number of damages-generating records for which there is no suspense history to match to and thus, Ms. Ley could not apply any suspense codes to determine whether those had unmarketable title and could have no understanding of the underlying reasons for the alleged Untimely Payment. This is another reason why Ms. Ley's damages are potentially overstated, and it would be necessary to determine for each transaction for which there are no historical codes what actually caused the alleged Untimely Payment in order to determine what the proper interest rate to apply would be (if any) for the transactions.

CONFIDENTIAL – Pursuant to Protective Order

14.  Based on Mr. Epperson's assignment of codes, a substantial portion of Ms. Ley's principal damages are associated with codes that are unmarketable title related based on my estimations after linking of the damages to historical suspense codes.  This means that instead of calculating the principal interest due at 12%, it would be more appropriate to apply a 6% interest rate to persons and properties in suspense for codes identified as likely unmarketable title, which would serve to substantially reduce Ms. Ley's damages.  It remains my opinion that these figures are likely an understatement of the damages value associated with the unmarketable title categories and these amounts will likely increase as further work associated with the historical suspense codes proceeds between now and the date of trial.

15.  However, for purposes of measuring the potential magnitude of this issue, I have been asked by Defendants' counsel to quantify the impact to Ms. Ley's damages of utilizing a 6% interest rate instead of a 12% interest rate for all transactions related to codes Mr. Epperson determined likely related to unmarketable title issues for the time periods for which those codes were in effect for any owner and property. Based on the above assumptions, I estimate that Ms. Ley's principal damages would be reduced from $48.2 million to approximately $44,639,775 in principal interest damages by accounting for any period in which a clearly unmarketable title code was used by Sunoco for either the entire period or for a shorter time period, but all for time periods for which Ms. Ley calculates damages.[7]  Put another way, my more refined analysis would reduce Ms. Ley's principal interest damages by about $3,560,225 and her "interest on interest" calculation by another $2,229,803.

16.  I have also been asked to quantify the effects of applying a 6% interest rate to both the records that have the "indeterminate" codes and the records for which there is no matching

---

[7] This would reduce Ms. Ley's interest on interest calculation from $27.3 million to approximately $25.1 million.  I note that if the Court were to determine interest on interest was appropriate to apply in this matter but at a different rate (such as a prejudgment interest rate), I stand ready to perform those calculations at the Court's direction.

*CONFIDENTIAL – Pursuant to Protective Order*

suspense codes.  In order to perform this, I have assigned a 6% interest rate to any period of any damages-generating record that (1) is associated with unmarketable title codes according to Mr. Epperson and, (2) for all indeterminate codes, and (3) for which there are no matching suspense codes.  I then have provided a range of damages in which the lower bound assumes a 6% interest rate and an upper bound which assumes a 12% interest rate for all undetermined codes and all records for which there are no matching suspense codes.

17.   The $44,639,775 estimate is the upper bound of applying a 12% interest rate to all of the records with indeterminate suspense codes and for which there are no matching codes at all.  However, if one were to apply a 6% interest rate to all records or subsets of records in which the associated code was not determinable by Mr. Epperson or was simply blank, Ms. Ley's principal damages would be reduced to $27,079,160.[8]  In my opinion, the range of Ms. Ley's principal interest damages after adjustment for those alleged late payments for which the 6% rate should be applied is between $27,079,160 on the low side, and $44,639,775 on the high side, with corresponding reductions in her "interest on interest" calculations.[9]

18.   I also note that all of my above quantifications are also potentially overstated as the overwhelming majority of the damages relate to payments to states for unclaimed property.  It is my understanding from its Memorandum Order from November 26, 2019, the Court acknowledged that the precise timing of when and whether unclaimed property payments become "late" under the Unclaimed Property Statutes and  the PRSA "presents a legal issue the Court will resolve at trial."[10]  Because Ms. Ley has calculated her damages on unclaimed property payments for the maximum time period under the PRSA, if the Court were to

---

[8] This would reduce Ms. Ley's interest on interest calculation from $27.3 million to approximately $15.1 million.
[9] I have also been asked to perform a calculation of applying a 6% interest rate to the entire alleged late period for any damages-generating records in which the owner ever had an unmarketable title code associated with their suspense history.  This results in changing Ms. Ley's principal damages from $48.2 million to $43,826,823.
[10] Memorandum Order dated November 26, 2019.

*CONFIDENTIAL – Pursuant to Protective Order*

determine at trial that two months after the sales date is not the point at which the unclaimed property payments became late or that the date of payment to the states is not the appropriate term of the "untimeliness," or is the not time when interest accrues, it would necessarily render Ms. Ley's damages overstated.

19. I have also reviewed Ms. Ley's workpapers in which she claims to have evaluated the suspense code history to determine the potential effect of applying a 6% interest rate to any records that are related to unmarketable title issues.[11]  The analysis performed by Ms. Ley is insufficient for properly quantifying the effect the suspense codes.  Ms. Ley performs the same type of superficial linkage I was forced to perform when only afforded a day to evaluate the data.  First, Ms. Ley does not utilize all the available data but instead, only two of the four databases provided – excluding the property transfer history from her analysis.  She effectively links records to a single code that reflects the last code used whenever an owner or property is transitioned from that code to a blank code and assigns that code to the entire damages-generating record.  This will not effectively capture the full extent to which the code changes may have an effect on what the appropriate interest rate would be for all the reasons discussed in detail above.

20. For example, if an owner was in "T3" (an unmarketable title code) for four years, but was then transferred to "N4" (no signed division order) for three months before being taken out of suspense and transferred into a blank code, Ms. Ley would apply a 12% interest rate to the full four years and three months instead of allocating 6% interest for four years and 12% for three months.  This naturally leads to an overstatement of damages and it is my opinion that the linkage established in Ms. Ley's November 8, 2019 report is insufficient and leads to

---

[11] Using her flawed methodology, Ms. Ley claims that giving meaning to the unmarketable title codes would only reduce her principal damages by $1.85 million.

