# EXHIBIT 5

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| PERRY CLINE, on behalf of himself and all others similarly situated, | § § § | |
| Plaintiff, | § § | |
| v. | § § | Case No. 17-cv-00313-JHP |
| SUNOCO, INC. (R&M) and SUNOCO PARTNERS MARKETING & TERMINALS, L.P., | § § § § | |
| Defendants. | § | |

EXPERT REPORT

ERIC R. KRAUSE, MBA

_____

ERIC R. KRAUSE

11/1/2019
_____

DATE

*CONFIDENTIAL – Pursuant to Protective Order*

# I. INTRODUCTION AND NATURE OF INVOLVEMENT

1. My name is Eric R. Krause.  I have been retained by Sunoco, Inc. (R&M) and Sunoco Partners Marketing & Terminals L.P. (individually or collectively, "Sunoco" or "Defendants") in the matter of *Perry Cline, on behalf of himself and all others similarly situated, v. Sunoco, Inc. (R&M) and Sunoco Partners Marketing & Terminals L.P.* I have been asked to assess the facts and circumstances related to Sunoco's potential obligations under the Oklahoma Production Revenue Standards Act, OKLA. STAT. tit. 52, Section 570, *et seq.* with respect to the quantification of any alleged damages the Plaintiff contends are due to the class.  Specifically, I have been asked to respond and to render opinions related to the expert report of Barbara A. Ley dated October 25, 2019 ("the Ley Report").

2. I previously filed an Expert Report in this matter related to the questions of class certification dated March 29, 2019.  I also filed a Declaration in this matter on August 14, 2019.  To the extent relevant and unless otherwise noted in this report, I hereby incorporate my opinions from my previous Expert Report and Declaration herein.

# II. CREDENTIALS AND COMPENSATION

3. I am a Director at Applied Economics Consulting Group, Inc. ("Applied Economics") in Austin, Texas.  Applied Economics conducts economic and financial analyses for a wide variety of clients across a number of industries.  I have held my role as Director since 2008 and prior to that, I was a Consultant with the same firm from 2003 to 2008.  I have an undergraduate degree in Economics from the University of Texas at Austin and a Master of Business Administration degree with a concentration in Finance from the University of Texas at Austin. A copy of my professional resume is attached to this report as Appendix A.

*CONFIDENTIAL – Pursuant to Protective Order*

4.   I have significant experience with litigation related to the oil and gas industry and the assessment of facts and circumstances in complex litigation.  I have been engaged to assist in the analysis of oil and gas royalty and valuation matters on multiple occasions, to review and prepare evaluations of economic damage claims, and present written reports and provide testimony in a subset of these matters.  I have served as both a consulting and testifying expert in multiple matters involving oil and gas matters.

5.   I also have significant experience in the capabilities, technical utilization, and data interpretation of oil and gas production and revenue accounting systems.  These include a number of software systems such as the PLADS Mainframe system (Purchasing and Lease Acquisition and Disbursement System) utilized by Sunoco, as well as other revenue accounting systems employed in the industry such as the Production and Revenue Accounting (PRA) system, Artesia, Excalibur, Oracle, Novistar, OGSys, among others.

6.   I have relevant experience in and an understanding of the economic issues present in this matter and both my academic and professional experiences qualify me to present this report.  Attached, as Appendix B, is a listing of cases in which I have testified.  Applied Economics is being compensated at the rate of $395 per hour for my work on this matter.  This compensation is not dependent in any way upon the outcome of this litigation or upon reaching any particular opinion or conclusion.

## III. INFORMATION REVIEWED

7.   In the course of my work in this matter, Applied Economics staff and I have reviewed documents and materials produced by the parties in discovery, including depositions of the parties.  I have also procured and reviewed information from public sources.  A listing of the materials considered in forming my opinions is attached to this report as Appendix C.  If any

*CONFIDENTIAL – Pursuant to Protective Order*

additional relevant or supplemental information or data becomes available to me, I will supplement this report as may be required.

## IV. BACKGROUND

### *Plaintiff*

8.   I understand Perry Cline ("Mr. Cline" or "Plaintiff") is a resident of the State of Oklahoma and a royalty owner in certain Oklahoma wells from which Sunoco purchases the oil production and has agreed with the operator/producers to disburse oil royalties on behalf of the operator of the wells.  It is my understanding that Mr. Cline claims to be "entitled to payment of oil and gas proceeds therefrom."[1]

9.   Based on the order certifying the class in this case, it is my understanding that Mr. Cline has been appointed as the class representative on behalf of the entire class that was certified by the Court.[2]

### *Defendants*

10.   Named Defendants include Sunoco, Inc. (R&M) (now Sunoco (R&M), LLC) and Sunoco Partners Marketing & Terminals, L.P.  Sunoco (R&M), LLC is an affiliate of Sunoco Partners Marketing & Terminals L.P., and both are subsidiaries of Energy Transfer LP.  Sunoco Partners Marketing & Terminals L.P. is engaged in the purchase and sale of crude oil in the United States including Oklahoma.[3]

---

[1] Plaintiff's Original Petition, dated July 6, 2017.
[2] Order, dated October 3, 2019.
[3] Crude Oil Transportation and Services, www.energytransfersunoco.com.

*CONFIDENTIAL – Pursuant to Protective Order*

# V. SUMMARY OF PLAINTIFF'S CLAIMS

11.  The Plaintiff's Original Petition enumerates several causes of action that are all generally predicated on an alleged underpayment or non-payment of statutory interest on portions of proceeds Plaintiff alleges were not paid timely in accordance with the Oklahoma Production Revenue Standards Act, OKLA. STAT. tit. 52, Section 570, *et seq*. ("PRSA").[4]  Based on my review of the Plaintiff's Original Petition and Ms. Ley's reports, it is my understanding that the Plaintiff's allegation is that Sunoco failed "to pay interest on 'proceeds from the sale of oil or gas production or some portion of such proceeds [that] are not paid prior to the end of the applicable time periods provided' by statute"[5] ("Untimely Payments"), citing the PRSA.[6]

12.  The Plaintiff will, at least as of the date of this report, have its claims adjudicated as a class action by the Court.  It is my understanding the presently certified class definition in this matter consists of:

> *"All non-excluded persons or entities who: (1) received Untimely Payments from Defendants (or Defendants' designees) for oil proceeds from Oklahoma wells on or after July 7, 2012, and (2) who have not already been paid statutory interest on the Untimely Payments. An "Untimely Payment" for purposes of this class definition means payment of proceeds from the sale of oil production from an oil and gas well after the statutory periods identified in OKLA. STAT. tit 52, §570.10(B)(1) (i.e., commencing not later than six (6) months after the date of first sale, and thereafter not later than the last day of the second succeeding month after the end of the month within which such production is sold). Untimely Payments do not include: (a) payments of proceeds to an owner under OKLA. STAT. tit 52, §570.10(B)(3) (minimum pay); (b) prior period adjustments; or (c) pass-through payments.*

---

[4] Plaintiff's Original Petition, dated July 6, 2017.
[5] Plaintiff's Original Petition, dated July 6, 2017, paragraph 5 and PRSA Section §570.10.
[6] Solely for ease of reference, I adopt the nomenclature of "Untimely Payments" throughout my report.  However, my use of this shorthand should not be construed to endorse Plaintiff's claims in any way.

*CONFIDENTIAL – Pursuant to Protective Order*

> *The persons or entities excluded from the Class are: (1) agencies, departments, or instrumentalities of the United States of America or the State of Oklahoma; (2) publicly traded oil and gas companies and their affiliates; (3) persons or entities that Plaintiff's counsel may be prohibited from representing under Rule 1.7 of the Oklahoma Rules of Professional Conduct; and (4) officers of the court."[7]*

13. I understand that the Plaintiff's original class definition did not specify a time period and that the Court has since limited the class to claims arising on or after July 7, 2012.[8]  Furthermore, the "Untimely Payments" in the certified class definition in this matter are defined as "payment of proceeds from the sale of oil production from an oil and gas well after the statutory periods identified" by the PRSA.[9]

14. The presently certified class in this matter is unique relative to certain other oil and gas class action litigation in Oklahoma in that it is not limited to royalty owners, but also includes overriding royalty interest owners and working interest owners (to the extent those owners are not otherwise excluded as publicly traded oil and gas companies). This fact adds substantial complexity to the determination of whether any payment was untimely and violates the PRSA, who is responsible for the late payment, and the proper rate of interest. As a purchaser of oil production from producers, most of Sunoco's payments are to producers/operators, and only a relatively smaller portion of all payments are to royalty owners, many of those producers are privately-held entities, not publicly-traded energy companies. Compared to other "late-payment interest" cases in Oklahoma that involve only a single defendant producer, this case involves thousands of producers, each of which also has its own working interest owners and royalty owners who are owed payments by the producer, but the payments are handled by Sunoco under separate contractual

---

[7] Order, dated October 3, 2019.
[8] Opinion, dated October 3, 2019; Order, dated October 3, 2019.
[9] Order, dated October 3, 2019.

*CONFIDENTIAL – Pursuant to Protective Order*

arrangements with each producer. This is significant because it adds an additional layer of complexity and individual factual circumstances across the class that must be accounted for in calculating the damages due to the certified class under the Plaintiff's allegations.

## VI. OPINIONS RELATED TO THE CALCULATION OF CLASS DAMAGES

15.  It is my opinion that the parameters of the presently certified class definition in this matter require a detailed analysis and factually intensive inquiries on a transaction by transaction basis before the defined class members can even be identified as payees who received Untimely Payments under the terms of the PRSA.  In order to determine who is in the certified class and whether liability can be established and damages can be calculated, the class damages require a determination of who received "Untimely Payments" in violation of the PRSA from the revenue accounting data and evidentiary review of the circumstances in which the payment appears to be paid late. A particular payment to a particular class member that violated the PRSA has to be established and the type of violation must be established by the Plaintiff before damages for that class member can be quantified. In my opinion, there is no simple (or administratively feasible) methodology or mechanism to identify all class members and calculate damages for each. As described below, and contrary to Ms. Ley's suggestion, that determination cannot be made from a simple review of the data and a calculation predicated entirely on Sunoco's accounting database.

16.  As a threshold matter, determining whether interest is due in the calculation of damages for the certified class for any payment that appears late in a given period requires a factual inquiry with regard to each transaction included in the damages calculation in order to establish if payment was indeed untimely under the certified class definition.  It must first be determined if a particular payment was "Untimely" under the combination of the PRSA itself, as well as the certified class definition and its exclusions.  Then, subsequently, for payments

*CONFIDENTIAL – Pursuant to Protective Order*

that have been confirmed as untimely, the central question to the determination of whether any interest is due, whether Sunoco or another party is liable for it, and what the proper rate of interest should be is "For what reason(s) was payment untimely?"

