IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA

PERRY CLINE, on behalf of himself and all      )
others similarly situated,                     )
                                               )
               Plaintiff,                      )
                                               )
v.                                             )        Case No: 6:17-cv-313-JAG
                                               )
SUNOCO, INC. (R&M); and                        )
SUNOCO PARTNERS                                )
MARKETING & TERMINALS, L.P.,                   )
                                               )
               Defendants.                     )

## DEFENDANTS' RESPONSE TO CLASS REPRESENTATIVE'S MOTION TO STRIKE SUNOCO'S EXPERT, ERIC KRAUSE

Mark D. Christiansen OBA # 1675
**EDINGER LEONARD & BLAKLEY PLLC**
6301 N. Western Avenue, Suite 250
Oklahoma City, OK 73118
Telephone: (405) 702-9900
Fax:  (405) 605-8381
mchristiansen@elbattorneys.com

Daniel M. McClure OBA # 20414
dan.mcclure@nortonrosefulbright.com
Kevin Yankowsky (*pro hac vice*)
kevin.yankowsky@nortonrosefulbright.com
Rebecca J. Cole (*pro hac vice*)
rebecca.cole@nortonrosefulbright.com
**NORTON ROSE FULBRIGHT US LLP**
1301 McKinney, Suite 5100
Houston, TX  77010-3095
Telephone (713) 651-5151
Fax (713) 651-5246

R. Paul Yetter (*pro hac vice*)
pyetter@yettercoleman.com
Robert D. Woods (*pro hac vice*)
rwoods@yettercoleman.com
**YETTER COLEMAN LLP**
811 Main Street, Suite 4100
Houston, TX 77002
Telephone: (713).632.8000
Fax:  (713) 632.8002

**ATTORNEYS FOR DEFENDANTS**

December 9, 2019

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

FACTUAL BACKGROUND ........................................................................................... 1

LEGAL STANDARD..................................................................................................... 10

ARGUMENT .................................................................................................................. 12

    I.      No Basis Exists for Excluding Any Portion of Mr. Krause's Initial
           November 1, 2019 Expert Report. ...................................................................... 12

    II.     No Basis Exists for Excluding Mr. Krause's December 2, 2019
           Supplemental Report............................................................................................ 14

          A.     Plaintiff's Complaints Concern Only a Portion of the Supplemental
                   Report................................................................................................... 14

          B.     The Portion of the Supplemental Report of Which Plaintiff
                   Complains Does Not Meet the Standards for Exclusion. ....................... 15

                1.     The Suspense Code Data Was Not Available Prior to
                       October 31, 2019......................................................................... 15

                2.     There Was No Prejudice. ............................................................. 16

                3.     There Was No Bad Faith............................................................... 17

                4.     The Supplement Will Not "Disrupt" Trial................................... 18

CONCLUSION................................................................................................................ 19

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Baker v. Indian Prairie Community Unit, School Dist. 204,*
No. 96-3927, 1999 WL 988799 (N.D. Ill. Oct. 27, 1999) ........................................................13

*Capitol Justice LLC v. Wachovia Bank, N.A.,*
706 F. Supp. 2d 34 (D.D.C. 2009) ..............................................................................13, 16, 18

*In re Complaint of C.F. Bean L.L.C.,*
841 F.3d 365 (5th Cir. 2016) ................................................................................................11

*Eugene S. v. Horizon Blue Cross Blue Shield of New Jersey,*
663 F.3d 1124 (10th Cir. 2011) ............................................................................................11

*Lab Crafters, Inc. v. Flow Safe, Inc.,*
No. CV-03-4025 .................................................................................................................17

*Minebea Co. v. Papst,*
231 F.R.D. 3 (D.D.C. 2005) .............................................................................................11, 15

*Niemi v. Lasshofer,*
770 F.3d 1131 (10th Cir. 2014) ............................................................................................14

*Nnadili v. Chevron, U.S.A., Inc.,*
Civ. No. 02–1620, 2005 WL 6271043 (D.D.C. Aug. 11, 2005) ...............................................13

*Orjias v. Stevenson,*
31 F.3d 995 (10th Cir. 1994) ................................................................................................11

*Pioneer Centres Holding Co. Employee Stock Ownership Plan & Tr. v. Alerus
Fin., N.A.,*
858 F.3d 1324 (10th Cir. 2017) ............................................................................................14

*Rodgers v. Beechcraft Corp.,*
759 F. App'x 646 (10th Cir. 2018) ........................................................................................13

*Smith v. Ford Motor Co.,*
626 F.2d 784 (10th Cir. 1980) .........................................................................................11, 19

*Talbert v. City of Chicago,*
236 F.R.D. 415 (N.D. Ill. 2006) ............................................................................................17

*Woodworker's Supply, Inc. v. Principal Mut. Life Ins. Co.,*
170 F.3d 985 (10th Cir. 1999) ..............................................................................................11

**Rules and Statutes**

52 O.S. § 5701.10(D)(1)-(2) ........................................................................................................14

Fed. R. Civ. P. 26(a)(2)(D) .......................................................................................................10

Fed. R. Civ. P. 26(a)(2)(E)........................................................................................................10

## INTRODUCTION

Plaintiff has filed a Motion to Strike Sunoco's Expert, Eric Krause (Doc. 207) ("Motion"), based on portions of a supplemental expert report prepared by Mr. Krause and served on December 2, 2019.  The Motion has no merit.  The supplement is well within the bounds of fair supplementation, and Plaintiff's assertions of bad faith and his repeated accusations of "egregious" or dilatory conduct are unfounded.  Mr. Krause's supplement causes no prejudice to Plaintiff, and will not disrupt the trial.  Simply put, there are no grounds for striking Mr. Krause.