*CONFIDENTIAL – Pursuant to Protective Order*

unreliable results.  Exhibit 2 to this report is a table of Ms. Ley's damages allocated by her assessment of the associated suspense codes.

## V. ADDITIONAL COMMENTS REGARDING THE REBUTTAL EXPERT REPORT OF BARBARA A. LEY

### *General Opinions Regarding Ms. Ley's Calculations*

21. The following sections of this report set forth my opinions and comments regarding the Ley Report.  My previous reports outline examples of the minimum considerations underlying Sunoco's potential obligations borne out of PRSA Section §570.10 with respect to the presently certified class.  Throughout her reports, Ms. Ley simply overlooks and/or oversimplifies these considerations in favor of a rough and selective approach, resulting in conclusions that are disassociated with the facts and circumstances in this matter, as well as being seemingly disconnected with the allegations and claims being made by the Plaintiff.

22. Ms. Ley concludes in her updated report that it is her current opinion that class-wide late payment principal statutory interest totals $48,189,893.06 and annually compounded interest on interest totals $27,293,211.89 (approximately $7.1 million fewer dollars than her October 25, 2019 report).[12]  Ms. Ley has also reduced the number of owners for whom any damages are claimed from over 74,000 in her October 25 report to 52,951 in her November 8th report.[13]  There are 9,028 unique properties associated with her damages.[14]

23. The inexorable link between the statutory obligations and the necessity of an evaluation of the underlying facts and circumstances for the apparent late transactions resulting therefrom render Ms. Ley's opinions unreliable.  As stated in my previous report, Ms. Ley has not arrived

---

[12] Ley Report, Exhibit 3.  Ms. Ley calculates these figures through a scheduled trial date of December 16, 2019.
[13] Ley Report, Exhibit 8.
[14] Ley Report, Exhibit 8.

*CONFIDENTIAL – Pursuant to Protective Order*

at her conclusions, or key assumptions, through any analysis of the actual individual circumstances underlying presently certified class members (as that would necessarily require numerous individualized analyses as demonstrated by the exemplars provided in my previous report).

24.   It will also be necessary to further adjust any damages calculations to account for any damages associated with owners that opt out of the class which will not be known until after December 9th when the class administrator reports that information.  Any members of Ms. Ley's damages that opt-out of the class would serve to reduce the damages and any associated interest on interest in Ms. Ley's calculations. All of Ms. Ley's current damages calculations overstate class damages because they include damages of opt-outs who are not in the class.

### *Calculation of Interest on Unclaimed Property Payments*

25.   As a threshold matter, Ms. Ley claims that Sunoco's records reflect that unclaimed property payments "are… being made to the actual Owner."[15]  However, when Sunoco makes any payments for proceeds to a state, it does so under the laws and regulations of those states such that the state is the entity that receives the funds under those circumstances. All payments in the Sunoco database with a check number with the prefix "ES" were paid to states, not directly to owners, and the states (not the original owners) received those funds. While the records contain a name for the last known owner, the fact is that the funds were made to unclaimed property divisions of the states because those funds were unclaimed or the owner un-locatable.  Exhibit 1 to this report provides a summary of Ms. Ley's damages for unclaimed property payments made by Sunoco on a state by state basis. In mentioning

---

[15] Ley Report, page 6.

*CONFIDENTIAL – Pursuant to Protective Order*

these facts, I do not offer any legal opinion about the legal effect of those payments to the states, which is a matter for the Court to determine.

26.  I note that approximately one-third of the payments for unclaimed property were made to the state of Texas because there was no previous owner address available.  Because Sunoco is domiciled in the state of Texas, they remit funds for owners on which they have no basis to pay any other state to the unclaimed property division of the state of Texas.   This represents $15.9 million of Ms. Ley's overall damages.  163,786 of the 880,101 unclaimed property records in in Ms. Ley's damages contain absolutely no address information. Likewise, 2,791 of the owners in Ms. Ley's damages whose funds were paid to unclaimed property divisions of states have no associated address from any data source.

27.  As was the case in her prior report, a substantial number of the transactions on which Ms. Ley predicates her damages model are actually unclaimed property transactions that are made to various state entities subject to and in compliance with those states' laws and regulations after Sunoco has attempted to locate and pay the owner that may own the oil and gas interests generating those proceeds.  To this end, approximately $30.92 million of Ms. Ley's $48.19 million in updated principal damages are associated with unclaimed property funds.[16]  Moreover, of the 25,897,764 total records in Sunoco's revenue accounting database, 4,154,777 are associated with "ES" check numbers designating unclaimed property payments to states.[17]   Additionally, Ms. Ley's damages model is calculated for 52,951 unique class members, of which 7,039 owners are exclusively associated with records in which the funds were paid to the states' unclaimed property divisions.[18]  It further follows that $18.3

---

[16] Ley Report, Exhibit 8.
[17] Ley Report, Exhibit 8.
[18] Ley Report, Exhibit 8.

*CONFIDENTIAL – Pursuant to Protective Order*

million of Ms. Ley's calculation of interest on interest damages are associated with unclaimed property payments made to the states.[19]

28.     Approximately $4,465,982 of Ms. Ley's calculation of damages on unclaimed property payments are associated with records for which there is not even a name, much less an address and are assigned an owner name of "Undivided" in the Sunoco system.[20]   These records represent over 15,000 records in the data and all of them are made to the state of Texas unclaimed property division because there are no preceding owner names or addresses on which to base unclaimed property remittance to another state.[21]

29.     As stated above, it is my understanding from Defendants' counsel that the Court in this matter has stated that these payments to the states are included in the Class.   However, I note that Ms. Ley's damages on the unclaimed funds are established from the assumption that the payments are "late" if they are not made within two months of the sales date.   I understand that the Court has stated that <u>when</u> an unclaimed property payment actually becomes late is a legal determination for the Court to make at trial.   Thus, it is not possible for Ms. Ley or anyone to quantify the damages (if any) associated with unclaimed property payments by Sunoco until those determinations are made by the Court.   Finally, as noted above, $18.3 million of Ms. Ley's calculation of interest on interest damages are associated with unclaimed property payments made to the states.   If it is determined by the Court that Sunoco has satisfied its obligations under the PRSA and the Unclaimed Property Statutes once the proceeds payments were made to each of the states, then it would be the case that the $18.3 million in added interest on interest is not appropriate.