17.   In my review of the Ley Report, as will be discussed in greater detail below, performing this analysis for each transaction is necessary as not doing so can lead to unreliable and flawed results for individual class members.  A class-wide damages methodology simply cannot be reliably applied to each of the members of the class because the individual circumstances applying to those owners would yield alternative results in the quantification of damages relative to their particular outcome in Ms. Ley's class-wide approach.

18.   However, I have been asked by Defendants' Counsel to review the calculations performed by Ms. Ley in her October 25, 2019 report and provide my opinions regarding her analysis and conclusions.

## VII.  COMMENTS REGARDING THE EXPERT REPORT OF BARBARA A. LEY

### *General Opinions Regarding Ms. Ley's Methodology*

19.   The following sections of this report set forth my opinions and comments regarding the Ley Report.   The preceding sections of this report outline examples of the minimum considerations underlying Sunoco's potential obligations borne out of PRSA Section §570.10 with respect to the presently certified class.  Throughout her report, Ms. Ley simply overlooks and/or oversimplifies these considerations in favor of a rough and selective approach, resulting in conclusions that are disassociated with the facts and circumstances in this matter, as well as being seemingly disconnected with the allegations and claims being made by the Plaintiff.

*CONFIDENTIAL – Pursuant to Protective Order*

20.   Ms. Ley concludes that it is her current opinion that class-wide late payment principal statutory interest totals $52,621,879.30 and annually compounded interest on interest (as of October 25, 2019) totals $28,615,113.03.[10]

21.   The inexorable link between the statutory obligations and the necessity of an evaluation of the underlying facts and circumstances for the apparent late transactions resulting therefrom render Ms. Ley's opinions unreliable.  Ms. Ley has not arrived at her conclusions, or key assumptions, through any analysis of the actual circumstances underlying presently certified class members (as that would necessarily require numerous individualized analyses).    It is my opinion that there is no way this can be determined on the facts and circumstances of the class representative, nor without a review of the underlying liability and appropriate damages calculation for each transaction that relies on numerous data sources outside of the revenue accounting data.

22.   Ms. Ley's class-wide damages model is wholly disconnected from liability, and makes no attempt to relate the damages to any liability issues. A basic concept in forensic accounting and economic damages analysis is that the damages model must be connected to the alleged liability. Otherwise, it simply generates an arbitrary number that fails to associate the determination of what damages stemmed from any violation of the PRSA.

23.   Additionally, Ms. Ley simply ignores any independent economic assessment of PRSA Section §570.10 and fails to include any discussion of the central question to the determination of the interest due (if any) – "For what reason(s) was payment untimely?" To this end, Ms. Ley's opinions and conclusions are undermined by her lack of consideration regarding the complexity of the layered individualized inquiry required on an owner-by-owner, well-by-

---

[10] Ley Report, pages 5, 10-13, Exhibits 2 and 3.  Ms. Ley also calculates these figures through a scheduled trial date of December 16, 2019.

*CONFIDENTIAL – Pursuant to Protective Order*

well, purchaser-by-purchaser, product-by-product analysis on a period-by-period basis for the numerous reasons outlined above.  Thus, Ms. Ley's opinions are unreliable and fail to properly consider the contours and nuance of both Mr. Cline's situation in relation to other members of the presently certified, and Sunoco's potential obligations thereto.

*Inclusion of Escheat Payments*

24.   Often times, in the normal course of accounting for oil and gas proceeds disbursements for royalties (and other interest types), when funds have remained unclaimed for a requisite time period because the payor is unable to locate or resolve who the rightful owner of the proceeds is, those proceeds are suspended and escheated to the state entity associated with the last known owner's address.  Generally speaking, escheating is the transferring of unclaimed estate assets (such as royalty proceeds) to a state if no rightful owner can be identified.  The concept recognizes that property always has a recognized owner, which would be the state or government if no other claimants to ownership exist or identified.  When Sunoco escheats any proceeds to a state, it does so under the laws and regulations of those states such as Oklahoma, Texas, or Delaware.  The state is ultimately the entity that receives the funds under those circumstances.

25.   I understand precedent addressing the issue of how escheated funds should be disposed was established by the Supreme Court in *Texas v. New Jersey.*[11]  The Court indicated that held property is first reportable to the state of last known address of the owner on the books and records of the holding company.  More specifically, the Court noted:

> *"The rule recommended by the Master will tend to distribute escheats among the States in the proportion of the commercial activities of their residents. And by*

---

[11] *Texas v. New Jersey*, 379 U.S. 674 (1965).

*CONFIDENTIAL – Pursuant to Protective Order*

*using a standard of last known address, rather than technical legal concepts of residence and domicile, administration and application of escheat laws should be simplified. It may well be that some addresses left by vanished creditors will be in States other than those in which they lived at the time the obligation arose or at the time of the escheat. But such situations probably will be the exception, and any errors thus created, if indeed they could be called errors, probably will tend to a large extent to cancel each other out. <u>We therefore hold that each item of property [379 U.S. 674, 682] in question in this case is subject to escheat only by the State of the last known address of the creditor, as shown by the debtor's books and records</u>."[12]* [emphasis added]

26.   Thus, it is my understanding that the company (*e.g.,* Sunoco) must report unclaimed mineral interests to the state of the owner's last known address based on its own books and records and this is how Sunoco does, in fact, remit escheat payments.

27.   A substantial number of the transactions on which Ms. Ley predicates her damages model are actually escheat transactions that are made to various state entities in compliance with those states' laws and regulations after Sunoco has exhausted its efforts to identify a rightful owner that own the interests generating those proceeds.  These escheat payments are easily ascertainable from the transaction data itself in that any escheat payment included in the data is reflected by a check number with an "ES" prefix.  This ascertainability is binary – all escheat payments have an "ES" check number code and payments that do not include an "ES" prefix are not escheat payments.

28.   I note that in calculating her damages, I have confirmed that Ms. Ley did not exclude any of the escheat payments made to the respective states that received them.  I understand from Defendants' counsel that the certified class definition in this matter would not include any state entities and contend that escheat payments would be subject to the laws and

---

[12] *Texas v. New Jersey*, 379 U.S. 674 (1965).

*CONFIDENTIAL – Pursuant to Protective Order*

regulations of those states receiving the escheated funds.  Thus, it is inappropriate for Ms. Ley to calculate any damages for escheated funds in her model as they are payments to non-class members and subject to superseding rules of each state in lieu of the PRSA.

29. Setting aside the other flaws in Ms. Ley's class-wide damages model that are outlined in this report, I note that removing all of the escheated funds to state entities from her calculations and leave all other facets of her model untouched, her principal interest damages are reduced from $52.62 million to approximately $18.41 million.  With respect to her interest on interest totals, Ms. Ley's quantification of $81.23 million of principal and interest damages are reduced to $27.85 million.  See Exhibit 1 to this report.  This represents a substantial overstatement of damages and further serves to undermine the reliability of Ms. Ley's calculations.

*Ms. Ley's Purported Class-Wide Methodology is Deeply Flawed, Oversimplified and an Insufficient Class-Wide Damages Model*

30. Ms. Ley claims that the "PRSA provides instructions for calculating statutory interest on Untimely Payments…" and subsequently details a purported class-wide damages methodology that she claims can be used to identify potential class members and calculate damages.[13]

31. Setting aside the aforementioned overarching flaws discussed above, Ms. Ley's model and underlying methodology is replete with errors and oversimplification.  For example, Ms. Ley claims to have identified and excluded minimum suspense payments from her class-wide damages calculation.[14]  Ms. Ley states she has "achieved this result by summing revenue due

---

[13] See Ley Report.
[14] Ley Report, pages 9-10.

*CONFIDENTIAL – Pursuant to Protective Order*

to each owner for the rolling twelve months during the Class Period."[15]  More specifically, she excluded these "accumulated amounts" between $10 and $100 if it was "paid within a year of the original production date," and further did not calculate interest on "accumulated amount[s] over 12 months time [if it was] less than $10 no interest."[16]

32.  As a consequence, Ms. Ley has included transactions in her damages methodology that were actually minimum suspense releases and not subject to any interest under the PRSA.  In addition, due to her oversimplified methodology, she has also excluded *rightful* class members under the certified class who were paid late for reasons other than minimum suspense.  This underscores the lack of reliability of Ms. Ley's oversimplified model, as well as the need for a calculation that occurs on a transaction-by-transaction basis.  Because Ms. Ley's oversimplified methodology likely omits owners who have rightful claims under the certified class definition, this raises numerous concerns regarding the ability to adequately provide notice to the certified class, much less properly calculate damages.

33.  Additionally, on the issue of minimum suspense, it is also necessary to perform an inquiry as to whether or not Sunoco provided sufficient notice to owners being suspended for amounts between $10 and $100 as to their rights to request that they be exempted from minimum suspense accruals, as well as whether or not that request was made and complied with.  Ms. Ley's analysis simply ignores all of these pertinent inquiries related to express requirements included in the PRSA.  I also note that in the case of minimum suspense, if the $25 to $100 threshold is to be recognized then one must endeavor to determine if the Payor has fulfilled its notice obligations and whether the owner has responded in kind.[17]  This gives rise to a

---

[15] Ley Report, pages 9-10.
[16] Ley Report, pages 9-10.
[17] Additionally, it would be necessary to determine over the entire period if the notice provided by Sunoco was sufficient to meet the requirements set forth by the statute and if the nature of the provided notice ever changed.

*CONFIDENTIAL – Pursuant to Protective Order*

potentially misleading result when utilizing only the revenue accounting data to determine that a payment was not made within the two/three-month requirement.

34.   Ms. Ley's attempts to "streamline" and simplify her task of constructing a class-wide damages model are inadequate.  Another example highlighting the flaws of her damages model is that it fails to properly account for issues related to prior period adjustments.  Ms. Ley states in her report that she "identified [prior period adjustments] and eliminated them from my calculation of Class damages." [18]  She believes that by eliminating transactions with an adjustment reason code and that are for the "first payment date, *per owner*, per owner interest type, per production month, and per product," that she had removed all prior period adjustments.[19]  This is demonstrably incorrect.