The Court should deny the Motion.

## FACTUAL BACKGROUND

There is much to correct in the "Factual Background" provided by Plaintiff.  It is incomplete, inaccurate, and highly misleading, and largely just consists of Plaintiff's assertions and characterizations without any citation to the record.  Sunoco will do its best to set the record straight here.

Although Plaintiff asks the Court to preclude Mr. Krause from testifying altogether, the subject of the motion to strike is Mr. Krause's supplemental report served on December 2, 2019.  Contrary to what Plaintiff asserts, that supplement did not set forth "entirely new opinions."  Motion at 2.  Instead, Plaintiff's complaints about the supplement focus on Mr. Krause's disclosure of what is nothing more than a somewhat refined version of a ***previously-disclosed*** calculation applying a 6% rate of interest (as required for unmarketable title) to certain transactions rather than the 12% rate that Plaintiff's expert Ms. Ley uses.  In his report of November 1, 2019, Mr. Krause had fully explained his methodology for identifying the transactions to which he would apply the 6% rate, and even provided a preliminary calculation of the impact on Ms. Ley's damages model of applying the 6% rate to those transactions.  The supplement discloses his completed work on this discrete issue.

- 1 -

Plaintiff also misleads about the need for the supplement.  As Mr. Krause explained in his original report, he was relying on historical suspense code data from Sunoco to perform his 6% calculation, but he had not yet had a chance to utilize the data fully since it had become available to him only shortly before his report was due.  There was good reason for that—it was not simply that "Sunoco refused to produce it during the discovery period," as Plaintiff asserts (Motion at 1). The reason is that the data did not exist in useable, accessible form in Sunoco's accounting system, and it was only through a massive effort appropriately undertaken after the Court certified the class on October 3 that Sunoco was able to come up with it at all.

Plaintiff contends he requested historical suspense code data "in his initial discovery requests in 2017."  Motion at 1.  That is simply not true.  The requests for production cited by Plaintiff do not ask for historical suspense code data.  *See* Ex. 1 to Motion, at RFP Nos. 13-15. Only RFP No. 15 asked for any suspense data, but only for money "Defendant currently holds in suspense," not historical code data preceding payments already made.  Sunoco timely objected to the vagueness of these requests, but stated it would produce Oklahoma accounting payment data subject to its objections.  *See* Ex. 4 at Response to RFP Nos. 13-15.  Sunoco then produced a "complete payment accounting database" that, consistent with what Plaintiff requested and the limitations of the Sunoco system, showed only "what owners were in suspense when that data was extracted," not "the historical suspense codes that had been associated with each owner or property that had been in suspense during any time in the past or what the suspense code had been before the 'late' payment was made."  Ex. 2 at ¶ 7.  This was confirmed in a letter to Plaintiff's counsel in April 2018 and in Amended Responses served in August 2018.  *See* Ex. 3 at ¶¶ 4-5. Significantly, despite accusing Sunoco of various discovery failings in a motion to compel filed in

October 2018, Plaintiff neither contended he had actually requested historical suspense code data, nor complained he had not received it.  *Id.* at ¶ 6.

Plaintiff did eventually request the historical suspense code data—but only in a discovery request served on ***August 21, 2019***.[1]  *See* Ex. 2 to Motion, at RFP No. 37.  Plaintiff fails to mention in his Motion that Sunoco timely objected to this request.  *See* Ex. 5 at Response to RFP No. 37. And there was a very good reason for the objection:  the data ***did not exist*** in useable form at Sunoco.  As Sunoco's Eric Koelling testifies:

> Other than information on persons *currently* in suspense, . . . there was no single "data table" that would reflect the historical suspense information for each owner and property.  The PLADS system only allowed for a search by a specific owner or property, and there was no existing report that would show that information for all owners and properties on a historic basis, which would require extensive additional programming that was not currently performed or in existence.  The PLADS system was not programmed to generate such a report.

Ex. 2 at ¶ 8 (emphasis original).  Thus, "Sunoco truthfully objected that the information requested would require extensive programming not currently performed or in existence, or require electronically stored information from sources that are not reasonably accessible."  *Id.* at ¶ 9.  What is more, Plaintiff was requesting historical suspense code data for all payees for the period from January 1995 to present, even though the Court had not yet certified a class, much less one that would essentially go back to the beginning of time as Plaintiff sought.  Under all these circumstances, Sunoco quite reasonably objected that producing the data—if it could be done at

---

[1] That Plaintiff requested the historical suspense code data in a new discovery request in August 2019 is tantamount to an admission he had not previously requested it.  Underscoring this is the fact that elsewhere in the August 2019 discovery request, Plaintiff specifically noted where he considered a new request to have been "encompassed" by a previous request.  *See* Ex. 2 to Motion, at 1 n.1.  Plaintiff made no such notation in connection with his request for historical suspense codes.

all—would be unduly burdensome and not proportional to the needs of the case pre-certification. Plaintiff never moved to compel.  Ex. 3 at ¶ 9.