---

[19] Ley Report, Exhibit 8.
[20] Ley Report, Exhibit 8, BA# 0009134057 and 0007005424.   It is currently unclear to me how the Plaintiff performed any type of class notice to owner(s) associated with these claimed damages.
[21] Ley Report, Exhibit 8.

*CONFIDENTIAL – Pursuant to Protective Order*

30.     Moreover, the Defendants' counsel in this matter has asked me to evaluate and estimate what the typical percentage of unclaimed property funds in the various states that eventually get claimed by any owners of property.  From these statistics, I have also estimated how much of Ms. Ley's damages would be interest on proceeds paid to the states as unclaimed property that are associated with owners that would might actually recover the funds from the states.  I have performed a review of unclaimed property statistics from across the United States, as well as individual states, in order to quantify what the probable value of such claimed funds would be.  Since the proceeds are paid to the states after a substantial period of time has passed with no owners providing marketable title claims to the property, it is necessary once the payments are remitted to the states, for someone to make a claim to the state for that property.[22]

31.     Based on research I have performed, it is clear that a very small percentage of unclaimed property is ever actually claimed by potential owners of that property.  Nationwide, it appears that less than 5% of unclaimed property collections are returned by the states.  An article in the University of Pittsburgh Law Review states:

> *"Thus, while the unclaimed property laws describe the state as acting on behalf of the owner, the state's behavior is not consistent with such a characterization. Nor would such behavior be practical, given the small percentage of owners who seek return of unclaimed property. Estimates put the total amount of property returned by the states at only four percent of total collections, and the percentage of property currently returned as a*

---

[22] I note that in her report, Ms. Ley makes reference to an owner who made such a claim named Dan Caldwell.  It is my understanding that Mr. Caldwell was paid interest for the amounts paid to the State of Texas as unclaimed funds that he later recovered from the Stat and, based on my review of Ms. Ley's damages and class member list, it does not appear that Mr. Caldwell is a member of this class.  I am not aware of any other owners that have made claims to unclaimed property funds held by states that notified Sunoco that they did so and requested or were paid interest by Sunoco.  See Declaration of Koelling, November 13, 2019.

CONFIDENTIAL – Pursuant to Protective Order

> *percentage of property currently collected as approaching twenty-five*
>
> *percent."*[23]

32.  In 2019, the Texas State Comptroller (the state where the largest unclaimed property proceeds are paid in this matter) issued a press release stating that it had issued its highest ever payouts in its history at $308.4 million.[24]  However, this is merely *6%* of the more than $5 billion in currently held unclaimed property funds held by the Texas State Comptroller, up from $3.8 billion in 2014.[25]  Similarly, the New York Office of the Comptroller issued a fact sheet in May 2019 stating it currently holds approximately $16 billion in unclaimed funds and that in the preceding year, they returned $430 million (or 2.6%).[26]

33.  A 2016 District of Delaware opinion noted that approximately 5% of unclaimed property in Delaware was ultimately returned:

> *"The difference between the amount collected by the state and the amount*
> *returned to owners shows that a large percentage of unclaimed property*
> *revenue remains with the state. For example, in [Delaware in] 2007,*
> *approximately $364.9 million in unclaimed property went to the state's*
> *general fund. But, around that same time, no more than $20 million was*
> *returned to owners."*[27]

34.  Based on the preceding statistics, it is probable that the majority of the damages Ms. Ley calculates will never be claimed from the states by any owners.  If only 5% of the damages are claimed and recovered by owners from the states, that would represent $1.55 million of Ms. Ley's principal damages being claimed and leaving $29.4 million of her principal damages

[23] Inadvertence & the Internal Revenue Code: Fed. Tax Consequences of State Unclaimed Prop. Laws, 62 U. Pitt. L. Rev. 123, 158 (2000).
[24] https://comptroller.texas.gov/about/media-center/news/2019/190918-unclaimed-property.php.
[25] Ibid.
[26] https://www.osc.state.ny.us/ouf/.
[27] Temple-Inland, Inc. v. Cook, 192 F. Supp. 3d 527, 532–33 (D. Del. 2016).

*CONFIDENTIAL – Pursuant to Protective Order*

unclaimed.  Even if 25% of the damages are claimed, that would represent $7.73 million of Ms. Ley's damages, leaving $23.19 of her principal damages unclaimed.

*Ms. Ley's Purported Class-Wide Methodology is Deeply Flawed, Oversimplified and an Insufficient Class-Wide Damages Model*

35.  Ms. Ley's model and underlying methodology is replete with errors and oversimplification. For example, Ms. Ley claims to have identified and excluded minimum suspense payments from her class-wide damages calculation in that she has "now fully removed any payments which do not equal or exceed $100 for a twelve-month period."[28]  As discussed in my previous report, due to Ms. Ley's oversimplified methodology, she has also excluded *rightful* class members under the certified class who were paid late for reasons other than minimum suspense.  I note Ms. Ley has failed to cure the inadequacy of her damages model to account for these failings, despite recognition that such a consideration "might" impact class-wide damages.[29]

36.  Ms. Ley also takes issue with my pointing out an exemplar prior period adjustment inclusion in her model due to an owner transfer.  Rather than address this core flaw of her damages model in her November 8, 2019 report, Ms. Ley attempts to assume it away, suggesting that the exemplar was a single anomaly.  Ms. Ley fails to recognize that my providing of such an example is just that – one example of the type of consideration for which Ms. Ley's damages model cannot adequately account for given that she fails to conduct a damages analysis on a transaction-by-transaction basis.  I have not attempted to identify each and every instance of this occurrence in the millions of transactions in Ms. Ley's damages estimate, but instead,

---

[28] Ley Report, page 8.
[29] See, for example, Ley Report, page 9.