35.   In attempting to eliminate all prior-period adjustments in her model, she is only able to remove subsequent PPA payments if the owner remains the same for all time.  In cases where a PPA is made for sales dates years in advance (a very common occurrence), if there is a successor or different owner who has ownership of the interest as of the date of the PPA, Ms. Ley's oversimplified approach still includes 12% interest on that transaction despite her intention to exclude it.  This is because by looking at it on a per owner basis, instead of evaluating the underlying interest decimal to determine if the interest passed from one owner to another owner before the prior period adjustment, Ms. Ley's methodology will not flag the transaction as a prior period adjustment because it will be the first apparent payment for that owner in that well, production month, product, and interest type despite being an adjustment to a previous payment to another owner.

---

[18] Ley Report, page 10.
[19] Ley Report, page 10 [emphasis added].

*CONFIDENTIAL – Pursuant to Protective Order*

36.  In fact, this precise occurrence is present in Ms. Ley's damages model.  By way of example, her quantification of damages includes calculated principal interest for the BJ Horne Trust Atwaylah J. Horne TTEE (Owner Number 103331385) of $3.09 for a payment sent on property number 159320100 for the production and sales month of December 2015.  While Ms. Ley eliminates the original payment made for that interest to the preceding owner Revocable Inter Vivos Trust of Bill J. Horne (Owner Number 102403052) in January 2016 from her calculations due to it being timely, because a prior period adjustment occurs to the payment in August 2017 to a different owner with a different owner number that the interest transferred to (BJ Horne Trust Atwaylah J. Horne TTEE) and that was the first time that owner name was present for a payment associated with that sales date, she includes that payment as an Untimely Payment that accrues interest.  This payment does not have any type of adjustment reason codes or "PROP_SUB" code and thus, it is not detected by Ms. Ley's methodology or eliminated from her calculations.  This means her calculations absolutely include prior period adjustments despite them being excluded from the class.  A preliminary review of the recently produced suspense history (discussed below) confirms that the interest held by the Revocable Inter Vivos Trust of Bill J. Horne (Owner Number 0102403052) in this property was, in fact, transferred to BJ Horne Trust Atwaylah J. Horne TTEE (Owner Number 10331385) in August 2017.   This is a mere example of such a PPA that Ms. Ley calculates interest for in her damages model and further serves to undermine the reliability of her model.

37.  Ms. Ley's purported class-wide damages methodology also fails to consider any type of situations requiring further investigation that possibly occurred in the presently certified class – even those contemplated by the statute itself.  For example, Sunoco made a payment to

*CONFIDENTIAL – Pursuant to Protective Order*

the Clerk of Oklahoma County on September 26, 2016 in the amount of $9,633.11.[20]  A review of the underlying circumstances of that payment that includes sources outside of the revenue accounting data reveals that this payment was for the purpose of interpleading funds that were held in suspense by Sunoco to the Court in which proceedings over unmarketable title were being litigated.[21]  These funds were to be deposited with the Clerk of Oklahoma County in accordance with a consolidated Order of Discharge and Journal Entry of Judgment.[22] The statute states the following with respect to interplead funds:

> *"Where marketability has remained uncured for a period of one hundred twenty (120) days from the date payment is due under this section, any person claiming to own the right to receive proceeds which have not been paid because of unmarketable title may require the holder of such proceeds to interplead the proceeds an all accrued interest into court for a determination of the persons legal entitled thereto.* <u>*Upon payment into court the holder of such proceeds shall be relieved of any further liability for the proper payment of such proceeds and interest thereon.*</u>*"[23]* [emphasis added]

38.  Despite language above from the statue explicitly relieving Sunoco of liability in this scenario, Ms. Ley calculates $3,284.94 statutory interest on this payment. [24]  This leads to an overstatement of damages and renders Ms. Ley's purported class-wide damages unreliable. It is also serves to demonstrate that it is not possible to identify facts and circumstances such as these by simply performing an aggregation of the revenue accounting data provided by Sunoco.

39.  Additionally, there exists numerous indemnifying or liability-shifting agreements in place that are not reflected in the accounting data that lead Ms. Ley's calculations to erroneous

---

[20] SUN-CL-00020198 – 00205.
[21] SUN-CL-00020198 – 00205.
[22] SUN-CL-00020198 – 00205.
[23] PRSA §570.10.
[24] Ley Report, Exhibit 10.

*CONFIDENTIAL – Pursuant to Protective Order*

conclusions.   As discussed in my class certification report, instruments outlining the obligations between working interest owners also contemplate a framework regarding indemnification and/or liability in the event such claims arise.   For example, consider the Term Indemnity Agreement between Sunoco Partners Marketing & Terminals, LP and Husky Ventures, which states:

> *"The Lease Operator shall indemnify and hold Sunoco Partners from and against any and all loss, cost, damage, and expense, including but not limited to attorney's fees, incurred by reason of, or in any way arising from, any payment made by Sunoco Partners in accordance with the provisions of Paragraph 2 hereof for Crude Oil sold and delivered hereunder. In addition, **Lease Operator agrees to indemnify and hold Sunoco Partners harmless from any interest costs demanded by interest owners and paid by Sunoco Partners if title is not provided within 180 days of first production**."*[25]

[emphasis added]

40.   Despite this clear and unambiguous indemnification language between Sunoco and Husky Ventures, I note Ms. Ley has calculated late payment principal statutory interest of $88,638 due to Husky Ventures for payments on precisely these wells.[26]   The inclusion of such a substantial damages sum that Ms. Ley states is due to Husky Ventures despite the existing agreement between Sunoco and Husky related to exactly these issues further serves to undermine the reliability and accuracy of Ms. Ley's calculations.[27]

---

[25] SUN-CL-00019748 – 19751; at -749.

[26] Ley Report, Exhibit 10.

[27] I note that Ms. Ley includes "Defendants' production of documents" and the "materials identified in Exhibit C to the Expert Report of Eric Krause" in her "Items Reviewed and/or Relied Upon" (see Ley Report, Exhibit 9).  Nonetheless, Ms. Ley fails to consider this underlying evidence outside of Sunoco's revenue accounting data in her class-wide damages model.

*CONFIDENTIAL – Pursuant to Protective Order*

41.  Another example of an owner and member of Ms. Ley's damages calculations granting indemnification relating to suspended funds can be observed in the letter agreement between Sunoco Partners Marketing & Terminals, LP and New Dominion LLC which states:

> "*In consideration for SPMT making payment to New Dominion for these suspended funds, New Dominion agrees to hold SPMT harmless from all loss, cost, damage or expense, including reasonable attorney's fees, that SPMT may suffer or incur whether it is named as a party or otherwise by reason of this payment to New Dominion, including but not limited to the right of set off against any other properties or contracts.* New Dominion further agrees to make proper accounting to the specified interest owners or the appropriate payment to the state for any unclaimed funds, and save SPMT free, clear and harmless from any loss, cost, damage or expense by reason of New Dominion's distribution of the proceeds due these owners as described above."[28] [emphasis added]

42.  I note Ms. Ley has calculated late payment principal statutory interest of <u>$232,468</u> owed to New Dominion LLC in her damages model in this matter.[29]  Once again, the inclusion of such a substantial damages sum that Ms. Ley states is due to New Dominion LLC despite the existing agreement between Sunoco and New Dominion related to exactly these issues further serves to undermine the reliability and accuracy of Ms. Ley's calculations.[30]

43.  Furthermore, indemnification of the release of suspended funds as a result of unmarketable title issues can be observed in the circumstances of Berexco LLC.  Funds due to royalty owner Berexco LLC on the Lacquement #3 well were being held in suspense due to unmarketable

---

[28] SUN-CL-00019752 – 19759; at -754.
[29] Ley Report, Exhibit 10.
[30] I note that Ms. Ley includes "Defendants' production of documents" and the "materials identified in Exhibit C to the Expert Report of Eric Krause" in her "Items Reviewed and/or Relied Upon" (see Ley Report, Exhibit 9).  Nonetheless, Ms. Ley fails to consider this underlying evidence outside of Sunoco's revenue accounting data in her class-wide damages model.

*CONFIDENTIAL – Pursuant to Protective Order*

title issues, which were communicated to royalty owner Berexco LLC on June 12, 2018.[31]

Royalty owner Berexco LLC subsequently provided documentation to Sunoco on June 19, 2018 that cured the unmarketable title issues, stating:

> *"As I understand Sunoco has been holding money in suspense for Berexco LLC's account (Owner No. 0102305075) in the referenced well due to a title requirement concerning Shell Canadian Exploration Company and Shell Oil Company. Attached please find documentation filed with the Oklahoma Secretary of State wherein Shell Canadian Exploration Company merged into Shell Oil Company. <u>This documentation should clear up the title requirement which has resulted in our royalty interest being held in suspense. Accordingly, we would ask that Sunoco immediately release funds on the account from suspense, as I believe you should already have a signed division order for the interest</u>."[32]* [emphasis added]

44. Berexco LLC also reiterated its indemnification understanding between the parties below:

> *"While Berexco has already indemnified Sunoco in the execution of its division order for the interest attributable to the foregoing parties, <u>please accept this email as further assurance that Berexco LLC will hold Sunoco Partners, and its affiliates, harmless from and against any and all liability asserted by any such party arising from Sunoco's reliance upon Berexco LLC to received revenue payments on behalf of Okmar Oil Company, CJD investors, LP and Robert M. Beren, LP.</u>"[33]*

45. I note Ms. Ley has calculated late payment principal statutory interest of <u>$29,880</u> owed to Berexco LLC in her damages model in this matter.[34]  This is yet another example that further serves to undermine the reliability and accuracy of Ms. Ley's calculations.[35]

---

[31] SUN-CL-00020840 – 20865.

[32] SUN-CL-00020840 – 20865; at -844.

[33] SUN-CL-00020840 – 20865; at -843.

[34] Ley Report, Exhibit 10.

[35] I note that Ms. Ley includes "Defendants' production of documents" and the "materials identified in Exhibit C to the Expert Report of Eric Krause" in her "Items Reviewed and/or Relied Upon" (see Ley Report, Exhibit 9).  Nonetheless, Ms. Ley fails to consider this underlying evidence outside of Sunoco's revenue accounting data in her class-wide damages model.

*CONFIDENTIAL – Pursuant to Protective Order*

46.    Moreover, from an economic perspective, language such that above serves to indemnify a respective party as it relates to a third party's claims of interest due on the production and sale of hydrocarbons.   While the revenue accounting data available from Sunoco's pay revenue history can be invaluable in attempting to aggregate data or calculate what was actually paid and when, it is woefully inadequate for establishing the existence of an actual Untimely Payment for which Sunoco is liable, establishing the underlying cause of a late payment, establishing the interest period and interest rate applicable, or calculating the appropriate amounts due to any presently certified class member, much less the class as a whole.