Plaintiff also makes much of the fact that Mr. Krause inquired to Sunoco about historical suspense code data in 2018.  Motion at 3, 8.  But as Mr. Krause explained at his deposition, he was interested in it at that point merely because it might be "partially useful" or "helpful" as a starting point for ascertaining the reason for an apparent late payment.  Ex. 10 at 67-68.  In any event, Sunoco advised him what it later told Plaintiff—that the data did not exist in any accessible form and it would be an "extremely difficult process" to try to obtain it.  *Id.* at 56, 66.

The Court certified a class on October 3, 2019.  Following certification, Sunoco worked diligently and with considerable effort to update the previously-produced payment accounting database, which Plaintiff claimed he needed in order to accomplish class notice.  Ex. 2 at ¶ 10. Now that there was a certified class with a defined scope and time period, Sunoco also sought to determine whether there was some way it could produce historical suspense code data for those within the class.  This was no easy task according to Mr. Koelling:

> I and other division order personnel consulted with Sunoco's IT Department and programmers to determine whether it was possible to engage in a programming effort to extract from PLADS or any other systems the historical suspense code information on owners paid during the relevant time frame of the class definition in some useable report or database.  I determined that such a report had never been generated in the past in the ordinary course of business.  The Sunoco programmers then studied the problem in detail and devised programming methods to attempt to extract the historical suspense code information on the identified owners and property.  A team of programmers then performed new programming that was able to extract whatever information was contained in PLADS on historical suspense codes and changes to suspense codes with respect to owners and properties during the relevant time period.  ***That programming effort was substantial and required several weeks and was not completed until the last week of October 2019.***

Ex. 2 at ¶ 11 (emphasis added).  Sunoco produced the historical suspense data on October 31, 2019, in four separate data files.  *Id.*  As Mr. Koelling attests, Sunoco performed the necessary

programming and generated the historical suspense data for all owners "as quickly as reasonably possible after the class certification of October 3, 2019." *Id.  See also* Ex. 3 at  11.

On November 1, 2019, Sunoco served Mr. Krause's original expert report. Ex. 5 to Motion. The report addressed a myriad of topics, including Ms. Ley's failure to account for and properly exclude minimum suspense and prior period adjustments from her damages model (¶¶ 31-36); false positives included within Ms. Ley's damages model (¶¶ 37-38); Ms. Ley's failure to consider various contracts or agreements that could be relevant to liability (¶¶ 39-47); her interest-on-interest calculations (¶¶ 64-67); check stub issues (¶¶ 68-72); and general issues with Ms. Ley's methodology (¶¶ 19-23).  The report also addressed Ms. Ley's inclusion in her damages model of interest allegedly owed on proceeds that had been paid to the various states pursuant to unclaimed property statutes (¶¶ 24-29), and, finally, the statutory need to use a 6% rate of interest for late payments where title had not been marketable (¶¶ 48-63).  It is this latter topic where the historical suspense code data became relevant.

When Sunoco places an interest owner in suspense, it often assigns a "suspense code" to that owner or its property.  The code, which can change over the period of suspense, provides a general approximation of the reason (or a reason) why the owner is not being paid.  As Mr. Krause explained in his November 1 report, it is not possible to rely on the codes *per se* to determine conclusively whether title was unmarketable such that the proper rate of interest is 6% rather than the 12% Ms. Ley blindly uses. Ex. 5 to Motion, at ¶¶ 50-56.  Nonetheless, Mr. Krause stated that he would rely on Sunoco's title expert, Kraettli Epperson, who offered opinions that certain codes likely denote unmarketable title, while certain others ***could*** denote unmarketable title but not necessarily (those codes are indeterminate).  *Id.* at ¶¶ 57-58.

Relying on Mr. Epperson and utilizing the historical suspense code data he had just obtained (only after Sunoco expended "significant time and programming resources" to create it for the certified class (*id.* at ¶ 49)), Mr. Krause provided a "preliminary" estimate that "at least $2.47 million of Ms. Ley's damages are associated with codes that are unmarketable title related," and that "$5.88 million of Ms. Ley's damages are associated with codes that Mr. Epperson states are not determinable based on the codes as to whether or not they are unmarketable title related." ¶¶ 59-60.  He also noted that "$8.17 million of Ms. Ley's damages are not associated with any suspense code from the historical suspense data."  *Id.* at ¶ 60.  Mr. Krause then explained that if unclaimed funds were removed from Ms. Ley's damages model, and a 6% interest rate were applied to transactions with a code that was unmarketable title code, and to 50% of the transactions associated with indeterminate codes or no codes, then the impact on Ms. Ley's damages calculation would be to reduce it from $18.4 million to approximately $14.18 million.  *Id.* at ¶ 61.

After laying out his methodology and a preliminary calculation, Mr. Krause then explained how he intended to refine the calculation to account for changes in suspense codes over time:

> This quantification is highly preliminary and will be refined going forward.  There are a number of instances in the suspense history data in which the codes change over time and as of the filing of this report, I have not completed a mapping of the codes to all the time periods.  Because the current calculations rely on the final code and the final code in the Sunoco suspense transfers is often N4 (which Mr. Epperson has concluded those are indeterminable) and are often preceded or followed by codes reflecting unmarketable title issues, the N4 codes have an out-weighted effect in terms of the applicable time periods in the calculations, rendering this preliminary value likely very conservative.  Moreover, additional work is necessary to trace the assignment of suspense between the owner-level suspense and the property-level suspense included in the data.

*Id.* at ¶ 62.  As the above shows, Mr. Krause specifically stated that his preliminary calculation was "likely very conservative," which belies Plaintiff's assertion that he could not have expected Mr. Krause's calculation to change following the November 1 report.  Motion at 15.