*CONFIDENTIAL – Pursuant to Protective Order*

provided it as an exemplar to demonstrate that her methodology necessarily does not account for the unique circumstances of each transaction and that without a review of each transaction, one cannot eliminate the possibility that such a scenario exists for each said transaction. If one were to perform an analysis into each of the transactions, they would undoubtedly find additional examples of prior period adjustments that Ms. Ley failed to account for.

37.    An additional example demonstrating the inability of Ms. Ley's model to properly remove these types of adjustments which she stated she could and would remove is observed in the following. Ms. Ley's quantification of damages includes calculated principal interest for owner Robert L West IV (BA Number 0103309456) of $0.69 for a payment sent on property number 8521210000 for the production month of January 2015 (I note that this damages-generating record is not removed for minimum suspense in Ms. Ley's methodology). While Ms. Ley eliminates the original payment made for that interest to the preceding owner Jackie West (BA Number 0001239128) in February 2015 from her calculations due to it being timely, because a prior period adjustment occurs to the payment in October 2017 to a different owner with a different BA number that the interest transferred to (Robert L West IV) and that was the first time that owner name was present for a payment associated with that sales date, she includes that payment as an Untimely Payment that accrues interest. This payment does not have any type of adjustment reason codes or "PROP_SUB" code and thus, it is not detected by Ms. Ley's methodology or eliminated from her calculations.

38.    A review of the recently produced suspense history confirms that the interest held by Jackie West (BA Number 0001239128) in this property was, in fact, transferred to Robert L West IV (BA Number 0103309456) effective March 2015. Again, this is a mere example of such a PPA that Ms. Ley calculates interest for in her damages model and further serves to undermine

*CONFIDENTIAL – Pursuant to Protective Order*

the reliability of her model despite her appeal to the examples I have provided as being precisely that – examples.  The purpose of highlighting these examples is to demonstrate that her model is not capable of accounting for these types of issues and it is simply unknown without a review of each transaction detail to determine how overstated her damages are as a result.

39.   In the database used by Ms. Ley to calculate class-wide damages, there are tens of thousands of instances in which owners transferred their oil and gas interests to other owner(s) in a one-to-one manner, one-to-many manner, and many-to-many manner, as evidenced by the suspense code trackers database recently produced. The database shows at least 37,000 owner transfers to other owners over the course of the 2012-2019 time period analyzed by Ms. Ley. Ms. Ley has simply assumed these instances are anomalous without performing any underlying investigation as to whether that is factually inaccurate. Given the very large number of owner transfers of interests in the whole database, it is highly likely that a material proportion of prior period adjustments occurred after a transfer to another owner (by sale, assignment, or inheritance) and Ms. Ley has not identified those instances, leaving such PPA transactions in her damages total even though they are excluded from the class definition.

40.   As noted in my previous report, Ms. Ley's damages methodology also fails to consider any type of situations requiring further investigation that possibly occurred in the presently certified class.  In my previous report, I identified numerous[30] indemnifying agreements that I understand are in place and are not reflected in the accounting data that led Ms. Ley's calculations to erroneous conclusions.  As discussed in my previous reports, instruments outlining the obligations of working interest owners as sellers of oil to Sunoco also provide

---

[30] For clarity, the cited exemplars are intended to represent precisely that – examples.  These are not the only such agreements that exist between Sunoco and class members and these examples are not intended to reflect an exhaustive, comprehensive list of such agreements.  Instead, they are intended to highlight the types of class member factual circumstances that have a direct impact on damages and for which Ms. Ley's model does not account.

*CONFIDENTIAL – Pursuant to Protective Order*

for indemnification and/or liability in the event such claims arise.  From an economic perspective, language such that discussed in my previous reports serves to indemnify Sunoco not only from a third party's claims of interest (such as a royalty owner) due on the production and sale of hydrocarbons, but also Sunoco's liability for interest and damages to those working interest owners who contracted with Sunoco and are included as members of the certified class. Ms. Ley has made no effort to account for those situations or to adjust her damages model accordingly.

41.   Ms. Ley has repeatedly bypassed addressing the issue of connecting the calculation of class-wide damages to Sunoco's alleged liability in her previous reports.[31]  Instead, in response to my identification of these types of factual examples in which her model cannot accommodate without an individualized review, she states: "Plaintiff's counsel advised me that that a determination of the legal effect (if any) that these documents may have on the Defendants' liability to the Class or the calculation of Class damages is a matter for the Court to decide."[32] This serves to highlight the existence of a liability question related to <u>each of the transactions</u> on which Ms. Ley is calculating her damages that requires determination based on the unique facts and circumstances related to that transaction by the Court before damages can be properly calculated.

42.   Notably, Ms. Ley now concurs with the notion expressed herein (as well as in my previous report) that a basic concept in forensic accounting and economic damages analysis is that the

---

[31] Expert Report of Barbara Ley, dated January 28, 2019, page 4: "I am not offering any opinions related to liability at this time."  Rebuttal Expert Report of Barbara Ley, dated May 24, 2019, page 10: "My work does not include liability determinations (which will be made by the Court), or considerations of whether any particular entity is required to indemnify Sunoco for liability that may result from this case. As such, the indemnification agreements identified by Mr. Krause have no impact on my analysis and calculations."  Expert Report Submitted by Barbara Ley, dated October 25, 2019, page 13: "If the Court were to divide the Class into sub-classes to address different questions of law or fact that may affect liability and/or damages, my damage calculations can be modified before or during trial to reflect those developments."
[32] Ley Report, page 13.

*CONFIDENTIAL – Pursuant to Protective Order*

damages model must be connected to the alleged liability.[33]  However, Ms. Ley nonetheless does not cure these methodological failings that undermine the reliability and accuracy of her calculations.[34]

43.   Also, as discussed in my previous reports, for claims against working interest owners, it would be necessary to review all of the contractual agreements between the parties to determine if alternative timing for payments was agreed to by Sunoco and potential class members or whether interest is waived or Sunoco indemnified for interest.  Working interest owners account for 2,514 of the owners for which Ms. Ley calculates damages and those owners account for 29,595 of the transactions on which Ms. Ley calculates damages.