47.    Again, these are mere examples of the types of underlying facts and circumstances amongst class member that lead to unreliable and flawed results in Ms. Ley's oversimplified methodology.   Ms. Ley does not consider any agreements such as the above or other instruments between Sunoco and all owners including working interest owners, overriding owners and royalty interest owners. As discussed above, for claims against working interest owners, it would be necessary to review all of the contractual agreements between the parties to determine if alternative timing for payments was agreed to by Sunoco and potential class members.  Working interest owners account for 2,824 of the owners for which Ms. Ley calculates damages and those owners account for 26% of the transactions on which Ms. Ley calculates damages.  Moreover, it is possible that those agreements may augment the need for, or the amount of interest due if payments are made late.  Similarly, a review of all the potential class members' leases and other instruments would be necessary to ensure that no owners' instruments have superseded the requirements of the statute for payment timing or the consequences of payments that do not comply with those agreed to parameters.  Ms. Ley does not appear to consider this in any way in constructing her damages methodology.

*CONFIDENTIAL – Pursuant to Protective Order*

*Unmarketable Title Issues*

48.  As a threshold matter, Ms. Ley's failure to adequately address unmarketable title issues is partially because Ms. Ley conducts her class-wide damages analysis under an indiscreet cloak of "simplification."  However, there is nothing about an appeal to simplicity that allows Ms. Ley to ignore that the very consideration of PRSA Section §570.10 expressly implicates layers of individualized facts and circumstances, as evidenced through this report.

49.  Ms. Ley states that "Defendants have not yet provided the requested information on their internal suspense coding for unmarketable title issues, or otherwise identified proceeds that were suspended and paid late because of unmarketable title issues."[36]   To this end, the Defendants produced data relating to historical suspense coding on October 31, 2019 that included tables of some historical suspense data.[37]  I understand that this data was generated only after Sunoco endeavored significant time and programming resources in a good faith effort to respond to the Plaintiff's requests.  Based on the nature of the data, in combination with only having received this data one day prior to this report, I am currently evaluating this data and my analysis of this newly produced data.[38]  As such, I reserve the right to supplement this report as permitted by the court once I am able to complete a refined study.

50.  However, it is important to recognize that Sunoco establishes suspense codes for their internal, corporate purposes.  As was testified to by Sunoco corporate representatives, one cannot simply look at the name of a suspense code and reach a full understanding of why any

---

[36] Ley Report, page 11.

[37] SUN-CL-00021529 – 21532.

[38] I note that based on my preliminary review of the historical suspense data, transactions representing millions of Ms. Ley's $52 million in damages cannot be linked to any historical suspense code because either: a) the owner-property combination does not appear in the data at all; or b) the owner-property combination appears but does not have any associated suspense code.  Thus, even after being provided this data, it will be impossible to determine the underlying causation for the payment appearing to be "Untimely" based solely on the historical suspense data.

*CONFIDENTIAL – Pursuant to Protective Order*

particular interest was placed under that code.[39]  The types of unmarketable title issues contemplated by the statute may exist across a number of codes.  The internal accounting codes established by Sunoco are not intended to facilitate the identification of the type of interest that is due under the PRSA in Oklahoma – it is a far broader mechanism for internal purposes and cannot be relied upon exclusively for understanding the underlying facts.

51.   Moreover, Sunoco regularly inherits suspense codes from other purchasers or from operators and those companies similarly do not design their suspense systems for the purpose of identifying interest obligations under Oklahoma's PRSA.  In inheriting suspense information from other companies, Sunoco is also required to try and map those codes as best they can.  Numerous companies used generalized suspense code (such as "general suspense"), and it is impossible to determine the nature of why it was suspended without a factual inquiry into those specific circumstances.[40]

52.   It is necessary to identify such issues from the actual underlying evidence and rationale for the decision to suspend the owner's interest beyond just a reliance on the codes utilized by Sunoco to determine whether or not any particular claim for interest would be a 6% claim or a 12% claim – even if it was possible to link between the check detail and the prior suspense data.  Further complicating these issues is that in Sunoco's system, the owner's suspense codes are not the single consideration in understanding what, in fact, occurred.  Sunoco has property level suspense codes and owner level suspense codes, further adding to the complexity of any analysis of a particular transaction.

---

[39] See, for example, Deposition of Eric Koelling, September 20, 2018, pages 219, 265 and Declaration of Eric Koelling, dated August 14, 2019, pages 6-7, 15-16.

[40] It is worth reiterating again that an inquiry into Mr. Cline's facts and circumstances will provide no insight or conclusions as it relates to the facts and circumstances of any other owner, including those with suspense codes that need to be investigated.

*CONFIDENTIAL – Pursuant to Protective Order*

53. Most companies, including Sunoco, have a number of suspense codes with different category titles, but, taken individually, it is necessary to review each suspense owner to determine if the issues that have caused their suspense designation qualify as the defined unmarketable title issues contemplated in the PRSA – resulting in a 6% interest rate instead of a 12% interest rate. Moreover, it would be necessary on a case-by-case basis to determine precisely *when* title became marketable (assuming it ever did) and the associated timing of when the funds were actually released. It is possible that, assuming liability, a specific release may have varying interest rates depending on the timing of those two events. Moreover, this can be further obscured by changes in the suspense code utilized over the life of the suspended funds.

54. For example, if an interest was held in suspense for two years while the title was being debated by third parties or the court and was then resolved, but Sunoco did not have a signed division order, Sunoco might move the owner from "Title" into a category for "No Division Order" for the interim period until Sunoco received the necessary information. Thus, when the owner's funds are released from suspense after receiving the necessary information, if one only observed the last suspense code then it would appear that for the whole period, the royalties were being suspended for not having a Division Order when the majority of the period was actually related to unmarketable title issues.

55. In my preliminary review of the newly-produced suspense data provided by Sunoco, I note that this occurs in tens of thousands of instances in which owners transition from one suspense code to another (in which at least one of the codes is clearly title related[41]) or in which interests transfer from one owner to new owner(s) in which the suspense reason codes

---

[41] It is worth reiterating that it is possible that some suspense codes that appear to be title related may not actually meet the unmarketable title standards in the PRSA and that some suspense codes that do not appear to be title related may actually be unmarketable title issues under the PRSA.

*CONFIDENTIAL – Pursuant to Protective Order*

change from one type to another (potentially requiring a bifurcated calculation of 6% for part of the period and 12% for part of the period).[42]

56.   This serves to merely illustrate the necessity of an individualized damages analysis not only on an owner-by-owner basis, but on a transaction-by-transaction basis, as different months may warrant different levels of interest. In fact, this precise example of a suspense transition over time occurs in Sunoco's revenue accounting and thus, it is necessary to calculate damages using such a methodology.

57.   Proper assignment of unmarketable title suspense allocations will have a direct and material impact to the calculation of damages for this class.  Based on my preliminary analysis of the historical suspense data, I have been able to perform at least a superficial linkage of the owner number included in each of Ms. Ley's damages calculations to the historical suspense records.  I have been asked by Defendants' counsel to perform a preliminary allocation of Ms. Ley's damages to the suspense codes included in the recently-produced historical suspense records.   I understand that Defendants' title expert Kraettli Epperson has reviewed the suspense codes included in the Sunoco systems and has opined as to which codes relate to unmarketable title issues.

58.   Mr. Epperson's opinions have been provided to me and I note that he has performed an assignment of a determination for marketable or unmarketable title on a number of the Sunoco suspense categories.  However, it is further worth noting that there are a number of categories that Mr. Epperson states it is impossible to divine from merely the code whether or not the possible underlying reason for the suspense was unmarketable title related or not. This further highlights that reliance on the historic suspense codes (which tie to less than half

---

[42] SUN-CL-00021529 – 21532.

*CONFIDENTIAL – Pursuant to Protective Order*

of the "untimely payments" alleged by Ms. Ley's model) exclusively to determine liability and what interest rate to apply will certainly lead to flawed and unreliable conclusions.

59.   I have performed a preliminary allocation of Ms. Ley's principal statutory interest damages of approximately $18.41 million (after removing the escheated funds) to the extent possible using Mr. Epperson's matrix of suspense codes.  Exhibit 2 to this report provides a preliminary breakdown of her damages based on the historical suspense codes.  As one can see from the exhibit, based on Mr. Epperson's assignment of codes, at least $2.47 million of Ms. Ley's damages are associated with codes that are unmarketable title related based on my preliminary linking of the damages to historical suspense codes.[43]  This means that instead of calculating the principal interest due at 12% as Ms. Ley did (as she did not have the codes at the time of her report), it would be more appropriate to apply at 6% interest rate which would serve to substantially reduce her damages.  For reasons that will be set out below, these figures are likely an understatement of the damages value associated with the unmarketable title categories and these amounts will likely increase as further work associated with the historical suspense codes proceeds.

60.   More problematic however, is that $5.88 million of Ms. Ley's damages are associated with codes that Mr. Epperson states are not determinable based on the code as to whether or not they are unmarketable title related based on my preliminary linking of the damages to historical suspense codes.  This means that Ms. Ley's damages are potentially overstated and it would be necessary to determine for each transaction in which those codes were relevant what the proper interest rate was.  Similarly, $8.17 million of Ms. Ley's damages are not associated with any suspense code from the historical suspense data based on my

---

[43] As discussed in detail in paragraphs 50 through 55 of this report, based on my discussions with Sunoco personnel, one cannot simply rely on the historical coding to understand what the specific facts and circumstances that may determine which would inform which provisions of the PRSA would necessarily govern for each transaction if it does, in fact, apply.

*CONFIDENTIAL – Pursuant to Protective Order*

preliminary linking of the damages to historical suspense codes.  This presents the same issue as Ms. Ley's damages are potentially overstated and it would be necessary to determine for each transaction in which there are no historical codes what actually caused the alleged "Untimely Payment" in order to determine what the proper interest rate to apply would be (if any).

61.   However, for purposes of measuring the potential magnitude of this issue, I have been asked by Defendants' counsel to quantify the impact to Ms. Ley's damages (after removing her damages for escheated funds) of utilizing a 6% interest rate instead of a 12% interest rate for all transactions related to codes Mr. Epperson determined related to unmarketable title issues, 50% of the damages transactions for codes Mr. Epperson concluded were indeterminable, and 50% of the damages transaction for which no code could be linked.  Based on the above assumptions, I estimate that Ms. Ley's preliminary principal damages (after removing her damages for escheated funds) would be reduced from $18.4 million to approximately $14.18 million in principal interest damages.