On November 8, 2019, Plaintiff's expert Ms. Ley served her "Rebuttal Expert Report."  Ex. 7.  For all of Plaintiff's complaints about Mr. Krause, Ms. Ley herself used her rebuttal report not merely to reply to Mr. Krause, but to make wholesale changes to her damages model and calculations.  Specifically, Ms. Ley altered her damages model by $7.1 million and reduced the number of class members by more than 20,000.  Ex. 1 at ¶ 15; Ex. 3 to Motion, at 1 n.1.  Moreover, Ms. Ley, like Mr. Krause, reserved the right to "supplement" her opinions—and she claimed the right to do this based not only on the new suspense code data, but on any "information obtained through the depositions of Mr. Krause, Mr. Epperson, or any fact witness."  Ex. 7 at ¶ 11.  Even on issues unrelated to marketable title and suspense codes, Ms. Ley indicated the "moving target" nature of *her* opinions.  *See, e.g.*, *id.* at ¶ 50 ("If Defendants identify any other instances of this occurring, my damages model will take that into account with adjusted calculations.").  In light of all this, if Mr. Krause's opinions are excluded, then Sunoco will move to exclude Ms. Ley's opinions on the very same grounds Plaintiff asserts for excluding Mr. Krause.

In her original report served October 25, Ms. Ley had invited production of the suspense code data so that she could then integrate it into her damages model.  *See* Ex. 6 at 12 ("If Defendants provide this additional requested information or otherwise identify the Untimely Payments that were delayed because of unmarketable title, I can integrate that information into my damages calculations to segregate the unmarketable title later payments and apply the 6% or 'prime interest' rate to them, as appropriate.").  After the data was produced, she purported to integrate it into her damages model in her rebuttal report while reserving the right to supplement.  Ex. 7.  She also stated that "like Mr. Krause, … my review of this new data is ongoing"; that she had used the data to form opinions; and that she was "currently working to make these links" of the suspense code data to payments in the Sunoco accounting data.  *Id.* at ¶¶ 35-38.

On December 2, 2019, Sunoco served Mr. Krause's supplemental report.  Sunoco made this disclosure ahead of Mr. Krause's scheduled deposition of December 5 in an effort to be transparent and fair.  The accusations that Sunoco's counsel told Mr. Krause to delay issuing the supplement as some sort of bad-faith gamesmanship could not be further from the truth.  As Mr. Krause explained at his deposition (Plaintiff only selectively references it), Sunoco's counsel told him on November 25 that the Court would be ruling on Sunoco's motion to clarify the very next day—as the Court had announced—and indicated he should wait for that ruling to finalize portions of his supplement that would depend on whether unclaimed proceeds were in the class or not.  Ex. 10 at 75-78, 80; Ex. 1 at ¶¶ 8-10.  Mr. Krause further explained that his supplement as a whole was *not* finalized and ready on November 26—contrary to what Plaintiff suggests—and that he continued to work on it over the ensuing days (including the Thanksgiving holiday) until it was completed and served on December 2.  Ex. 10 at 75-78, 80; Ex. 1 at ¶¶ 8-10.  Thus, there was no counsel-orchestrated effort to delay.

Plaintiff also massively overstates the effect of the supplement.  For all of Plaintiff's complaints, it might surprise the Court to learn that after Mr. Krause's refinement of the 6% calculation, his bottom line changed very little.  Indeed, Mr. Krause stated in his supplement that "my more refined analysis would reduce Ms. Ley's principal interest damages by about $3,560,225" (as compared to the original "very conservative" estimate of $2.5 million) when just taking into account transactions associated with codes Mr. Epperson identified as likely related to unmarketable title issues.[2]  Ex. 3 to Motion, at ¶ 15.  Mr. Krause also offered a slightly different

---

[2] Mr. Krause also mentions that Ms. Ley's calculation of "interest on interest" should be reduced by $2.2 million if her principal interest damages are reduced by the $3.5 million.  But it is hardly any surprise or mystery that if the principal interest damages are reduced, so too should be the interest allegedly due thereon.

way of capturing the uncertainty concerning the transactions associated with indeterminate codes or no codes. Instead of applying a 6% interest rate to 50% of those transactions as he had done previously, Mr. Krause made two calculations, one applying 6% to all such transactions and the other applying 12% to all such transactions, which resulted in a range of $27 million to $44 million. *Id.* at ¶¶ 16-17. This range simply illustrates the uncertainty in Ms. Ley's damages model. None of these updates or refinements were earth-shaking or out of step with Mr. Krause's previous disclosures, and none even remotely approach the magnitude of the changes Ms. Ley gratuitously made to her damages model in her rebuttal report. None, moreover, would leave Plaintiff unable to cross-examine Mr. Krause at trial, as Plaintiff repeatedly claims.

The supplemental report also touches on a number of other topics, most of which Plaintiff does not even mention. Some of these are new issues Ms. Ley improperly raised under the guise of her "rebuttal" report. Ex. 1 at ¶ 16. Plaintiff does complain about certain comments on unclaimed proceeds, but Mr. Krause offered these items in response to Ms. Ley's rebuttal report and in the wake of the Court's ruling on the motion to clarify, and much of this was already disclosed in his declaration on November 14 filed in support of that motion.