## VI.   SUNOCO PROCEEDS PAYMENT HISTORY METRICS

44.   I have been asked by Defendants' counsel to evaluate the proceeds payment and revenue accounting history provided by Sunoco in this matter to quantify the extent to which Sunoco pays working interest, overriding interests, and royalty interests within the two month period called for by the PRSA, setting aside the numerous exceptions enumerated within the Statute.

45.   Based on my review, I note that from July 2012 through September 2019, Sunoco paid out proceeds of $12,090,633,535 to all interest types being evaluated in this matter.  Of this $12.09 *billion* in payments, Sunoco paid $11,928,377,904 of those payments within two months of sales in compliance with the PRSA.  This represents 98.7% of all payments.  Similarly, of the $12.09 *billion* in payments, Sunoco paid $11,646,131,036 of its total payments within *one month.*  Stated another way, 96.3% of Sunoco's payments were made one month earlier than required by the statute.  Of the 1.3% of total payments made after

---

[33] Ley Report, page 11.
[34] I note that Ms. Ley includes "Defendants' production of documents" and the "materials identified in Exhibit C to the Expert Report of Eric Krause" in her "Items Reviewed and/or Relied Upon" (see Ley Report, Exhibit 9).  Nonetheless, Ms. Ley fails to consider this underlying evidence outside of Sunoco's revenue accounting data in her class-wide damages model.

*CONFIDENTIAL – Pursuant to Protective Order*

two months following the sales date, approximately a third of those payments were for unclaimed property funds which means that late payments actually made to owners represents less than 1% of the more than $12 billion in proceeds payments made by Sunoco to all interest types from July 2012 to September 2019.

## VII.  CONCLUSION

46.   The results of my supplemental analysis allocating Ms. Ley's principal statutory interest damages of approximately $48.2 million to the extent possible using Mr. Epperson's matrix of suspense codes results in a range of damages from $27.1 million to $44.6 million, depending on what determinations are made regarding damages records associated with "indeterminate" codes and no codes.[35]  If one were also then to remove all associated alleged damages associated with unclaimed property payments, as well as interest on interest, the remaining damages in Ms. Ley's model would be $13,163,712 at the lower bound and $16,880,058 at the upper bound.[36]

47.   The calculation of damages on unclaimed property payments to states is currently not possible as it is necessary for the Court to determine liability and when the payments became "late" for each payment, or accrue interest, before an accurate quantification of damages can be performed.

48.   All of Ms. Ley's damages calculations overstate damages to the extent they include persons and entities that opt out of the class, the identity of which will not be known until after the opt out deadline of December 9.

---

[35] I note that the interest on interest, were it to be determined to be appropriate at 12% compounding interest would total approximately $13.2 million (associated with the $23.6 million in principal damages) and $23.5 million (associated with the $41.56 million).  As stated above, if the Court were to determine interest on interest was appropriate to apply in this matter but at a different rate (such as a prejudgment interest rate), I stand ready to perform those calculations at the Court's direction.

[36] If interest on interest at 12% was allowed on these principal damages, they would total $19,961,976 at the lower bound and $25,743,031 at the upper bound.

*CONFIDENTIAL – Pursuant to Protective Order*

49. The various adjustments made by Ms. Ley to her damages model still do not fully and accurately identify and eliminate class exclusions and calculate class-wide damages.

50. Sunoco paid approximately 99% of its more than $12 billion in proceeds payments from July 2012 through September 2019 within two months of the sales date and approximately 96% of its more than $12 billion in proceeds payments from July 2012 through September 2019 within one month of the sales date.

51. My work in this matter is ongoing and if additional relevant information is provided to me or becomes otherwise available, I may supplement this report as permitted by the Court.