62.   This quantification is highly preliminary and will be refined going forward.  There are a number of instances in the suspense history data in which the codes change over time and as of the filing of this report, I have not completed a mapping of the codes to all the time periods.  Because the current calculations rely on the final code and the final code in the Sunoco suspense transfers is often N4 (which Mr. Epperson has concluded those are indeterminable) and are often preceded or followed by codes reflecting unmarketable title issues, the N4 codes have an out-weighted effect in terms of the applicable time periods in the calculations, rendering this preliminary value likely very conservative.  Moreover, additional work is necessary to trace the assignment of suspense between the owner-level suspense and the property-level suspense included in the data.

*CONFIDENTIAL – Pursuant to Protective Order*

63. For instance, if an owner was in title-related suspense code for a year while the funds were being suspended for reasons of a deceased owner, and then subsequently moved out of that title-related code once the title was resolved and the heirs were identified, there are instances in which the periods following the transfer to the heirs includes some time in which Sunoco is awaiting a signed division order (which would lead to a subsequent suspense code categorization of N4).  Currently, any "untimely payment" damages that are being quantified above are being quantified on the basis of the N4 coding.  Once an adequate mapping of time has occurred using the historical suspense, such an estimation would then allocate the periods in which the suspended funds were clearly in unmarketable title-related codes would be assigned a 6% interest rate as opposed to the 12% it is being assigned currently due to being an N4 code.

*Interest on Interest Calculations*

64. On page 12 of her report, Ms. Ley notes that, in calculating her damages, she added compounding interest to her principal interest figures from the original check date of the payment through two dates: a) October 25, 2019 which totals approximately $28.62 million, and b) December 16, 2019 (the scheduled date of trial) which totals approximately $29.96 million.  Specifically, she states:

> *"To calculate the amount of compounded statutory interest owed on the Untimely Payments Defendants made to the Class, I used a mathematical formula that applies a 12% statutory interest rate to the interest that accrued each year on the Untimely Payments. This is sometimes referred to as "compounded interest." To not add this additional compounded interest would only reward companies for*

*CONFIDENTIAL – Pursuant to Protective Order*

*further delaying the statutory interest owed under the PRSA. My understanding is*

*the PRSA requires payment of such interest."[44]*

65.   I am aware of no provision in the PRSA that requires the payment of such interest on the principal amount of interest due.  The interest discussed in the PRSA specifically applies to oil and gas royalty <u>proceeds</u> and the principal damages that Ms. Ley calculates in this matter reflect payments of interest on proceeds, not proceeds themselves.  I have been informed by Defendants' counsel that there is no legal or statutory basis to add a 12% compounding interest calculation on top of the principal damages (assuming any are due) in this matter.  Further, I understand from Defendants' counsel that there is no specific, required date on which PRSA interest is obligated to be paid under the PRSA itself.

66.   Removing Ms. Ley's interest on interest damages would obviously serve to reduce her damages significantly.

67.   I also note that the PRSA inherently accounts for the exemplary and punitive consequences for the remittance of late payment issues.  As an economic matter, and evidenced in the table below, "interest at the rate of twelve percent (12%) per annum to be compounded annually" far exceeds the rate generally attainable by an individual (or entity) in relatively safe investments for this period under circumstances where said individual (or entity) received the due funds in a timely manner:  Below is a table showing the various average annualized rates from 2012 to present of various risk-free rates.[45]

| Benchmark | Average Annualized Rate (2012-2019) | Multiplier for PRSA 12% Rate |
|---|---|---|
| 3-Month Treasury Rate | 0.71 | 16.90 |
| 1-Year Treasury Rate | 0.17 | 68.63 |
| 10-Year Treasury Rate | 1.80 | 6.65 |
| Money Market Rate | 0.11 | 112.94 |
| Savings Account Rate | 0.07 | 171.43 |

---

[44] Ley Report, page 12, Exhibits 2 and 3.

[45] Annualized averages since 2012.  See Federal Reserve Bank of St. Louis.  https://fred.stlouisfed.org/series/DGS3MO; https://fred.stlouisfed.org/series/DGS1; https://fred.stlouisfed.org/series/DGS10; https://fred.stlouisfed.org/series/MMNRNJ; https://fred.stlouisfed.org/series/SAVNRNJ.

*CONFIDENTIAL – Pursuant to Protective Order*

*Check Stub Issues*

68.  Ms. Ley states that there "is no line item or column that identifies the amount of statutory interest owed on an Untimely Payment" and that she further "believe[s] it is reasonable for an owner to rely on Defendants' checks as containing the full and complete amounts owed to owners - including statutory interest on Untimely Payments."[46]

69.  Ms. Ley seems to imply that Sunoco wrongfully omitted information relating to whether a payee is entitled to interest from the check stub.  Notably, however, Ms. Ley fails to comment on whether such information is required by Oklahoma law nor if Sunoco is indeed complying with the applicable Oklahoma law pertaining to check stubs.  I have reviewed the PRSA and from the perspective of an economist, I have seen no provisions in the PRSA that contemplate or require a Payor such as Sunoco to include any advisements on its check stubs regarding the potential for interest owed.

70.  I have reviewed the Sunoco check stubs remitted to the Plaintiff Perry Cline and produced by the Plaintiff, and other check stub examples produced in this matter, and I have determined that the requisite information for identifying if interest is owed is available on the check stub, assuming the owner is familiar with his own facts and circumstances as it relates to liability. The check stubs include the sales month and payment month most importantly, as well as the volumes, values, and net decimal among other information by well.  Moreover, if any interest is paid, it is shown on a separate line and there is a code (3B) that indicates that it was paid; and if there is no interest paid, the code is not denoted. When no interest is paid, it is apparent on the face of the check stub that no interest was calculated or paid, because the detailed calculation of the payment amounts are set out on the check stub.  It is possible for any Payee receiving a check stub from Sunoco to identify if a payment was more than two

---

[46] Ley Report, page 14.

*CONFIDENTIAL – Pursuant to Protective Order*

months after production and assuming they are familiar with their own facts and circumstances as it relates to liability, the check stub contains sufficient information to a Payee if a payment carries a requirement for interest and whether or not that interest has been paid. The check stub contains sufficient information to alert any payee of the possibility that the payment was untimely as defined in the PRSA and that interest may be owed under the statute.

71. For example, the payment to owner Bravo Arkoma LLC on October 20, 2017, a claimed presently certified class member by Ms. Ley,[47] does not contain the aforementioned 3B code, thus indicating no interest was paid.[48]  Notably, as shown below, the check stub contains a legend that identifies the code in the check stub, if any.[49]

**PAYMENT STUB DETAILS**

Owner: BRAVO ARKOMA LLC
Owner Number: 0102056299
Payment Date: 10/20/2017          Payment Number: 0001305465

| Lease Name Sales Date | Prod. | Volume | Avg. Price | Lease Number Gross Sales | State Tax | Net Value | Owner Interest | TI | County, State Owner Value | State Tax | Adj. Code | Adj. Value | Owner Net Value |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| PARKER #1 | | | | 0185820000 | | | | | HUGHES, OK | | | | |
| 03/16 | O | 93.01 | 34.421 | 3,201.50 | 230.68 | 2,970.82 | 0.000601000 | RI | 1.92 | 0.13 | 7A | 0.00 | 1.79 |
| 06/16 | O | 97.34 | 44.950 | 4,370.94 | 314.83 | 4,056.11 | 0.000601000 | RI | 2.63 | 0.18 | 7A | 0.00 | 2.45 |
| LENING 3-30/19H | | | | 1349240000 | | | | | HUGHES, OK | | | | |
| 09/17 | O | 167.80 | 45.741 | 7,675.48 | 169.07 | 7,506.41 | 1.000000000 | WI | 7,675.48 | 169.07 | | 0.00 | 7,506.41 |
| POD H3 | | | | 1351090000 | | | | | HUGHES, OK | | | | |
| 09/17 | O | 174.48 | 44.766 | 7,810.91 | 0.00 | 7,810.91 | 1.000000000 | WI | 7,810.91 | 0.00 | | 0.00 | 7,810.91 |
| OWL ROAD 1-5/8H | | | | 1352730000 | | | | | COAL, OK | | | | |
| 09/17 | O | 177.68 | 47.091 | 8,367.27 | 184.29 | 8,182.98 | 1.000000000 | WI | 8,367.27 | 184.29 | | 0.00 | 8,182.98 |
| BISHOP NORTH 2-14/11 | | | | 1363420000 | | | | | HUGHES, OK | | | | |
| 09/17 | O | 175.20 | 45.741 | 8,013.97 | 176.51 | 7,837.46 | 1.000000000 | WI | 8,013.97 | 176.51 | | 0.00 | 7,837.46 |
| BRUNNER 1-35/26H | | | | 1363450000 | | | | | HUGHES, OK | | | | |
| 09/17 | O | 157.73 | 45.741 | 7,214.85 | 158.91 | 7,055.94 | 1.000000000 | WI | 7,214.85 | 158.91 | | 0.00 | 7,055.94 |
| BRUNNER 3-35/26H | | | | 1363480000 | | | | | HUGHES, OK | | | | |
| 09/17 | O | 177.34 | 45.741 | 8,111.85 | 178.68 | 7,933.17 | 1.000000000 | WI | 8,111.85 | 178.68 | | 0.00 | 7,933.17 |
| BUFORD 1-28/21H | | | | 1363480000 | | | | | HUGHES, OK | | | | |
| BUFORD 1-28/21H | | | | 1363480000 | | | | | HUGHES, OK | | | | |
| 09/17 | O | 173.14 | 45.741 | 7,919.74 | 174.44 | 7,745.30 | 1.000000000 | WI | 7,919.74 | 174.44 | | 0.00 | 7,745.30 |
| POD H4 | | | | 1363600000 | | | | | HUGHES, OK | | | | |
| 09/17 | O | 170.51 | 43.971 | 7,497.63 | 0.00 | 7,497.63 | 1.000000000 | WI | 7,497.63 | 0.00 | | 0.00 | 7,497.63 |
| | | | | | | Total | | | 82,616.25 | 1,042.21 | | 0.00 | 61,574.04 |

| Adjustment Code | Description |
|---|---|
| 7A | OWNERSHIP CORRECTION |

---

[47] Ley Report, Exhibit 8.
[48] SUN-CL-00019908 – 1930; at -929-930.
[49] SUN-CL-00019908 – 1930; at -929-930.