In all events, Sunoco agreed on November 15 to make Mr. Krause available for a deposition on December 5, even though the discovery cutoff had come and gone. Plaintiff's counsel had requested the deposition in an email on November 15 that specifically anticipated and mentioned that they expected that Mr. Krause would file a supplemental report. Ex. 11; Ex. 3 at ¶ 13. Plaintiff has thus had a chance to depose Mr. Krause on the supplement, and Plaintiff's counsel, assisted by Ms. Ley, had the opportunity to ask Mr. Krause anything about his work in this case. Ex. 1 at ¶ 13. Plaintiff's deposition of Mr. Krause eviscerates any notion he will be unfairly surprised at trial and unable to respond.

In yet another exaggeration,[3] Plaintiff complains that Mr. Krause has said he intends to perform "further work" associated with the historical suspense codes before trial. Motion at 4. This is a non-event, and Plaintiff knows it. Mr. Krause explained at his deposition that the additional work he intends to do is a summary, for illustrative purposes only, of his already-disclosed opinions. Ex. 10 at 185-86, 214-15; Ex. 1 at ¶ 12. Sunoco assumes that Plaintiff also intends to use demonstrative aids or summaries at trial—or is Plaintiff, by this Motion, foreswearing that? Mr. Krause also indicated that both he and Ms. Ley would necessarily have to revise all their calculations on all topics before trial after the opt-out period ends on December 9 and any damages attributable to opt-outs are subtracted. Ex. 1 at ¶ 17.

The Motion is much ado about nothing, and should be denied.

## LEGAL STANDARD

The Federal Rules require parties to disclose expert testimony "at the times and in the sequence that the court orders." Fed. R. Civ. P. 26(a)(2)(D). Parties must supplement these disclosures as required by Rule 26(e). Fed. R. Civ. P. 26(a)(2)(E).

Violations of Rule 26 are governed by Rule 37(c): "If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."

---

[3] The Motion is replete with exaggeration. For example, Plaintiff cryptically refers to a "corrected" version of Mr. Krause's supplemental report. But as Plaintiff knows, the "corrected" version merely corrected two numbers in a footnote. Ex. 1 at ¶ 11. Plaintiff also complains about the "back-up" materials provided in advance of Mr. Krause's deposition. Those materials consisted only of SQL code backing up the calculations in Mr. Krause's report. Ex. 1 at ¶ 8. Plaintiff complains about the timing of their disclosure, but does not actually contend that they are material or that he was unable to adequately question Mr. Krause about them. Moreover, Ms. Ley has not produced anything comparable for her work on the suspense codes. *Id.*

"Whether a failure to disclose is harmless and/or justified under Rule 37 depends upon several factors that a district court should consider in exercising its discretion." *Eugene S. v. Horizon Blue Cross Blue Shield of New Jersey*, 663 F.3d 1124, 1129 (10th Cir. 2011). Among these are "(1) the prejudice or surprise to the party against whom the testimony is offered; (2) the ability of the party to cure the prejudice; (3) the extent to which introducing such testimony would disrupt the trial; and (4) the moving party's bad faith or willfulness." *Woodworker's Supply, Inc. v. Principal Mut. Life Ins. Co.*, 170 F.3d 985, 993 (10th Cir. 1999). In the context of supplemental reports under Rule 26(e), courts also consider whether the information was available at the time of the initial report. *See Minebea Co. v. Papst*, 231 F.R.D. 3, 6 (D.D.C. 2005).

Whether a violation of Rule 26(a) is substantially justified or harmless is left to the discretion of the district court. *Woodworker's Supply, Inc.*, 170 F.3d at 993. However, "[n]otwithstanding Rule 37(c), the district court may be found to have abused its discretion if the exclusion of testimony results in fundamental unfairness in the trial of the case."[4] *Orjias v. Stevenson*, 31 F.3d 995, 1005 (10th Cir. 1994) (citing *Smith v. Ford Motor Co.*, 626 F.2d 784, 794 (10th Cir. 1980)).

---

[4] The Fifth Circuit also recognizes that exclusion of expert testimony could result in fundamental unfairness. *See In re Complaint of C.F. Bean L.L.C.*, 841 F.3d 365, 369 (5th Cir. 2016). While considering similar factors, the Fifth Circuit also looks "at the importance of the testimony" when determining whether exclusion of expert testimony as untimely is an abuse of discretion. *Id.* Given that the exclusion of an expert report could result in fundamental unfairness if the testimony was central to the claims in the case, and not on a collateral issue, this court should also consider the importance of the testimony in its analysis. *See Orjias*, 31 F.3d at 1005 (holding that exclusion of testimony on a collateral issue did not constitute fundamental unfairness).

## ARGUMENT

I.    **No Basis Exists for Excluding Any Portion of Mr. Krause's Initial November 1, 2019 Expert Report.**

Although he complains only of Mr. Krause's supplemental report—and only as to a portion thereof—Plaintiff asks this Court to exclude Mr. Krause's original expert report and preclude him from testifying altogether ***on any topic***.  That is nonsensical.  As discussed above, Mr. Krause's original expert report sets forth opinions on all manner of topics that are wholly unrelated to the suspense code calculation and the relatively minor additional material on unclaimed proceeds in rebuttal to Ms. Ley that are the focus of Plaintiff's complaints about the supplement.  *See supra* at 5 (noting the various topics covered in Mr. Krause's November 1 report).  Whatever the merits of Plaintiff's arguments for excluding those items in the supplement—and there are none—there is no basis whatsoever for excluding the opinions on ***any*** topics as set forth in the November 1 expert report.