## Breakdown of Ms. Ley's Damages Associated with Unclaimed Property Funds Paid to States

*Source: Expert Report of Ms. Ley dated November 8, 2019*

| State Code | State | Principal Interest | Interest on Interest (thru 12/16/2019) | Total Pincipal plus Interest on Interest | Percentage of Total |
|---|---|---|---|---|---|
| TX | Texas | $ 11,892,090 | $ 7,363,080 | $ 19,255,170 | 39% |
| OK | Oklahoma | $ 10,775,707 | $ 6,101,584 | $ 16,877,291 | 34% |
| CA | California | $ 1,369,662 | $ 849,641 | $ 2,219,304 | 5% |
| FL | Florida | $ 818,845 | $ 465,151 | $ 1,283,997 | 3% |
| NY | New York | $ 711,035 | $ 418,442 | $ 1,129,476 | 2% |
| CO | Colorado | $ 443,552 | $ 244,347 | $ 687,899 | 1% |
| KS | Kansas | $ 417,538 | $ 241,159 | $ 658,696 | 1% |
| MO | Missouri | $ 372,997 | $ 219,521 | $ 592,518 | 1% |
| IL | Illinois | $ 328,158 | $ 144,176 | $ 472,334 | 1% |
| NM | New Mexico | $ 308,482 | $ 161,023 | $ 469,506 | 1% |
| NJ | New Jersey | $ 284,717 | $ 198,199 | $ 482,916 | 1% |
| WA | Washington | $ 280,778 | $ 149,447 | $ 430,226 | 1% |
| PA | Pennsylvania | $ 259,644 | $ 179,634 | $ 439,278 | 1% |
| AR | Arkansas | $ 228,511 | $ 151,530 | $ 380,041 | 1% |
| AZ | Arizona | $ 226,726 | $ 144,928 | $ 371,654 | 1% |
| VA | Virgina | $ 206,591 | $ 127,540 | $ 334,131 | 1% |
| GA | Georgia | $ 162,613 | $ 96,972 | $ 259,585 | 1% |
| MD | Maryland | $ 151,105 | $ 95,713 | $ 246,818 | 1% |
| CT | Connecticut | $ 149,097 | $ 89,894 | $ 238,990 | 0% |
| NC | North Carolina | $ 123,318 | $ 75,685 | $ 199,003 | 0% |
| OR | Oregon | $ 123,195 | $ 71,517 | $ 194,711 | 0% |
| MA | Massachusetts | $ 110,864 | $ 69,331 | $ 180,195 | 0% |
| DC | District of Columbia | $ 107,428 | $ 57,297 | $ 164,724 | 0% |
| NV | Nevada | $ 91,586 | $ 52,510 | $ 144,096 | 0% |
| DE | Deleware | $ 78,946 | $ 36,997 | $ 115,943 | 0% |
| LA | Louisiana | $ 78,646 | $ 50,930 | $ 129,576 | 0% |
| SC | South Carolina | $ 77,452 | $ 36,566 | $ 114,019 | 0% |
| MS | Mississippi | $ 74,556 | $ 41,358 | $ 115,914 | 0% |
| TN | Tennessee | $ 73,800 | $ 39,989 | $ 113,789 | 0% |
| IN | Indiana | $ 72,417 | $ 48,150 | $ 120,568 | 0% |
| MI | Michigan | $ 66,697 | $ 34,950 | $ 101,647 | 0% |
| MN | Minnesota | $ 61,900 | $ 38,929 | $ 100,829 | 0% |
| AL | Alabama | $ 58,086 | $ 38,343 | $ 96,430 | 0% |
| ID | Idaho | $ 44,486 | $ 26,656 | $ 71,142 | 0% |
| OH | Ohio | $ 43,645 | $ 31,247 | $ 74,892 | 0% |
| NE | Nebraska | $ 30,942 | $ 19,719 | $ 50,662 | 0% |
| UT | Utah | $ 24,529 | $ 16,483 | $ 41,012 | 0% |
| NH | New Hampshire | $ 24,221 | $ 15,581 | $ 39,801 | 0% |
| WI | Wisconsin | $ 23,946 | $ 12,302 | $ 36,248 | 0% |
| MT | Montana | $ 18,359 | $ 11,120 | $ 29,478 | 0% |
| VT | Vermont | $ 17,883 | $ 10,875 | $ 28,758 | 0% |
| RI | Rhode Island | $ 15,475 | $ 9,645 | $ 25,120 | 0% |
| WV | West Virginia | $ 14,822 | $ 10,484 | $ 25,306 | 0% |
| AK | Alaska | $ 14,444 | $ 9,285 | $ 23,729 | 0% |
| IA | Iowa | $ 13,123 | $ 7,752 | $ 20,875 | 0% |
| WY | Wyoming | $ 12,463 | $ 9,887 | $ 22,350 | 0% |
| HI | Hawaii | $ 11,905 | $ 7,043 | $ 18,949 | 0% |
| KY | Kentucky | $ 8,773 | $ 6,565 | $ 15,338 | 0% |
| ME | Maine | $ 7,506 | $ 4,319 | $ 11,825 | 0% |
| SD | South Dakota | $ 2,878 | $ 1,991 | $ 4,869 | 0% |
| ND | North Dakota | $ 1,569 | $ 657 | $ 2,226 | 0% |
| **Total** | | $ 30,917,708 | $ 18,346,148 | $ 49,263,856 | 100% |

*Note: Breakdown of Funds Paid to Texas*

| | | |
|---|---|---|
| *Paid to Texas for No Address* | *9,634,931* | *6,242,890* |
| *Paid to Texas for Foreign Address* | *180,426* | *106,748* |
| *Paid to Texas for Military Address* | *2,440* | *1,489* |
| *Paid to Texas for Texas Address* | *2,074,293* | *1,011,954* |
| *Total TX* | *11,892,090* | *7,363,080* |

Exhibit 2

## Breakdown of Ms. Ley's Damages By Her Association with Suspense Code
*Source: Expert Report of Ms. Ley dated November 8, 2019*