*CONFIDENTIAL – Pursuant to Protective Order*

72.   Alternatively, the following check paid to Perry Cline on December 15, 2017 clearly includes payment for late payment interest totaling $1,886.54, clearly notated with the code 3B and an explanation in the corner of the check stub describing it as an "Interest Payment."[50]

Owner: PERRY CLINE           Owner Number: 0102948692       Payment Date: 12/15/2017  Payment Number: 0098697986

| County | State | | | | | | | Owner | | Owner | | | Adj | Adj | Owner |
| Lease Name | Sales Date Lease Number MM/YY Product | Volume BBL/MCF | Average Price | Property Gross Value | State Tax | Property Net Value | Owner Interest TI | Gross Value | | State Tax | | | Code | Value | Net Value |
| KINGFISHER | OK | | | | | | | | | | | | | | |
| SHINNAH 1-18H | 1307630000 04/15 OIL | | | | | | | RI | | | | | 3B | -1,332.00 | 1,332.00 |
| SHINNAH 1 18H | 1307630000 04/15 OIL | | | | | | | RI | | | | | 3B | 666.03 | -668.00 |
| CLINE 1 13H | 1200299000 04/15 OIL | | | | | | | RI | | | | | 3B | -1,770.34 | 1,770.34 |
| CLINE 1 13H | 1200299000 04/15 OIL | | | | | | | RI | | | | | 3B | 889.17 | -889.17 |
| GOSS HOGG 1-14H | 1221360000 01/16 OIL | | | | | | | RI | | | | | 3B | -662.74 | 662.74 |
| GOSS HOGG 1 14H | 1221360000 01/16 OIL | | | | | | | RI | | | | | 3B | 331.37 | -331.37 |
| | | | | | | | | | | | | Totals | | -1,886.54 | 1,886.54 |

INTEREST TYPES(TI)            ADJUSTMENT CODES
RI - ROYALTY INTEREST        3B - INTEREST PAYMENT

## VIII.  CONCLUSION

73.   Due to the numerous instances of simplifying assumptions and a lack of review for purposes of determining how the PRSA would apply in a number of circumstances that would ultimately be connected to every presently certified class member (including any changes over time), it is my opinion that Ms. Ley's damages calculations included in her October 25, 2019 report are flawed and unreliable.

74.   My work in this matter is ongoing and if additional relevant information is provided to me or becomes otherwise available, I may supplement this report as permitted by the Court.

---

[50] Exhibit 1 to Appendix of Exhibits to Sunoco's Response to Plaintiff's Motion to Certify Class.

## Cline v. Sunoco - Comparison of Ms. Ley's October 25, 2019 Damages

| Category | Ms. Ley's Original Damages | Ms. Ley's Damages Associated with Escheated Funds | Ms. Ley's Damages Associated with Funds NOT Escheated |
|---|---|---|---|
| Principal Damages | $ 52,621,879 | $ 34,206,558 | $ 18,415,321 |
| Interest on Interest thru October 2019 | $ 28,615,113 | $ 19,006,171 | $ 9,608,942 |
| Interest on Interest thru Date of Trial | $ 29,960,687 | $ 19,874,346 | $ 10,086,341 |
| **Total (thru October 2019)** | **$ 81,236,992** | **$ 53,212,729** | **$ 28,024,263** |
| **Total (thru Date of Trial)** | **$ 82,582,567** | **$ 54,080,904** | **$ 28,501,663** |

*Note: The above figures do not account for any adjustments related to unmarketable title related claims and incorporates Ms. Ley's methodology assuming all alleged untimely payments accrue interest at 12%.

## Allocation of Ms. Ley's Damages by Suspense Code

| Suspense Code | Ms. Ley's Damages (Excluding Escheat) | | Mr. Epperson's Code Assignment[1] |
|---|---|---|---|
| Owner - A8 | $ | 112,113 | Indeterminable |
| Owner - BL | $ | - | Not Relevant |
| Owner - B3 | $ | - | Unmarketable Title |
| Owner - C2 | $ | 260,435 | Indeterminable |
| Owner - D6 | $ | 124,740 | Unmarketable Title |
| Owner - E8 | $ | 620,915 | Indeterminable |
| Owner - G3 | $ | 10,301 | Unmarketable Title |
| Owner - I2 | $ | 299,538 | Indeterminable |
| Owner - I3 | $ | 1,621 | Unmarketable Title |
| Owner - J3 | $ | 2,949 | Unmarketable Title |
| Owner - NT | $ | 2,625,296 | Assumes Marketable Title |
| Owner - N3 | $ | 4,132 | Unmarketable Title |
| Owner - P4 | $ | 44,496 | Assumes Marketable Title |
| Owner - S3 | $ | - | Unmarketable Title |
| Owner - TR | $ | 128,886 | Indeterminable |
| Owner - T3 | $ | 247,878 | Unmarketable Title |
| Owner - T5 | $ | 964,842 | Unmarketable Title |
| Owner - U2 | $ | 49,885 | Indeterminable |
| Owner - U5 | $ | 535,365 | Indeterminable |
| Owner - WC | $ | 118 | Not Relevant |
| Owner - WO | $ | 20,180 | Not Relevant |
| Owner - W3 | $ | - | Unmarketable Title |
| Owner - Z8 | $ | 4,821 | Indeterminable |
| Prop - A1 | $ | - | Unmarketable Title |
| Prop - A4 | $ | - | Assumes Marketable Title |
| Prop - C3 | $ | 3,706 | Unmarketable Title |
| Prop - D3 | $ | 34,382 | Unmarketable Title |
| Prop - D4 | $ | 272,581 | Unmarketable Title |
| Prop - F3 | $ | 25,059 | Unmarketable Title |
| Prop - F4 | $ | 0.03 | Assumes Marketable Title |
| Prop - G3 | $ | 403 | Unmarketable Title |
| Prop - I3 | $ | - | Unmarketable Title |
| Prop - L3 | $ | - | Unmarketable Title |
| Prop - M3 | $ | 36,073 | Unmarketable Title |
| Prop - N3 | $ | 32,245 | Unmarketable Title |
| Prop - N4 | $ | 3,862,881 | Indeterminable |
| Prop - O3 | $ | 23,459 | Unmarketable Title |
| Prop - O8 | $ | - | Not Relevant |
| Prop - P3 | $ | 7,160 | Indeterminable |
| Prop - P4 | $ | 23 | Assumes Marketable Title |
| Prop - S3 | $ | 196 | Unmarketable Title |
| Prop - T3 | $ | 459,319 | Unmarketable Title |
| Prop - T4 | $ | - | Unmarketable Title |
| Prop - T5 | $ | 219,981 | Unmarketable Title |
| Prop - T6 | $ | 1,635 | Unmarketable Title |
| Prop - T7 | $ | 9,258 | Unmarketable Title |
| Prop - U7 | $ | - | Unmarketable Title |
| Prop - U9 | $ | 198 | Unmarketable Title |
| Prop - V3 | $ | - | Not Relevant |
| Prop - W3 | $ | 1 | Unmarketable Title |
| No Code | $ | 8,166,481 | |
| **Total** | **$** | **19,213,552** | |

| | | |
|---|---|---|
| *Less Interest Paid (Excluding Forced Pool)* | $ | (796,323) |
| *Total* | $ | 18,417,229 |

| | | |
|---|---|---|
| Subtotal of Unmarketable Title-Related Damages per Mr. Epperson | $ | 2,474,961 |

| | | |
|---|---|---|
| Subtotal of Indeterminable Damages | $ | 5,881,998 |

*1) Source: Expert Report of Kraettli Epperson, Exhibit D.*

# ERIC R. KRAUSE

APPLIED ECONOMICS CONSULTING GROUP, INC.
1905 North Lamar Boulevard
Austin, Texas  78705
T-512.474.5860 F-512.474.6756
ekrause@aecgi.com www.aecgi.com

---

## EDUCATION

Masters in Business Administration, University of Texas at Austin, 2012

Bachelor of Arts in Economics, University of Texas at Austin, 2002

---

## WORK EXPERIENCE

Applied Economics Consulting Group, Inc., 2008 to Present
*Director*
> Financial consulting, litigation support and testimony as an expert in a variety of energy and other economic related matters.  Data analysis through model construction, programming, and statistical analysis.  Assist clients in support of valuation and financial damages analysis.

Applied Economics Consulting Group, Inc., 2003 to 2008
*Consultant*
> Financial consulting, litigation support to testifying experts in a variety of energy related matters.

George & Donaldson, LLP, 1998 to 2002
*Litigation Assistant*

Deja News, Inc., 1996 to 1997
*Assistant Principal Systems Architect for Statistical Testing*

---

## CIVIC AFFAIRS AND MEMBERSHIPS

American Economics Association

National Economics Association

World Economics Association

Leadership Austin

**Eric R. Krause**
List of Testimony 2008-2019
(client underlined)

1. Fridkin-Kaufman, Ltd., Plaintiff v. <u>Gastar Exploration Texas L.P. fka First Source Gas L.P., et al, Defendant</u> (In the 281st Judicial District Court of Harris County, Texas, Case No. 2008-74765) [Report]

2. <u>Trust Venture Company, L.L.C. on Behalf of the Torch Energy Royalty Trust, Plaintiff</u> v. Constellation Energy Partners, L.L.C., Defendant (In the Circuit Court of Tuscaloosa County, Alabama, Civil Action No. CV-2008-900751) [Hearing Testimony]

3. <u>Hat Creek Energy, L.L.C., Plaintiff</u> v. Gasco Production Company, Defendant (In the District Court, City and County of Denver, Colorado, Case No. 2012-CV-2055) [Report & Supplemental Report]

4. Fort Apache Energy, Inc. and Drilling Risk Management, Inc., Plaintiffs v. <u>Gemini Insurance Company, Berkeley Oil & Gas Specialty Services, LLC</u>, OCB Interests, L.L.C. f/k/a BC Johnson Associates a Unit of the Specialized Loss Adjusting Division of York Risk Services Ground, Inc., and J.H. Blades & Co., Inc., Defendants (In the 216th District Court of Kendall County, Texas, Case No. 12-066) [Designation]

5. <u>Choice Exploration Inc.; LLOG Exploration Company, LLC; LLOG Exploration Texas, LP; Seidler Oil & Gas, LP; Overlord Energy Investments, LLC; Henderson Group, Inc.; Russo Exploration, LLC; Oil2 Eisenhower Prospect, LP; & Big "6" Drilling Company, Plaintiffs</u> v. Weatherford U.S., LP; Weatherford International, Inc.; Weatherford Artificial Lift Systems, Inc.; Freudenberg Oil & Gas, LLC; MWW-MDV Operations, LP; MWW-MDV Properties, LP; MWW-GP, LLC; MDV-GP, LLC; Michael W. Ward; Michael D. Viator; Cameron International Corporation; Cameron, Inc.; & Cameron Solutions, Inc., Defendants (In the 269th District Court of Harris County, Texas, Cause No. 2013-18463) [Report, Supplemental Report & Deposition]