Plaintiff argues that because Mr. Krause refined his calculation utilizing the historic suspense code data, that is somehow an admission that his original report was "materially incomplete," thereby warranting exclusion.  Motion at 9.  There are multiple flaws in this argument, however.  First, it is unsupported by any law; Plaintiff cites not a single case in which a ***supplement*** to an expert disclosure, even if improper in and of itself, retroactively rendered the ***prior*** disclosure subject to exclusion.  Second, and as just discussed, even if *arguendo* the suspense code calculation in the initial report were "incomplete," that would not somehow render the other opinions, offered on a host of unrelated topics, "incomplete."  Third, Plaintiff is simply wrong when he claims that Mr. Krause made "material" changes even to his suspense code calculation.  As shown above, he did not.  The initial report explained Mr. Krause's methodology, offered a preliminary calculation, and explained what Mr. Krause intended to do going forward once he had

a chance to work with the data in more depth.  The supplement was not a "material" change; it simply refined and finalized what was already disclosed in spades in the initial report.  There is nothing improper about that.  *See Capitol Justice LLC v. Wachovia Bank, N.A.*, 706 F. Supp. 2d 34, 38 (D.D.C. 2009) ("Rule [26(e)] anticipates that in complex litigation an expert witness may 'refine ... his or her opinion as he or she prepares for trial.'" (quoting *Nnadili v. Chevron, U.S.A., Inc.*, Civ. No. 02–1620, 2005 WL 6271043, at *1 (D.D.C. Aug. 11, 2005)).  In *Capitol Justice*, the Court held that a revised report was a proper supplement because the expert did not wholly rework the damages claim, but "used the same methodology" and "only changed the inputs and calculations to produce a more complete and accurate report."  *Id.* at 39.  So too here.  *Cf. Rodgers v. Beechcraft Corp.*, 759 F. App'x 646, 670 (10th Cir. 2018) (rejecting supplement where it made wholly new arguments, as opposed to merely "fill[ing] a gap or a previously incomplete claim or discussion in the original report"); *Baker v. Indian Prairie Community Unit, School Dist. 204*, No. 96-3927, 1999 WL 988799, *2 (N.D. Ill. Oct. 27, 1999) (striking reports containing "new conclusions which d[id] not merely correct or complete prior opinions").

Desperate, Plaintiff even argues that the Court should exclude the portion of the November 1 report that deals with suspense code calculations because Sunoco allegedly bears the burden of proof as to which transactions were delayed due to unmarketable title, and therefore, any report by Sunoco's expert concerning marketable title was supposedly due October 25.  Motion at 11-13.  This is wrong.  As Sunoco has shown elsewhere,[5] ***Plaintiff*** bears the burden to show that he and the class are entitled to 12% rather than 6% interest.  The PRSA sets up two rates that apply in a mutually exclusive manner (not a "default" rate as Plaintiff asserts), and a plaintiff

---

[5] *See* Sunoco Defendants' Pretrial Brief on Burden of Proof (Doc. 213).  Defendants incorporate the pretrial brief on burden of proof by reference.

must prove she has marketable title in order to show she is entitled to 12% interest under the statute. 52 O.S. § 5701.10(D)(1)-(2). *See, e.g.*, *Pioneer Centres Holding Co. Employee Stock Ownership Plan & Tr. v. Alerus Fin., N.A.*, 858 F.3d 1324, 1335 (10th Cir. 2017) ("Where a statute is silent on burden allocation, the ordinary default rule is that plaintiffs bear the risk of failing to prove their claims."); *Niemi v. Lasshofer*, 770 F.3d 1131, 1355 (10th Cir. 2014) ("A plaintiff bears the burden of proving his damages."). Moreover, as shown previously by Sunoco, Plaintiff and Ms. Ley herself long embraced the notion that Plaintiff bears the burden of proof on this issue. Doc. 118 at 7-8. Their eleventh-hour change of position on this topic does not mean that Sunoco had to submit any portion of Mr. Krause's report on October 25. This is especially so in the absence of any court ruling on this issue.

Finally, Plaintiff has known since November 1 that Mr. Krause had included material about marketable title in his expert report. If Plaintiff truly believed it was untimely because it should have been included in a report filed October 25, then he would have moved to exclude Mr. Krause's opinions on that topic at that time. He did not. Instead, Plaintiff waited until after taking Ms. Krause's deposition on December 5 to file what was obviously a motion to strike previously prepared and strategically held until after the deposition.

## II.   No Basis Exists for Excluding Mr. Krause's December 2, 2019 Supplemental Report.

### A.   Plaintiff's Complaints Concern Only a Portion of the Supplemental Report.

As discussed above, the supplemental report covers more than just the suspense code calculations and the minor additional material about the extremely low rate of claims made to states for property being held as unclaimed (in response to Ms. Ley's November 8 report). It covers various other topics, including the new material Ms. Ley improperly raised in her "rebuttal" report. Plaintiff makes no argument that these other aspects of the supplement should be excluded.

**B.**     **The Portion of the Supplemental Report of Which Plaintiff Complains Does Not Meet the Standards for Exclusion.**

Even a violation of Rule 26(a) does not result in exclusion when the violation was "substantially justified" or "harmless." *See supra.* Here, the supplements of which Plaintiff complains were substantially justified or harmless.