| Property Suspense Code | BA Suspense Code | Principal Interest | Interest on Interest (thru 12/16/2019) | Total Pincipal plus Interest on Interest | Percentage of Total |
|---|---|---|---|---|---|
| Blank | Blank | $ 40,298,096 | $ 22,689,329 | $ 62,987,425 | 82% |
| | NT | $ 2,020,974 | $ 1,116,736 | $ 3,137,710 | 4% |
| T7 | | $ 1,426,721 | $ 1,440,771 | $ 2,867,492 | 4% |
| N4 | | $ 1,058,749 | $ 610,929 | $ 1,669,678 | 2% |
| | U5 | $ 840,232 | $ 268,026 | $ 1,108,258 | 1% |
| | T5 | $ 768,279 | $ 341,654 | $ 1,109,933 | 1% |
| | E8 | $ 403,759 | $ 246,746 | $ 650,504 | 1% |
| N4 | NT | $ 376,454 | $ 218,597 | $ 595,051 | 1% |
| N4 | T5 | $ 189,509 | $ 79,684 | $ 269,193 | 0% |
| Blank | T3 | $ 156,239 | $ 78,850 | $ 235,089 | 0% |
| N4 | U5 | $ 149,127 | $ 57,310 | $ 206,437 | 0% |
| T3 | | $ 144,669 | $ 76,062 | $ 220,730 | 0% |
| D4 | | $ 129,532 | $ 80,051 | $ 209,582 | 0% |
| | I2 | $ 123,674 | $ 72,755 | $ 196,428 | 0% |
| | TR | $ 121,291 | $ 87,112 | $ 208,404 | 0% |
| D3 | | $ 119,084 | $ 22,214 | $ 141,297 | 0% |
| T6 | | $ 91,195 | $ 27,994 | $ 119,189 | 0% |
| | A8 | $ 90,593 | $ 44,727 | $ 135,320 | 0% |
| T3 | A8 | $ 54,400 | $ 30,464 | $ 84,864 | 0% |
| T5 | T5 | $ 42,951 | $ 25,770 | $ 68,721 | 0% |
| | C2 | $ 40,894 | $ 27,960 | $ 68,854 | 0% |
| N4 | E8 | $ 36,879 | $ 27,965 | $ 64,843 | 0% |
| T5 | | $ 31,201 | $ 29,565 | $ 60,765 | 0% |
| | D6 | $ 30,925 | $ 15,701 | $ 46,626 | 0% |
| | P4 | $ 26,278 | $ 7,673 | $ 33,950 | 0% |
| N4 | I2 | $ 20,276 | $ 15,685 | $ 35,961 | 0% |
| | Z8 | $ 20,223 | $ 24,431 | $ 44,654 | 0% |
| T3 | NT | $ 20,218 | $ 11,180 | $ 31,399 | 0% |
| T5 | U5 | $ 19,690 | $ 3,544 | $ 23,235 | 0% |
| N4 | T3 | $ 18,865 | $ 7,468 | $ 26,333 | 0% |
| | U2 | $ 14,555 | $ 8,472 | $ 23,027 | 0% |
| N3 | T3 | $ 7,373 | $ 1,180 | $ 8,553 | 0% |
| | G3 | $ 6,235 | $ 1,789 | $ 8,024 | 0% |
| N3 | | $ 4,660 | $ 2,535 | $ 7,195 | 0% |
| T6 | T3 | $ 3,767 | $ 261 | $ 4,028 | 0% |
| T3 | I2 | $ 2,863 | $ 440 | $ 3,302 | 0% |
| | N3 | $ 2,587 | $ 2,712 | $ 5,299 | 0% |
| D3 | U5 | $ 2,159 | $ 799 | $ 2,958 | 0% |
| N4 | U2 | $ 2,041 | $ 2,024 | $ 4,065 | 0% |
| P3 | | $ 2,013 | $ 1,248 | $ 3,261 | 0% |
| N4 | A8 | $ 1,973 | $ 802 | $ 2,774 | 0% |
| D4 | NT | $ 1,577 | $ 791 | $ 2,368 | 0% |
| D4 | E8 | $ 1,223 | $ 135 | $ 1,357 | 0% |
| N4 | TR | $ 970 | $ 549 | $ 1,519 | 0% |
| N4 | P4 | $ 871 | $ 66 | $ 937 | 0% |
| U9 | | $ 846 | $ 76 | $ 923 | 0% |
| D4 | U5 | $ 725 | $ 174 | $ 899 | 0% |
| N4 | D6 | $ 350 | $ 34 | $ 384 | 0% |
| T3 | T3 | $ 349 | $ 397 | $ 747 | 0% |
| C3 | | $ 317 | $ 104 | $ 421 | 0% |
| D3 | NT | $ 246 | $ 162 | $ 408 | 0% |
| M3 | | $ 183 | $ 101 | $ 283 | 0% |
| | WO | $ 68 | $ 6 | $ 75 | 0% |
| N4 | C2 | $ 51 | $ 11 | $ 62 | 0% |
| O3 | | $ 45 | $ 40 | $ 85 | 0% |
| N4 | I3 | $ 28 | $ 25 | $ 53 | 0% |
| | I3 | $ 19 | $ 17 | $ 36 | 0% |
| | B3 | $ 7 | $ 8 | $ 15 | 0% |
| P4 | | $ 4 | $ 1 | $ 5 | 0% |
| **Total** | | **$ 48,929,081** | **$ 27,811,911** | **$ 76,740,991** | **100%** |
| *Less Removals for Interest Paid* | | (739,187) | (518,699) | (1,257,887) | |
| **Ley Damages Total** | | **$ 48,189,893** | **$ 27,293,212** | **$ 75,483,105** | |

Perry Cline v. Sunoco, Inc. (R&M), et al.
Documents Received by Eric Krause

| Beginning Bates Number | Ending Bates Number | Date | Document Description |
|---|---|---|---|
| **Bates Numbered Documents** | | | |
| PLC-000001 | PLC-000063 | | |
| SUN-CL-000001 | SUN-CL-00001341 | | |
| SUN-CL-00001342 | SUN-CL-00001353 | | |
| SUN-CL-00002321 | SUN-CL-00002332 | | |
| SUN-CL-00002508 | SUN-CL-00002565 | | |
| SUN-CL-00018775 | SUN-CL-00021448 | | |
| SUN-CL-00021485 | SUN-CL-00021486 | | |
| SUN-CL-00021487 | | | |
| SUN-CL-00021529 | SUN-CL-00021532 | | |
| **Case Law & Code** | | | |
| | | | 1989 OK AG 53 |
| | | | 52 OK Stat Sec 570.10 |
| | | | Federal Rule of Civil Procedure 23 |
| | | | OK Sec 735:80-1-3 |
| | | | *Temple-Inland, Inc. v. Cook* |
| | | | *Texas v New Jersey* |
| | | | *Wal-Mart, Inc. v. Dukes* |
| **Court Documents and Correspondence** | | | |
| | | 8/14/2019 | Appendix of Exhibits to Sunoco's Response to Plaintiff's Motion to Certify Class and to Sunoco's Motion to Exclude Plaintiffs' Expert Ley with Exhibits |
| | | 8/14/2019 | Declaration of Eric Koelling |
| | | 8/14/2019 | Defendants' Motion to Exclude the Reports and Opinions of Plaintiff's Proposed Expert, Barbara A. Ley |
| | | 8/14/2019 | Defendants' Response to Plaintiff's Motion to Certify Class |
| | | 1/28/2019 | Expert Report of Barbara A. Ley, CPA, CITP, CFF with Exhibits and Workpapers |
| | | 10/25/2019 | Expert Report Submitted by Barbara A. Ley, CPA, CITP, CFF on Behalf of the Certified Class with Exhibits |
| | | 11/26/2019 | Memorandum Order |
| | | 6/14/2019 | Motion to Certifiy Class, to Appoint Class Representative, and to Appoint Class Counsel and Brief in Support with Exhibits |
| | | 10/3/2019 | Opinion |
| | | 10/3/2019 | Order |
| | | 1/5/2018 | Plaintiff Perry Cline's Answers and Objections to Defendants' First Set of Interrogatories |
| | | 1/5/2018 | Plaintiff Perry Cline's Responses and Objections to Defendants' First Set of Requests for Production of Documents |
| | | 9/15/2017 | Plaintiff's First Set of Requests for Production of Documents, Requests for Admission, and Interrogatories to Defendant Sunoco Partners Marketing & Terminals, L.P. |
| | | 9/15/2017 | Plaintiff's First Set of Requests for Production of Documents, Requests for Admission, and Interrogatories to Defendant Sunoco, Inc. (R&M) |
| | | 7/6/2017 | Plaintiff's Original Petition |
| | | 5/31/2018 | Plaintiff's Second Set of Interrogatories and Requests for Production of Documents to Defendants Sunoco Partners Marketing & Terminals, L.P. |
| | | 5/31/2018 | Plaintiff's Second Set of Interrogatories and Requests for Production of Documents to Defendants Sunoco, Inc. (R&M) |