6. Bigie Lee Rhea, Plaintiff v. <u>Apache Corporation, Defendant</u> (In the United States District Court for the Eastern District of Oklahoma, State Case No. CJ-2014-170) [Affidavits, Report & Deposition]

7. In the Matter of the Marriage of <u>K.S.L.</u> and R.R.L. (In the 408th District Court of Bexar County, Texas, Case No. 2013-CI-05201) [Affidavit]

8. Energy Services Group, Inc., Plaintiff v. <u>Quality Carriers, Inc.</u> and Reagent Chemical & Research, Inc., Defendants (In the United States District Court for the Northern District of Texas, Fort Worth Division, Civil Action No. 4:14-cv-449-A) [Report & Supplemental Report]

9. Kevin L. Jeter, Joe A. Jeter, Barbara Lucas, James H. Miller, Sharon Rigsby Miller, Larry Smith, and Janice Sue Parker, Individually and as a Class Representatives on Behalf of All Similarly-Situated Persons, Plaintiffs v. <u>Wild West Gas, LLC; Wild West Gas, Inc.; Bullseye Energy, Inc.; Fountainhead, LLC; and KRS&K, an Oklahoma General Partnership, Defendants</u> (In the United States District Court for the Northern District of Oklahoma, Case No. 12-CV-411 JHP PJC) [Report, Supplemental Report & Deposition]

Appendix B

10. Carl O. Gurecky, Plaintiff v. <u>Zachry Exploration LLC and Zachry Exploration, Ltd., Defendants</u> (In the District Court Colorado County, Texas 25th Judicial District, Cause No. 23755) [Designation]

11. Roy McMullen, Plaintiff v. <u>Quad/Graphics Marketing, LLC, Defendant</u> (In the United States District Court in and for the Eastern District of Texas, Lufkin Division, Case No. 9:15-cv-00040-MHS) [Report]

12. Elster Oil and Gas, LLC, Claimant v. <u>Extraction Oil and Gas, LLC, Respondent</u> (American Arbitration Association, Case No. 01-15-0004-0836) [Report]

13. <u>Expro Engineering, Inc., Panther City Exploration Company, LLC, and Trinity East Energy, LLC, Plaintiffs</u> v. Weatherford International, LLC and Texas CES, Inc. d/b/a Basin Tool Company, Shale Tank Truck, and Mercer Well Service, and National Oilwell DHT, LP d/b/a National Oilwell Varco DHT, LP, Defendants (In the 68th Judicial District of Dallas County, Texas, Cause No. DC-14-13868) [Report]

14. Tony R. Whisenant, on behalf of himself and all others similarly situated, Plaintiffs v. <u>Strat Land Exploration Co., Defendant</u> (In the District Court of Beaver County, State of Oklahoma, Case No. CJ-2014-4) [Report & Hearing Testimony]

15. D&D Cajun Ventures, LLC and Eileen H. Baur, Plaintiffs v. Atlantic Richfield Company; Arco Oil & Gas Co.; Vista Resources, LLC; <u>Cody Energy, LLC; Cabot Oil & Gas Corporation; Union Oil Company of California</u>; Dunhill Exploration and Production, LLC; Dune Energy, Inc.; Brammer Engineering, Inc.; Phoenix Exploration Company, LP; White Oak Energy, LLC; White Oak Operating Company, LP; <u>Newfield Exploration Company</u>; Goldking Texas, Inc.; Texaco Exploration and Production, Inc.; <u>Chevron USA, Inc.</u>; Pan-Ok Production Company, Inc.; Henry Production Company; KMC Energy, LLC; and Bay Holdings, LLC, <u>Defendants</u> (in the 15th Judicial District Court of Vermilion Parish, State of Louisiana, Case No. 87,694) [Report & Deposition]

16. Fremak Industries, Inc., Claimant v. <u>ISMT Limited, Respondent</u> (International Court of Arbitration Case No. 20784/RD) [Report & Arbitration Testimony]

17. <u>Lancaster Management Services, Inc., Plaintiff</u> v. Chad Scott Nall, individually and d/b/a Setnique Tradeshow Services, and Your Labor Management, LLC, Defendants (In the District Court of Dallas County, Texas, 298th Judicial District, Case No. DC-15-08144) [Report, Supplemental Report & Hearing Testimony]

18. Prime Natural Resources, Inc., Plaintiff v. <u>Certain Underwriters at Lloyd's London, Syndicate Numbers 2020, 1084, 2001, 457, 510, 2791, 2987, 3000, 1221, 5000, Navigators Insurance Company, UK, Defendants</u> (In the District Court of Harris County, Texas, 281st Judicial District, Cause No. 2015-51137) [Designation, Report & Deposition]

19. Certain Underwriters at Lloyd's London and Certain Insurance Companies, Manti Exploration, LP, Shoreline Southeast, LLC, Ankor E&P Holdings Corporation, Dune Properties, Inc., Manti Exploration Operating, LLC, San Isidro Development Co., LC, Leeville West Energy, LLC, CC Bay, LLC, Winn Exploration Co., Inc., C. Douglas Jamba, LLC, D&C Energy Resources, Inc., Plaintiffs v. United States Steel Corporation and United States Steel Tubular Products, Inc., Defendants. (In the District Court of Lafourche Parish, State of Louisiana, 17th Judicial District, Cause No. 125577) [Report, Supplemental Report]

20. Robert E. Lee, Jr., Hitch Land & Cattle Company, and Suzanne V. Landess, Trustee of the Suzanne V. Landess Revocable Trust, Plaintiffs v. ConocoPhillips Company, Defendant. (In the United States District Court for the Western District of Oklahoma, Case No. CIV-14-01391-D) [Report & Deposition]

21. Duncan Frank, on behalf of himself and all others similarly situated, Plaintiffs v. Crawley Petroleum Corporation, Defendant. (In the United States District Court for the Western District of Oklahoma, Case No. CIV-13-01193-R) [Report]

22. Portal Investments, LLC, Claimant v. Rival Holdings LLC, Douglas L. Johnson, Chad D. Johnson, Todd J. Johnson, Respondents. (JAMS Arbitration, Case No. 16372) [Report, Supplemental Report, Arbitration Hearing Testimony]

23. Chuck Travis Cowan, on behalf of himself and all others similarly situated, Plaintiff v. Devon Energy Corporation; and Devon Energy Production Company, LP (including affiliated predecessors and affiliated successsors), Defendants. (In the District Court of Pittsburg County, State of Oklahoma, Case No. CJ-2016-242) [Deposition]

24. Occidental Energy Marketing, Inc. and Oxy Ingleside LPG Pipeline, LLC, Plaintiffs v. NuStar Logistics, L.P., Defendant. (In the District Court of Harris County, Texas, 11th Judicial District, Cause No. 2015-39021) [Report]

25. Ryder Truck Rental, Inc., d/b/a Ryder Transportation Services, Plaintiff v. Maalt LP, et al, Defendants. (In the United States District Court for the Northern District of Texas, Dallas Division, Civ Action No. 3:15-CV-3325-N) [Report, Deposition, Trial Testimony]

26. Sutter Ranch Corporation, and Oklahoma corporation and Sutter Ranch Mineral Trust, Plaintiffs v. Cabot Oil & Gas Corporation, Lime Rock Resources, Apache Corporation, Defendants. (In the District Court of Ellis County, State of Oklahoma; Case No. CJ-2015-7) [Report]

27. Sutter Ranch Corporation, and Oklahoma corporation and Sutter Ranch Mineral Trust, Plaintiffs v. Cabot Oil & Gas Corporation, Lime Rock Resources, Apache Corporation, Defendants. (In the District Court of Ellis County, State of Oklahoma; Case No. CJ-2015-7) [Report]

28. Sutter Ranch Corporation, and Oklahoma corporation and Sutter Ranch Mineral Trust, Plaintiffs v. Cabot Oil & Gas Corporation, Lime Rock Resources, Apache Corporation, Defendants. (In the District Court of Ellis County, State of Oklahoma; Case No. CJ-2015-7) [Report]

29. KMD Operating Company, LLC, KMD Acquisitions, LLC, and California Resources Production Corporation, Claimants v. Innex California, Inc. and General Crude Company, Inc., Respondents. (Matter of Arbitration, CPR File No. G-16-32-C) [Report, Supplemental Report, Arbitration Hearing Testimony]

30. Ashcraft Group, LLC for itself and all others similarly situated, Plaintiffs v. Silver Creek Oil & Gas, LLC, Defendant. (In the United States District Court for the Eastern District of Oklahoma; Case No. 16-CV-388-RAW) [Report, Deposition]

31. Stellar Oil & Gas, LLC, Plaintiff v. BlueCrest Cosmopolitan, LLC, Defendant. (In the District Court of Harris County, Texas, 80th Judicial District, Cause No. 2017-04220) [Report]

32. Michael Kernen for himself and all others similarly situated, Plaintiffs v. Casillas Operating, LLC and Casillas Petroleum Corporation, Defendants. (In the District Court of Garvin County, State of Oklahoma, Case No. CJ-17-186) [Declaration, Deposition]

33. Antero Resources Corporation, Plaintiff v. Washington Gas Light Company and WGL Midstream, Inc., Defendants. (In the District Court of the City and County of Denver, Colorado, Case No. 2017CV33930) [Report, Supplemental Report, Updated Supplemental Report, Rebuttal Report]

34. State of Oklahoma *ex rel.,* Commissioners of the Land Office, Plaintiff v. Apache Corporation, Defendant. (In the District Court in and for Beckham County, State of Oklahoma, Case No. CJ-17-1) [Declaration]

35. Richard L. Kuffa and Denise D. Kuffa, Claimants v. Statoil USA Onshore Properties, Inc. f/k/a StatoilHydro USA Onshore Properties, Inc., Respondent. (American Arbitration Association, Scranton, Pennsylvania, Case No. 1-17-0005-6012) [Report, Deposition]

36. San Isidro Development Company, LC and San Isidro Energy Company, LLC, Plaintiffs v. BHP Billiton Petroleum Properties (N.A.), LP F/K/A Petrohawk Properties, LP, et al, Defendants. (In the 36th Judicial District Court of McMullen County, Texas, Cause No. M-15-0050-CV-C) [Disclosure]

37. Chieftain Royalty Company, for itself and all other similarly situated, Plaintiffs v. SM Energy Company (including predecessors, successors and affiliates), Enervest Energy Institutional Fund XIII-A, L.P., Enervest Energy Institutional Fund XIII-WIB, L.P., Enervest Energy Institutional Fund XIII-WIC, L.P., Enervest Operating, L.L.C. and FourPoint Energy, LLC, Defendants. (In the United States District Court for the Western District of Oklahoma, Case No. CIV-11-177-D) [Report, Supplemental Report]