**1.**     **The Suspense Code Data Was Not Available Prior to October 31, 2019.**

In deciding whether to exclude supplemental reports under Rule 26(e) or allow them as substantially justified or harmless, courts consider whether the information was available at the time of the initial report. *See Minebea Co. v. Papst*, 231 F.R.D. 3, 6 (D.D.C. 2005). Here, as outlined above, the evidence shows that the historical suspense code data was not available prior to October 31, 2019, one day before Mr. Krause's initial report was due. And despite Plaintiff's repeated accusations, the reason it was not available was not that Sunoco simply "chose not to" produce it, or decided to "withhold" it. The reason, rather, was that the data ***did not exist*** in any kind of useable form  That changed only after Sunoco undertook heroic efforts following class certification on October 3 to find a way to program its systems to produce the data in useable form. The evidence on this point is undisputed. Ex. 2 at ¶¶ 7-11; Ex. 3 at ¶¶ 7-12.

Betraying the weakness of his position, Plaintiff feels the need to assert that he requested the historical suspense code data back at the outset of this case, in 2017. As shown above, that is simply not true. Plaintiff requested such data for the first time in August 2019. At that point, no class had been certified, much less a class as expansive as the one Plaintiffs were then proposing. Under those circumstances, Sunoco quite reasonably—and fairly—objected to producing historical suspense data, which could not be easily accomplished, if it could be accomplished at all.

As the Court is aware, the scheduling in this case is extremely compressed, with trial following just two and a half months after the order granting class certification, and expert disclosures even earlier.  Sunoco did not agree to that schedule—in fact it objected to it—but it did its level best following class certification to produce this data. Ex. 3 at ¶¶ 14-15.  It was simply not available prior to October 31.  *Id.* at ¶ 11.  And even though he had just one day with the data, Mr. Krause was able to lay out a methodology, provide a preliminary calculation, and give a roadmap as to what he intended to do to further refine his suspense code calculation.

## 2.    There Was No Prejudice.

In deciding whether to exclude, courts also consider the prejudice or surprise to the party against whom the testimony is offered.  *See supra.*  Here, there was **no** prejudice or surprise whatsoever.  As just stated, and as set forth above in detail, Mr. Krause fully explained his methodology in his initial report.  He explicitly stated he would supplement his preliminary calculation, and said just how he would do it.  Any claim of surprise, puzzlement, or confusion based on the supplement is therefore not credible, especially in light of the unprompted email request from Plaintiff's counsel on November 15 referencing an anticipated supplemental report and asking to schedule a deposition of Mr. Krause following that report.  Ex. 11.  Likewise, given the rather modest change to Mr. Krause's bottom line—and the little bit of additional factual data he added about unclaimed proceeds, which Plaintiff claims is irrelevant anyway (Motion at 17)—the supplement was not something that should leave Plaintiff unable to handle Mr. Krause on cross-examination at trial, as Plaintiff astonishingly claims.

Moreover, the fact that Plaintiff deposed Mr. Krause on December 5 and had a chance to fully explore his supplement with him eviscerates any claim of prejudice.  *See Capitol Justice LLC*, 706 F. Supp. 2d at 39-40 (even if report was not a proper supplementation, it would still not be excluded under Rule 37(c) because the untimely submission was harmless; the opposing party

"had the opportunity to depose [the expert] on his revised report and there was no disruption in the trial schedule"); *Lab Crafters, Inc. v. Flow Safe, Inc.*, No. CV-03-4025 SJF/ETB, 2007 WL 7034303, at *8 (E.D.N.Y. Oct. 26, 2007) ("Here, Lab Crafters has already had an opportunity to depose Saar as to the content of his expert report, and has done so. . . .  Accordingly, there is no prejudice to Lab Crafters by allowing Saar's expert testimony at trial.").  In fact, the evidence shows that Plaintiff's counsel fully anticipated that Mr. Krause would issue a supplemental report, and that is why they requested his deposition and set it for December 5.  Ex. 11; Ex. 3 at ¶ 13.

In addition, the very existence of the supplemental report *itself* belies any claim of prejudice.  *Talbert v. City of Chicago*, 236 F.R.D. 415, 421 (N.D. Ill. 2006) ("Allowing, as a discretionary matter, the filing of a supplemental report that fully informs the recipient of the anticipated testimony of the expert accomplishes that very purpose [of preventing surprise at trial].  So long as that decision does not entail some greater harm to the opponent of the report, sound discretion would seem to counsel allowing the supplemental report to be filed.").

Finally, per her November 8 rebuttal report, Ms. Ley has been reviewing and analyzing the suspense code data since she received it.  Ex. 7 at ¶¶ 35, 38.  To date, she has not disclosed the results of that work, but presumably she has been available to Plaintiff to consult about Mr. Krause's work, including as set forth in his supplement.  Under these circumstances, Plaintiff's claims of prejudice are just not credible.

### 3.    There Was No Bad Faith.

Bad faith is another factor courts consider in deciding whether to exclude.  *See supra*.  Like the others, this factor is also lacking here.

As demonstrated above, Sunoco has been forthcoming at every step.  When Plaintiff asked for the historical suspense data in August 2019 (which was the first time he asked for it), Sunoco explained the conundrum and asserted an objection that was as clear as a day in May.  Plaintiff did

nothing about that objection.  When Sunoco was able to obtain the historical suspense data on October 31, Sunoco promptly produced it, and Mr. Krause did his best to lay out a methodology, provide a preliminary calculation, and explain what he planned to do by way of further work. When Plaintiff asked for Mr. Krause's deposition, Sunoco agreed to it, even though the discovery cutoff had come and gone.  And when Mr. Krause finished his work with the suspense code data, Sunoco had him prepare his final conclusions in writing, in a supplemental report, so that Plaintiff would have that well ahead of his already-scheduled deposition, and certainly before trial.  This is hardly "egregious" conduct, or bad faith.