Perry Cline v. Sunoco, Inc. (R&M), et al.
Documents Received by Eric Krause

| Beginning Bates Number | Ending Bates Number | Date | Document Description |
|---|---|---|---|
| | | 11/1/2019 | Preliminary Expert Report of Kraettli Q. Epperson |
| | | 5/24/2019 | Rebuttal Expert Report of Barbara A. Ley, CPA, CITP, CFF with Exhibits |
| | | 11/8/2019 | Rebuttal Expert Report Submitted by Barbara A. Ley CPA, CITP, CFF on Behalf of the Certified Class |
| | | 6/24/2019 | Response RE Footnote 2 found on Page 6 of Ley Rebuttal Report.pdf |
| | | 6/24/2019 | Response RE Paragraph 25 of Ley Rebuttal Report.xlsx |
| | | 6/25/2018 | Sunoco Defendants' Amended Answer to Interrogatory Number 4 |
| | | 3/19/2018 | Sunoco Defendants' Amended Answers to Interrogatory Numbers 2, 3, and 6 |
| | | 8/21/2017 | Sunoco Defendants' Answer to Original Petition |
| | | 10/29/2018 | Sunoco Defendants' Objections, Answers, and Responses to Plaintiff's Fourth and Fifth Sets of Interrogatories and Third Set of Requests for Production |
| | | 9/20/2018 | Sunoco's Answers to Plaintiff's Third Set of Interrogatories |
| | | 8/3/2018 | Sunoco's First Amended Objections and Responses to Plaintiff's Second Set of Requests for Production of Documents |
| | | 8/3/2018 | Sunoco's First Amended Objections, Responses, and Answers to Plaintiff's First Set of Requests for Production of Documents |
| | | 2/14/2018 | Sunoco's First Amended Response to Requests for Admissions |
| | | 10/16/2017 | Sunoco's Objections, Responses, and Answers to Plaintiff's First Set of Requests for Production of Documents, Requests for Admissions, and Interrogatories |
| | | 7/2/2018 | Sunoco's Objections, Responses, and Answers to Plaintiff's Second Set of Interrogatories and Requests for Production of Documents |
| Depositions and Exhibits | | | |
| | | 3/14/2018 | Deposition Transcript of Alice Holland with Exhibits |
| | | 3/13/2019 | Deposition Transcript of Barbara Ley with Exhibits |
| | | 9/18/2018 | Deposition Transcript of Demi Lanceslin with Exhibits |
| | | 9/20/2018 | Deposition Transcript of Eric Koelling with Exhibits and Errata |
| | | 3/1/2018 | Deposition Transcript of Eric Koelling with Exhibits and Errata |
| | | 10/25/2018 | Deposition Transcript of Eric Koelling with Exhibits and Errata |
| | | 9/13/2018 | Deposition Transcript of Kathy Lynn Warren with Exhibits |
| | | 9/17/2018 | Deposition Transcript of Patricia Redding with Exhibits |
| | | 6/12/2018 | Deposition Transcript of Perry Loren Cline with Exhibits |
| | | 10/25/2018 | Deposition Transcript of Perry Loren Cline with Exhibits |
| | | 10/30/2018 | Deposition Transcript of Terry Oakley with Exhibits |

Perry Cline v. Sunoco, Inc. (R&M), et al.
Documents Received by Eric Krause

| Beginning Bates Number | Ending Bates Number | Date | Document Description |
|---|---|---|---|
| **Publicly Available Documents** | | | |
| | | | 1 Year LIBOR, macrotrends.net |
| | | | 2017 Title Examination Standards Handbook, Oklahoma Bar Association, Article I: Title Evidence and Examination Practice, Chapter 1 |
| | | | 2017 Title Examination Standards, OK and TX |
| | | | 2019 Title Examination Standards Handbook, Oklahoma Bar Association |
| | | | 3 Month Treasury Bill Rate (Secondary Market), Federal Reserve Bank of St. Louis |
| | | 3/26/2019 | About Us - History of Sunoco, sunoco.com |
| | | | Audit Procedures for Unclaimed Property |
| | | 4/3/2019 | Crude Oil Transportation and Services, energytransfers.com |
| | | | Historical Prime Rate, jpmorganchase |
| | | | Inadvertence & the Internal Revenue Code: Fed. Tax Consequences of State Unclaimed Prop. Laws, 62 U. Pitt. L. Rev. 123, 158 (2000) |
| | | | NYS Comptroller Unclaimed Funds |
| | | 2/12/2019 | Oklahoma Corporation Commission Form 1002A regarding the Anna Lee 1-30Y Well |
| | | | Unclaimed Property: Rethinking the State's Lost & Found Program |
| **Other Documents** | | | |
| | | | PLADS_LS_VCHR_BARDEL.txt |
| | | | 20191015 Cline v Sunoco - List of BA Owners with Late Payments as of 10-....xlsx |