38. Hitch Enterprises, Inc., on behalf of itself and all others similarly situated, Plaintiffs v. Key Production Company, Inc., Defendant (In the District Court of Texas County, Oklahoma, Case No. CJ-2017-01) [Report, Rebuttal Report, Supplemental Report]

39. Baker Hughes Oilfield Operations, LLC and Baker Petrolite, LLC, Claimant v. BlueCrest Alaska Operating LLC, Respondent. (The American Arbitration Assocation Under the Commercial Rules, Case No. 01-17-0007-3892) [Report, Reply Report]

40. Perry Cline, on behalf of himself and all others similarly situated, Plaintiff v. <u>Sunoco, Inc. (R&M) and Sunoco Partners Marketing & Terminals, LP, Defendants</u>. (In the United States District Court for the Eastern District of Oklahoma, Case No. 17-cv-00313-JHP)   [Report, Deposition, Declaration]

41. <u>Marc Marrocco and Antonio Albanese, directly and derivatively on behalf of Centurion Logistics, LLC, and directly and derivatively on behalf of Centurion Pecos Terminal, LLC, a Texas Limited Liability Company, Plaintiffs</u> v. James Ballengee, Ballengee Interests, LLC, John Calce, Chris A. Mott, Tom Ramsey, Stampede Tx Energy, LLC, Centurion Midstream Group, LLC, Centurion Terminals, LLC, Centurion Brownsville Terminal, LLC, James Hock, Vispi Jilla, and JupiterMLP, LLC, Defendants and Centurion Pecos Terminal LLC, a Texas Limited Liability Company, Nominal Defendant. (In the District Court of Dallas County, Texas, B-44th Judicial District, Cause No. DC-16-07706) [Report, Declaration]

42. Judy Grellner, on behalf of herself and all others similarly situated, Plaintiff v. <u>Devon Energy Corporation and Devon Energy Production Company, LP</u>, Defendants. (In the District Court of Pittsburgh County, State of Oklahoma, Case No. CJ-2016-242) [Declaration]

43. Chieftain Royalty Company, on behalf of himself and all others similarly situated, Plaintiff v. <u>Unit Petroleum Company</u>, Defendant. (In the District Court of LeFlore County, State of Oklahoma, Case No. CJ-2016-230) [Report, Deposition]

44. Jesus Guerra, Plaintiff v. <u>United States of America</u>, Defendant. (In the United States District Court for the Western District of Texas, El Paso Division, Case No. EP-18-CV00270-FM) [Report]

45. James Slamon, on behalf of himself and all others similarly situated, Plaintiff v. <u>Carrizo (Marcellus), LLC, Reliance Marcellus II, LLC, Reliance Holdings USA, Inc., BKV Operating LLC and BKV Chelsea, LLC</u>, Defendants. (In the United States District Court for the Middle District of Pennsylvania, Case No. 3:16-cv-02187-RDM) [Report]

Perry Cline v. Sunoco, Inc. (R&M), et al.
Documents Received by Eric Krause

| Beginning Bates Number | Ending Bates Number | Date | Document Description |
|---|---|---|---|
| Bates Numbered Documents | | | |
| PLC-000001 | PLC-000063 | | |
| SUN-CL-000001 | SUN-CL-00001341 | | |
| SUN-CL-00001342 | SUN-CL-00001353 | | |
| SUN-CL-00002321 | SUN-CL-00002332 | | |
| SUN-CL-00002508 | SUN-CL-00002565 | | |
| SUN-CL-00018775 | SUN-CL-00021448 | | |
| SUN-CL-00021485 | SUN-CL-00021486 | | |
| SUN-CL-00021487 | | | |
| SUN-CL-00021529 | SUN-CL-00021532 | | |
| Case Law & Code | | | |
| | | | 1989 OK AG 53 |
| | | | 52 OK Stat Sec 570.10 |
| | | | Federal Rule of Civil Procedure 23 |
| | | | OK Sec 735:80-1-3 |
| | | | *Texas v New Jersey* |
| | | | *Wal-Mart, Inc. v. Dukes* |
| Court Documents and Correspondence | | | |
| | | 8/14/2019 | Appendix of Exhibits to Sunoco's Response to Plaintiff's Motion to Certify Class and to Sunoco's Motion to Exclude Plaintiffs' Expert Ley with Exhibits |
| | | 8/14/2019 | Defendants' Motion to Exclude the Reports and Opinions of Plaintiff's Proposed Expert, Barbara A. Ley |
| | | 8/14/2019 | Defendants' Response to Plaintiff's Motion to Certify Class |
| | | 1/28/2019 | Expert Report of Barbara A. Ley, CPA, CITP, CFF with Exhibits and Workpapers |
| | | 10/25/2019 | Expert Report Submitted by Barbara A. Ley, CPA, CITP, CFF on Behalf of the Certified Class with Exhibits |
| | | 6/14/2019 | Motion to Certifiy Class, to Appoint Class Representative, and to Appoint Class Counsel and Brief in Support with Exhibits |
| | | 10/3/2019 | Opinion |
| | | 10/3/2019 | Order |
| | | 1/5/2018 | Plaintiff Perry Cline's Answers and Objections to Defendants' First Set of Interrogatories |
| | | 1/5/2018 | Plaintiff Perry Cline's Responses and Objections to Defendants' First Set of Requests for Production of Documents |
| | | 9/15/2017 | Plaintiff's First Set of Requests for Production of Documents, Requests for Admission, and Interrogatories to Defendant Sunoco Partners Marketing & Terminals, L.P. |
| | | 9/15/2017 | Plaintiff's First Set of Requests for Production of Documents, Requests for Admission, and Interrogatories to Defendant Sunoco, Inc. (R&M) |
| | | 7/6/2017 | Plaintiff's Original Petition |
| | | 5/31/2018 | Plaintiff's Second Set of Interrogatories and Requests for Production of Documents to Defendants Sunoco Partners Marketing & Terminals, L.P. |
| | | 5/31/2018 | Plaintiff's Second Set of Interrogatories and Requests for Production of Documents to Defendants Sunoco, Inc. (R&M) |
| | | 11/1/2019 | Preliminary Expert Report of Kraettli Q. Epperson |
| | | 5/24/2019 | Rebuttal Expert Report of Barbara A. Ley, CPA, CITP, CFF with Exhibits |
| | | 6/24/2019 | Response RE Footnote 2 found on Page 6 of Ley Rebuttal Report.pdf |
| | | 6/24/2019 | Response RE Paragraph 25 of Ley Rebuttal Report.xlsx |

Perry Cline v. Sunoco, Inc. (R&M), et al.
Documents Received by Eric Krause

| Beginning Bates Number | Ending Bates Number | Date | Document Description |
|---|---|---|---|
| | | 6/25/2018 | Sunoco Defendants' Amended Answer to Interrogatory Number 4 |
| | | 3/19/2018 | Sunoco Defendants' Amended Answers to Interrogatory Numbers 2, 3, and 6 |
| | | 8/21/2017 | Sunoco Defendants' Answer to Original Petition |
| | | 10/29/2018 | Sunoco Defendants' Objections, Answers, and Responses to Plaintiff's Fourth and Fifth Sets of Interrogatories and Third Set of Requests for Production |
| | | 9/20/2018 | Sunoco's Answers to Plaintiff's Third Set of Interrogatories |
| | | 8/3/2018 | Sunoco's First Amended Objections and Responses to Plaintiff's Second Set of Requests for Production of Documents |
| | | 8/3/2018 | Sunoco's First Amended Objections, Responses, and Answers to Plaintiff's First Set of Requests for Production of Documents |
| | | 2/14/2018 | Sunoco's First Amended Response to Requests for Admissions |
| | | 10/16/2017 | Sunoco's Objections, Responses, and Answers to Plaintiff's First Set of Requests for Production of Documents, Requests for Admissions, and Interrogatories |
| | | 7/2/2018 | Sunoco's Objections, Responses, and Answers to Plaintiff's Second Set of Interrogatories and Requests for Production of Documents |
| | | | Depositions and Exhibits |
| | | 3/14/2018 | Deposition Transcript of Alice Holland with Exhibits |
| | | 3/13/2019 | Deposition Transcript of Barbara Ley with Exhibits |
| | | 9/18/2018 | Deposition Transcript of Demi Lanceslin with Exhibits |
| | | 9/20/2018 | Deposition Transcript of Eric Koelling with Exhibits and Errata |
| | | 3/1/2018 | Deposition Transcript of Eric Koelling with Exhibits and Errata |
| | | 10/25/2018 | Deposition Transcript of Eric Koelling with Exhibits and Errata |
| | | 9/13/2018 | Deposition Transcript of Kathy Lynn Warren with Exhibits |
| | | 9/17/2018 | Deposition Transcript of Patricia Redding with Exhibits |
| | | 6/12/2018 | Deposition Transcript of Perry Loren Cline with Exhibits |
| | | 10/25/2018 | Deposition Transcript of Perry Loren Cline with Exhibits |
| | | 10/30/2018 | Deposition Transcript of Terry Oakley with Exhibits |
| | | | Publicly Available Documents |
| | | | 2017 Title Examination Standards Handbook, Oklahoma Bar Association, Article I: Title Evidence and Examination Practice, Chapter 1 |
| | | | 2019 Title Examination Standards Handbook, Oklahoma Bar Association |
| | | 4/3/2019 | Crude Oil Transportation and Services, energytransfers.com |
| | | | 2017 Title Examination Standards, OK and TX |
| | | | 1 Year LIBOR, macrotrends.net |
| | | | 3 Month Treasury Bill Rate (Secondary Market), Federal Reserve Bank of St. Louis |
| | | | Historical Prime Rate, jpmorganchase |
| | | 3/26/2019 | About Us - History of Sunoco, sunoco.com |
| | | | Audit Procedures for Unclaimed Property |
| | | 2/12/2019 | Oklahoma Corporation Commission Form 1002A regarding the Anna Lee 1-30Y Well |

Appendix C

Perry Cline v. Sunoco, Inc. (R&M), et al.
Documents Received by Eric Krause

| Beginning Bates Number | Ending Bates Number | Date | Document Description |
|---|---|---|---|
| Other Documents | | | |
| | | | PLADS_LS_VCHR_BARDEL.txt |
| | | | 20191015 Cline v Sunoco - List of BA Owners with Late Payments as of 10-....xlsx |