But Plaintiff is desperate, so he stretches to make all manner of accusations against Sunoco and its counsel.  Over and over, he claims that Sunoco's counsel instructed Mr. Krause to withhold an otherwise finished supplemental report.  There is absolutely nothing to this accusation, as the evidence shows.  Ex. 10 at 75-78, 80; Ex. 1 at ¶¶ 8-10.  Nor is there any credibility to Plaintiff's repeated charge that Mr. Krause has announced plans to change his opinions before trial.  Motion at 10, 18.  As Mr. Krause has explained, the only work he intends to do is to prepare an illustrative aid based on the materials he has already disclosed and new calculations to adjust for opt outs.  Ex. 10 at 185-86, 214-15; Ex. 1 at ¶¶ 12, 17.  That hardly qualifies as some sort of nefarious plan to prejudice Plaintiff.  Plaintiff knows this, but persists anyway in misleadingly attempting to make up a case of bad faith.

### 4.    The Supplement Will Not "Disrupt" Trial.

The final factor courts consider when deciding whether to exclude or allow a supplement as substantially justified or harmless is the extent to which introducing the testimony would disrupt the trial.  Plaintiff wholly misses the mark with his assertions as to this factor.  To weigh in favor of exclusion, there must be an actual disruption of the trial schedule.  *See, e.g.*, *Capitol Justice LLC*, 706 F. Supp. 2d at 40 (holding that even if an expert report was untimely, the rule 26(a)

violation was harmless because, *inter alia*, party "had the opportunity to depose [the expert] on his revised report and there was no disruption in the trial schedule." (citation omitted)); *Smith v. Ford Motor Co.*, 626 F.2d 784, 797, 799 (10th Cir. 1980) (applying same factors in determining whether to exclude testimony not listed in pretrial order; holding that when testimony is discovered mid-trial, adjourning for depositions would result in a "significant disruption of trial").  Here, Plaintiff makes no allegation that if Mr. Krause's supplemental report is not excluded, he will need a continuance of the trial setting or otherwise seek to upset the trial schedule.  Moreover, he has already deposed Mr. Krause about his supplemental report; there will be no need to adjourn mid-trial to allow a deposition.  Thus, this factor, like all the others, weighs in favor of finding that Mr. Krause's supplemental report is harmless and substantially justified.

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiff's Motion to Strike Sunoco's Expert, Eric Krause (Doc. 207).

Dated: December 9, 2019

Mark D. Christiansen OBA # 1675
**EDINGER LEONARD & BLAKLEY PLLC**
6301 N. Western Avenue, Suite 250
Oklahoma City, OK 73118
Telephone: (405) 702-9900
Fax:  (405) 605-8381
mchristiansen@elbattorneys.com

R. Paul Yetter *(pro hac vice)*
pyetter@yettercoleman.com
Robert D. Woods *(pro hac vice)*
rwoods@yettercoleman.com
**YETTER COLEMAN LLP**
811 Main Street, Suite 4100
Houston, TX 77002
Telephone: (713) 632-8000
Fax:  (713) 632-8002

*/s/ Daniel M. McClure*
Daniel M. McClure OBA # 20414
dan.mcclure@nortonrosefulbright.com
Kevin Yankowsky *(pro hac vice)*
kevin.yankowsky@nortonrosefulbright.com
Rebecca J. Cole *(pro hac vice)*
rebecca.cole@nortonrosefulbright.com
**NORTON ROSE FULBRIGHT US LLP**
1301 McKinney, Suite 5100
Houston, TX  77010-3095
Telephone (713) 651-5151
Fax (713) 651-5246

**ATTORNEYS FOR DEFENDANTS**

## CERTIFICATE OF SERVICE

I hereby certify that on this 9th day of December, 2019, I presented the foregoing to the Clerk of the Court for filing and uploading to the CM/ECF system that will send notice of electronic filing to all counsel of record, including the following:

Michael Burrage
WHITTEN BURRAGE
mburrage@whittenburragelaw.com

Bradley E. Beckworth
Jeffrey J. Angelovich
Lisa P. Baldwin
Andrew G. Pate
Trey Duck
Cody L. Hill
NIX PATTERSON, LLP
bbeckworth@nixlaw.com
jangelovich@npraustin.com
lbaldwin@nixlaw.com
dpate@nixlaw.com
tduck@nixlaw.com
codyhill@nixlaw.com
bchurchman@nixlaw.com

Susan R. Whatley
NIX PATTERSON, LLP.
swhatley@nixlaw.com

Patrick M. Ryan
Philip G. Whaley
Jason A. Ryan
Paula M. Jantzen
RYAN WHALEY COLDIRON JANTZEN
      PETERS & WEBBER PLLC
pryan@ryanwhaley.com
pwhaley@ryanwhaley.com
jryan@ryanwhaley.com
pjantzen@ryanwhaley.com

Lawrence R. Murphy, Jr.
LAWRENCE R. MURPHY, JR., P.C.
larrymurphy999@gmail.com

Robert N. Barnes
Patranell Lewis
Emily Nash Kitch
BARNES & LEWIS, LLP
208 NW 60th Street
Oklahoma City, OK 73118
rbarnes@barneslewis.com
plewis@barneslewis.com
ekitch@barneslewis.com

/s/ *Daniel M. McClure*
Daniel M. McClure