IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA

PERRY CLINE, on behalf of himself
and all others similarly situated,
                    Plaintiff,

v.                                              Civil Action No. 6:17-cv-313-JAG

SUNOCO, INC. (R&M), et al.,
                    Defendants.

## OPINION

Sunoco owes millions of dollars in interest on late payments for crude oil. Oklahoma law requires a first purchaser of crude oil—such as Sunoco—to pay promptly for the oil. If the purchaser pays late, it must pay interest to the owner of the well that produced the oil. This case involves Sunoco's failure to pay that interest.

Long ago, Sunoco decided not to pay interest on late payments. Recognizing that the law mandated interest, Sunoco has adopted a policy only to pay if the well owner requests an interest payment. Since most well owners do not know they can get the payment, few request their interest, and Sunoco keeps the money. It amounts to millions of dollars each year.

Sunoco's indifference to its obligation extends far beyond not paying what it should. Sunoco has never even bothered to figure out how much interest it owes to owners. It keeps scant records of why it made late payments. Instead, Sunoco simply keeps the money for its own use, knowing two things: that most owners will not request interest, and that eventually the owners' potential claims will die at the hands of the statute of limitations. And when that happens, Sunoco will have irrevocably pocketed the money.

In this case, a farmer named Perry Cline calls Sunoco to task on this practice.

# I.  INTRODUCTION

Perry Cline, the named plaintiff, represents a class of owners of interests in oil wells in Oklahoma.[1]  The defendants, Sunoco, Inc. (R&M), and Sunoco Partners Marketing & Terminals, L.P. (collectively, "Sunoco"), purchase crude oil from those wells, sell the oil, and pay proceeds to well owners pursuant to Oklahoma's Production Revenue Standards Act ("PRSA").  *See* Okla. Stat. tit. 52, § 570, *et seq.*  The PRSA says that, when Sunoco pays well owners late, it must pay interest on those late payments.

Cline has sued Sunoco under the PRSA for failing to pay the statutory interest on late payments it made on oil proceeds.  He also contends that Sunoco committed fraud by failing to disclose that it owed interest on those payments.

This case requires the Court to resolve several straightforward questions:  Under the PRSA, when Sunoco pays an interest owner late, must Sunoco automatically pay statutory interest owed on the late payment?  If Sunoco did not pay interest at the same time it made the late payment, does interest continue to accrue?  Does Sunoco's failure to disclose that it did not pay interest on a late payment constitute fraud?  And how much does Sunoco owe?

On December 10, 2019, the Court concluded that the PRSA requires Sunoco to make statutory interest payments automatically with the late payment.  The Court held a bench trial on the remaining issues from December 16-19, 2019.  The Court heard closing arguments on June 17, 2020.[2]  The Court now issues this Opinion to set forth its findings of fact and conclusions of law resolving the remaining questions in this case.  *See* Fed. R. Civ. P. 52(a)(1).

---

[1] Cline serves as the named representative of a class certified by the Court on October 3, 2019.  The Court uses the terms "the class" and "Cline" interchangeably.

[2] The Court delayed ruling on the case until the parties received the trial transcript and had a chance to brief the case.  Unfortunately, by the time the parties filed briefs, Coronavirus 2019

## II.  **PROCEDURAL HISTORY**

On July 7, 2017, Cline filed this case in Oklahoma state court on behalf of himself and all others similarly situated.  Cline asserts claims for a violation of the PRSA (Count One) and fraud (Count Two).  He seeks compensatory and punitive damages, and various forms of equitable relief.

Almost immediately after Cline filed suit, Sunoco removed the case to the U.S. District Court for the Eastern District of Oklahoma (Dk. No. 2) and filed its answer (Dk. No. 23).  The case moved along slowly, and, finally, on June 14, 2019, Cline moved to certify the class, appoint a class representative, and appoint class counsel.  (Dk. No. 91.)

On July 18, 2019, the Court reassigned this case to the undersigned.  (Dk. No. 97.)  Given the length of time the case had gone on, the Court set the case for trial on December 16, 2019, set a discovery cutoff of October 18, 2019, and set other pretrial deadlines.  (Dk. No. 102.)

On October 3, 2019, the Court certified the following class:

> All non-excluded persons or entities who: (1) received Untimely Payments from Defendants (or Defendants' designees) for oil proceeds from Oklahoma wells on or after July 7, 2012, and (2) who have not already been paid statutory interest on the Untimely Payments.  An "Untimely Payment" for purposes of this class definition means payment of proceeds from the sale of oil production from an oil and gas well after the statutory periods identified in Okla. Stat. tit 52, § 570.10(B)(1) (i.e., commencing not later than six (6) months after the date of first sale, and thereafter not later than the last day of the second succeeding month after the end of the month within which such production is sold).  Untimely Payments do not include: (a) payments of proceeds to an owner under Okla. Stat. tit 52, § 570.10(B)(3) (minimum pay); (b) prior period adjustments; or (c) pass-through payments.

> The persons or entiles excluded from the Class are: (1) agencies, departments, or instrumentalities of the United States of America or the State of Oklahoma; (2) publicly traded oil and gas companies and their affiliates; (3) persons or entities that Plaintiff's counsel may be prohibited from representing under Rule 1.7 of the Oklahoma Rules of Professional Conduct; and (4) officers of the court.

---

(COVID-19) had struck, and the judge could not immediately return to Oklahoma to hear oral argument.

(Dk. No. 127, at 1.)

When it became clear that the case would move forward, Sunoco adopted a number of tactics to derail the litigation. First, after the Court set the case for trial, Sunoco moved to dismiss it as moot. Sunoco had finagled its mootness argument by sending Cline an unrequested check for the amount of interest it owed him, and then, nearly two years later, claimed that the tendered check deprived him of standing. This attempt to pick him off as a plaintiff failed. (Dk. Nos. 122-23)

Second, on October 8, 2019, Sunoco moved to stay this case pending its appeal of the Court's class certification decision to the Tenth Circuit Court of Appeals, pursuant to Federal Rule of Civil Procedure 23(f). The Court denied the stay. (Dk. Nos. 131, 149-50.) On November 13, 2019, the Tenth Circuit denied Sunoco's request to appeal the Court's class certification ruling. (Dk. No. 170.)

Third, after the Court certified the class (and long after the Court set a trial date and discovery cutoff), Sunoco finally began to look through thousands of files for evidence of what it might owe. This resulted in a massive production of millions of lines of data to the plaintiff—after the plaintiff's expert report was due, and after the discovery cutoff.[3] Sunoco characterizes its search for data as heroic; in reality, Sunoco ignored its files for years because it never intended to pay much interest, and let this case sit around for three years without getting its evidence together. Notwithstanding its untimely production of millions of pieces of evidence, Sunoco scolded Cline's expert for not including it in her calculations. And Sunoco's own expert, Eric Krause, relied upon the compilation of data to file tardy reports of his own—reports that he supplemented and that

---

[3] Sunoco produced the same data to its own expert, helping to fatally delay his report, as discussed below.

4

continued to evolve to fit the defense's needs.  (*See* Dk. Nos. 207, 230, 234.)  Indeed, he even revised his opinion the weekend before the trial in this case.

Fourth, Sunoco filed a motion to "clarify" the class definition, which merely amounted to an argument to cut down the size of the class.  (Dk. No. 172.)  On November 26, 2019, the Court denied this motion.  (Dk. No. 186.)

In December, 2019, the case finally moved toward rulings on the merits.  On December 10, 2019, the Court granted Cline's motion for partial summary judgment.  (Dk. Nos. 231-32.)  The Court concluded that the PRSA requires Sunoco to pay interest at the same time it makes a late payment, and that Sunoco cannot wait for a request from the owner before paying that interest.  (*See* Dk. No. 231.)  The Court held a bench trial in this case from December 16-19, 2019, and heard closing arguments on June 17, 2020.

### III.  THE PRSA

Before reciting the facts, the Court begins by setting forth the relevant provisions of the PRSA.  In this case, Sunoco admits that it frequently makes late payments for oil.  The PRSA sets forth different interest rates on late payments, depending on the cause of the lateness.  A great deal of the evidence at trial dealt with the issue of the correct rate of interest.  The significance of the evidence in the case, therefore, only grows clear when viewed through the prism of the PRSA's requirements.

As noted above, the PRSA imposes duties on the first purchaser who buys oil or gas from an interest owner or the person holding the proceeds from the sale of the oil and gas.  Specifically, the first purchaser must pay owners their proceeds within six months from the date of first sale and within two months after the month of subsequent sales.  Okla. Stat. tit. 52, § 570.10(B)(1).  This

requirement has several exceptions, including one that allows less frequent payments for small royalties of less than $100. *See, e.g.*, *id.* §570.10(B)(3).

The Oklahoma Legislature adopted the prompt payment rule because of abusive practices by the oil industry, which frequently withheld payments from owners for a long time. *See Krug v. Helmerich & Payne, Inc.*, 362 P.3d 205, 214 (Okla. 2015). To compensate owners for delayed payment, and to provide an incentive to pay properly, the statute requires the oil industry to pay interest on late payments. When "proceeds from the sale of oil or gas production . . . are not paid prior to the end of the applicable time periods provided in" the PRSA, those proceeds "shall earn interest." Okla. Stat. tit. 52 §570.10(D)(1)-(2). "Except as otherwise provided in paragraph 2 of this subsection [regarding late payments due to marketable title]," a 12 percent interest rate applies to late payments "until the day paid." *Id.* § 570.10(D)(1). When a first purchaser or holder of proceeds does not pay proceeds due to an issue with marketable title,[4] a 6 percent interest rate applies to periods before November 1, 2018, and "the prime interest rate as reported in the Wall Street Journal" applies to periods on or after November 1, 2018.[5] *Id.* § 570.10(D)(2)(a). The interest compounds annually. One of the big fights in this case revolves around whether Sunoco owes 12 percent or 6 percent interest.

---

[4] "Marketability of title shall be determined in accordance with the title examination standards of the Oklahoma Bar Association." § 570.10(D)(2)(a). The title examination standards define "marketable title" as "one free from apparent defects, grave doubts and litigious uncertainty, and consists of both legal and equitable title fairly deducible of record." (Defs.' Ex. 26, at 12.)

[5] The lower interest rate also applies until "the holder has received an acceptable affidavit of death and heirship in conformity with Section 67 of Title 16 of the Oklahoma Statutes," or until the proceeds are interpled, as set forth in § 570.10(D)(2)(b). *See* § 570.10(D)(2)(a). The Court will refer to the lower interest rate as the 6 percent interest rate throughout this Opinion. This rate only applies until title to the interest becomes marketable. *Id.*

The PRSA also bears on Cline's argument that Sunoco committed fraud by withholding information from well owners.  The statute says that, when a first purchaser or holder of proceeds makes a payment to an owner, it must provide the owner with the following information:

1.  Lease or well identification;
2.  Month and year of sales included in the payment;
3.  Total barrels or MCF attributed to such payment;
4.  Price per barrel or MCF, including British Thermal Unit adjustment of gas sold;
5.  Total amount attributed to such payment of severance and other production taxes, with the exception of windfall profit tax;
6.  Net value of total sales attributed to such payment after taxes are deducted;
7.  Owner's interest, expressed as a decimal, in production from the property;
8.  Owner's share of the total value of sales attributed to such payment prior to any deductions;
9.  Owner's share of the sales value attributed to such payment less owner's share of the production and severance taxes; and
10.  A specific listing of the amount and purpose of any other deductions from the proceeds attributed to such payment due to the owner upon request by the owner.

Okla. Stat. tit. 52, § 570.12(A).

## IV.  FACTS

### A.  *The Parties*

#### 1.  *Sunoco*

Sunoco, Inc. (R&M) (now Sunoco (R&M), LLC) is a limited liability company that is a wholly owned subsidiary of ETP Holdco Corporation ("ETP").  Sunoco Partners Marketing & Terminals, L.P., is a limited partnership with no corporate parents.  Sunoco has a net value over $30 billion.

Sunoco buys crude oil from oil producers and sells the oil.  (Trial Tr. vol. 1, 168:11-20.) Sunoco is a first purchaser under the PRSA.  (*Id.* 77:7-10, 85:21 to 86:8.)  As a first purchaser, Sunoco is a "holder" of the oil proceeds owed to owners until Sunoco pays the oil proceeds directly

to owners or to states as "unclaimed" property on behalf of unlocated owners. (*Id.* 77:7-13, 86:3-8, 131:8-24.)

Sunoco is not itself an oil and gas producer and does not have leases with individual landowners. (*Id.* 112:18 to 113:1, 177:7-9.) Rather, "operators" typically extract the oil from the ground and, pursuant to contracts, convey it to Sunoco.[6] Sunoco then pays owners their proceeds directly. (*Id.* 86:3-8, 191:2-14.) Sunoco has paid thousands of owners across the United States. (*Id.* 178:3-5.) In many cases, Sunoco has agreed to pay these owners pursuant to a contract with the operator.[7] (*See, e.g.*, Defs.' Ex. 29, at 3 ¶ 6.) Sunoco often relies on information provided by a well operator to pay owners their proceeds. (*See, e.g.*, Trial Tr. vol. 1, 178:6 to 181:11.) That information is not always correct. (*Id.* 171:6-14, 178:6 to 181:11.)

---

[6] Oil production has a cast of varied characters. When someone (such as Cline) owns land that may have oil on it, an exploration and production ("E&P") company leases the land to drill for and extract the oil. (Trial Tr. vol. 1, 174:22 to 175:8.) The E&P company agrees to split the proceeds from the sale of that oil with the landowner if the company can extract it. (*Id.* 175:10-13.) Usually, the landowner gets at least a one-eighth royalty and bears no costs or risk associated with drilling the well or cleaning and closing a dry hole. (*Id.* 175:14-20.) The E&P company partners with other industry players, known as working interest owners, to drill the well, and they split the remaining interest. (*Id.* 175:21-24.) One of the working interest owners is deemed the "operator." (*Id.* 175:25 to 176:2.) The operator "frequently ha[s] either a majority interest, or [it is] elected because [it is] knowledgeable and the other working interest owners respect [it]." (*Id.* 176:3-7.) The working interest owner with the largest share of the interest performs and coordinates the work, with the remaining companies sharing in the cost and risk. (*Id.* 176:8-13.) After the working interest owners extract the oil, companies such as Sunoco will enter into contracts with the operators to transport and market the oil. (*Id.* 176:24 to 177:6.) The landowner's interest may fracture over time, such as when a landowner dies or sells the interest to another individual or entity. (*Id.* 177:13 to 178:10.) Thus, it is not unusual for Sunoco to pay anywhere from tens to thousands of interest owners for oil produced from a well. (*Id.* 172:19-25.)

[7] The contracts sometimes include an indemnity agreement under which the producer or operator agrees to indemnify Sunoco for costs associated with late payments to owners. (*See* Trial Tr. vol. 1, 125:22 to 127:4.)

### 2.  *Cline and the Class*

Cline lives in Oklahoma and owns royalty interests in three oil wells.  (Dk. No. 175.)  He works as a farmer and has no training in the oil and gas industry. (Trial Tr. vol. 2, 428:2-16.) During the class period, Sunoco paid Cline royalty proceeds on all three wells; on occasion, Sunoco paid the royalties late.  (Dk. No. 175.)  Cline did not ask Sunoco to pay him interest on the late payments.  (Trial Tr. vol. 1, 257:1-4.)  At all relevant times, Sunoco had Cline's correct contact and interest information.  (*See id.* 99:8-15, 103:21 to 110:4; Pl.'s Exs. 459-60, 463.)

Cline represents a class of individuals and entities who own royalty interests in wells from which Sunoco purchased crude oil and paid proceeds late without paying interest on the proceeds. (*See* Dk. No. 127, at 1.)

### B.  *Sunoco's Conduct*

### 1.  *Late Payments*

Sunoco generally pays proceeds to owners on time.  (Trial Tr. vol. 1, 77:25 to 78:2, 222:8-14.)  On approximately one percent of its payments, however, Sunoco pays owners the proceeds late as defined by the PRSA.  (*Id.* 77:14-24, 78:3-5, 91:12-20, 222:8-14.)  Because Sunoco deals with thousands of owners, making many payments to each owner, over the years this small percentage amounts to millions of late payments.

The reasons for the late payments vary.  Sometimes, the payments are just not on time. Other times, Sunoco has an internal reason why they are late.  For example, Sunoco may suspend payment on an account if the owner has not returned a division order.[8]  (*Id.* 103:6-20.)  If Sunoco

---

[8] Sunoco uses division orders to confirm ownership and ensure accuracy of the payments. (Trial Tr. vol. 1, 186:19 to 187:11.)  Oklahoma law says that an oil company cannot withhold payments because the owner has not signed a division order.  Whether Sunoco's practices with regard to division orders violate the PRSA is not before the Court.

does not have current or accurate information either from the owner or from the producer to pay the owner, sometimes it cannot remit the funds, or it may receive a returned check.[9]  (*Id.* 186:21 to 187:11, 221:1 to 222:1, 281:4-8.)  If Sunoco does not know the identity of the interest owner, it does not remit payment to anyone and instead pays those proceeds to Texas as unclaimed funds.[10] (Trial Tr. vol. 3, 577:7-24, 578:23 to 580:8.)

When Sunoco pays owners late, it does not automatically pay statutory interest.  (Trial Tr. vol. 1, 78:6-13, 116:3-11; Pl.'s Ex. 43.)  As noted above, Sunoco only pays statutory interest when specifically requested by an owner.  (Trial Tr. vol. 1, 78:10-13, 82:20-23; Holland Dep. 55:18 to 56:16; *see, e.g.*, Pl.'s Ex. 38.)  Sunoco does not get many requests for interest each year.  (*See, e.g.*, Trial Tr. vol. 1, 83:21-24; Holland. Dep. 33:5-15; Pl.'s Ex. 62.)

Sunoco takes a haphazard approach to its obligations arising from late payments.  In fact, Sunoco has not even tried to identify every instance of a late payment in Oklahoma.  (Trial Tr. vol. 1, 79:6-7; Holland Dep. 102:5-19.)  For its millions of late payments, it says it cannot determine the amount of interest due.  This inability, however, does not arise from a lack of information.  Rather, it arises from Sunoco's unwillingness to make the effort, at the time of the late payment, to determine the cause of the lateness and the amount of interest due.  On the rare occasions when Sunoco receives a request for interest, it usually has the information it needs to calculate the amount of interest due on the late payment.  (*See, e.g.*, Trial Tr. vol. 1, 99:8-15; Holland Dep. 34:8-24.)  Sunoco employees simply look at the files for each payment to determine the reason the payment was late and whether Sunoco owes that owner 6 percent interest or 12 percent interest.

---

[9] When Sunoco gets bad owner information from a producer or operator, it generally does not tell the producer or operator.  (*See* Pl.'s Ex. 339.)

[10] Sunoco calls payments for which it has no owner information "undivided payments."

(Trial. Tr. vol. 1, 94:1 to 95:3, 223:17 to 224:7.)  One employee handles calculating interest after other employees research the request.  (*Id.* 94:1-21.)  Sunoco uses a computer program into which a Sunoco employee manually inputs information to calculate the interest.  (*Id.* 94:1 to 95:3; Holland Dep. 19:8 to 21:19; *see* Defs.' Exs. 261-79.)  When Sunoco finally gets around to paying interest, it pays the interest due only through the date Sunoco paid the proceeds to the owner. (Holland Dep. 123:7 to 124:18.)

Although Sunoco knows that it owes interest on late payments under the PRSA, it takes the position that the statute does not set forth a due date; in other words, the debt never becomes due.  Sunoco takes this position based on industry practice and the advice of counsel.  (*See, e.g.*, Trial Tr. vol. 1, 84:15-24.)

After Cline filed this lawsuit, Sunoco investigated Cline's claim for interest.  (*Id.* 98:21 to 99:17; Pl.'s Ex. 4.)  Sunoco had not paid Cline because Cline had not signed a division order and had not otherwise responded to Sunoco's communications with him.  (*Id.* 99:21 to 100:7.)  On December 19, 2017, Sunoco sent Cline a check for $1,886.54 in unpaid interest.  (Dk. No. 175; Pl.'s Exs. 4, 24.)  Sunoco applied a 12 percent interest rate compounded through the date it had paid Cline his late proceeds.  (Trial Tr. vol. 1, 99:16-20; Pl.'s Exs. 4, 24.)  When Cline did not cash the check, Sunoco sent Cline a letter asking Cline to respond and explaining that failure to respond would lead Sunoco to deem the funds as unclaimed, which could have resulted in the money going to Oklahoma's unclaimed property agency.  (Trial Tr. vol. 1, 110:9 to 111:21; Pl.'s Ex. 476.)  To date, Cline has not cashed Sunoco's check.  (Trial Tr. vol. 2, 445:10-19.)

As a result of this litigation, Sunoco has decided to stop paying proceeds and interest in Oklahoma.  (Trial Tr. vol. 1, 74:10 to 75:19.)

## 2. *The Amount of Interest Due*
### *Because of Late Payments*

Sunoco owes millions of dollars in interest on late payments.  To prove the precise amount

due, Cline relied on the expert testimony of Barbara Ley, a certified public accountant who has

extensive experience with accounting in the oil and gas industry.  (*See, e.g.*, Trial Tr. vol. 3, 493:4

to 510:15.)  Ley testified credibly, and described a thorough and defensible method of calculating

the amount due from Sunoco.  Ley received information from Sunoco to create a database of

individual owner information and to determine whether each payment was late based on that data.

(*Id.* 510:17 to 588:12.)  Sunoco's data identifies the date proceeds were sold, the date Sunoco paid

proceeds to an owner, and the amount of the proceeds.  (Trial Tr. vol. 1, 89:3-15.)  To the extent

she could, Ley checked the sale date against public records.  (Trial Tr. vol. 3, 519:4 to 520:17.)

She also reviewed depositions and other documents produced in the case, and was present in the

courtroom during the majority of the trial.  (*Id.* 505:1-24).  Sunoco agrees that Ley's data reliably

reflects the sale date, payment date, and amount of proceeds.  (Id. 90:8-20.)

Ley removed some late payments from her database because they fell outside the class

certification definition.  She did this based on Sunoco's accounting data, Sunoco's suspense

codes,[11] and discussions with class counsel and Sunoco's experts.  (*Id.* 561:9 to 570:4, 587:14 to

588:12.)  Further, Ley excluded payments made to unclaimed property funds[12] when Sunoco

issued a check to the interest owner on time.  (*Id.* 580:21 to 582:7.)  Thus, she did not include

payments to unclaimed funds if Sunoco previously sent a timely check to the owner that went

---

[11] Suspense codes are Sunoco's administrative notes about delayed payments.  In relying on Sunoco's suspense codes, Ley bent over backwards to give Sunoco the benefit of the doubt.  As discussed below, even Sunoco's own experts say that the suspense codes do not give reliable information about the reasons for late payments.

[12] Unclaimed property payments are discussed below.

uncashed.  (*Id.* 580:21 to 582:13.)   She also excluded statutory interest payments Sunoco previously made during the class period for the types of payments at issue in this case.  (*Id.* 574:15 to 575:5.)  All told, Ley only considered liability for interest on late payments falling within the class definition.  (*Id.* 589:5-17.)

Ley determined that Sunoco made 1,596,945 late payments to approximately 53,000 class members.  (*Id.* 554:8-12, 568:21 to 569:1; Pl.'s Ex. 454.)  As of December 16, 2019, Sunoco owed $74,763,113.00 in late interest payments, based on a 12 percent interest rate compounded annually.[13]  (Trial Tr. vol. 3, 571:23 to 572:5.)

### C.  *Evidence Related to Sunoco's Defenses*

#### 1.  *Unclaimed Property Funds*[14]

Sunoco says that it should not have to pay interest on proceeds it pays to unclaimed property funds.  Each state has created by statute a government agency that collects money held

---

[13] Because the actual damages in this case include amounts that will continue to compound until the Court enters judgment, the Court must explain its reference point for damages.  At trial, Cline presented a damages figure of $74,763,113.00 based on Ley's calculations.  (Trial Tr. vol. 3, 571:23 to 572:5.)  That figure represented the statutory interest due on the late payments through December 16, 2019, less interest Sunoco already paid and any opt-outs received during the class notification process as of the first day of trial.  (*Id.* 572:9 to 576:25.)  For ease, the Court will base its damages award off the $74,763,113.00 discussed during trial.  Thus, the interest owed in this case is $74,763,113.00 plus any additional interest due from December 17, 2019, to the date of this Opinion.  Further, for the reasons set forth below, the Court will apply a 12 percent interest rate to all the late payments.

After trial, however, the class administrator submitted information about additional opt-out requests and withdrawals of previously submitted opt-out requests.  Although the Court will award damages based on the figure presented at trial, the Court will require counsel to submit updated calculations before it enters the final judgment order.  Nevertheless, the Court believes it is appropriate to issue this Opinion and Order because the exclusion requests do not affect the merits of this case.  Further, Sunoco had adequate notice of the additional exclusion requests well before closing arguments in June, 2020.  Issuing this decision will stop interest from compounding and will enable counsel to provide a final damages calculation.

[14] The parties sometimes refer to these payments as "escheat" payments.

by businesses for people who cannot be found.  The agency holds the money on behalf of the true owners.

When Sunoco cannot identify or locate an owner, it eventually sends the owner's proceeds to the unclaimed property fund of the state of the owner's last known residence.  (*See, e.g.*, *id.* 131:8 to 132:21.)  For example, if someone stops cashing his or her checks and does not respond to the notice Sunoco sends, Sunoco sends the proceeds to the unclaimed agency of the owner's state.  It makes this payment after it holds the funds for a certain number of years set by state unclaimed property law.  (*Id.* 265:10 to 270:2)  If Sunoco does not know the address of the owner or the payment is an undivided payment, it pays unclaimed proceeds to Texas, Sunoco's home state.  (*Id.* 262:10-20.)  When Sunoco sends unclaimed proceeds to a state, it does not send any interest owed on those proceeds.  (*Id.* 132:22-25.)

Sunoco does not conduct an extensive search to locate unidentified or unlocated owners.  (*Id.* 137:6 to 138:8; Lanscelin Dep. 67:24 to 69:8, 70:23 to 71:02.)  Rather, if Sunoco has an address for an owner who has stopped cashing checks, it will send a division order twice to the address on file, a stale check notice, a letter notifying the owner that it may send the funds to the state as unclaimed, and a due diligence notice.  (Trial Tr. vol. 1, 135:16 to 137:5, 156:8-22.)  Sometimes people will respond to Sunoco's notices, at which point Sunoco verifies the owner's identity or ownership.  (*Id.* 271:4 to 272:3.)[15]

---

[15] Cline  offered evidence designed to show that Sunoco did not make a bona fide effort to find people before sending their proceeds to unclaimed property funds. For instance, Sunoco claimed not to know where well owner Paul Walker lived, even though he had lived at the same place for decades.  Fred Buxton, an oil producer, said that his company took many steps more than Sunoco does to find correct addresses for owners.  And Sunoco threatened to send one of Cline's interest checks to unclaimed property, even though it was in litigation with Cline, knew his address, and had frequent contact with his lawyers.  While interesting, and indicative of a lackadaisical attitude by Sunoco, this evidence does not figure in the Court's analysis.

### 2. *Unmarketable Title*

Under the PRSA, a purchaser owes only 6 percent interest if a delay in payment occurs because  the owner does not have marketable title to the oil sold.  Sunoco tried to show that many of its late payments could have stemmed from the owner's unmarketable title.

To establish unmarketability, Sunoco relied on its "suspense" codes.  When Sunoco puts a payment in suspense, it does not send the money to the owner.  Someone at the company makes a file entry reflecting one of fifty codes.  The codes are shorthand for reasons to withhold payments. As an example, Sunoco might not make a payment if the IRS had asserted a lien over the proceeds; an employee at Sunoco would then make an entry for the code relating to IRS liens.  The validity of suspense codes to establish marketability was a central issue at trial.

Sunoco called Kraettli Epperson as an expert on marketable title.  Epperson testified about the title opinion process and opined that the title examination standards do not presume marketability, but that "you have to look at the record, you have to determine in essence whether it is clear that somebody owns it."  (Trial Tr. vol. 4, 707:9-16.)  Thus, a title examiner must review a variety of records to determine whether title is marketable.  (*Id.* 708:20 to 710:11.)

Epperson did not examine any titles, and could not testify that any of the owners did not have marketable title.  He did talk about the suspense codes, and opined that some of them might mean that the owner did not have unmarketable title.  Ultimately, however, the suspense codes were, at best, "a crude surrogate" for marketability.  (*Id.* 715:5.)  They do not give a determination that title is marketable or unmarketable.  (*Id*. 718:9-14.)  As defense counsel observed at trial, Sunoco's employees prepared the codes to justify failure to make payments.  The codes are simply an administrative tool, not an indication of marketability.  (*Id.* 629:15-18.)

Epperson did not conduct a title search on property of any of the 53,000 owners to whom Sunoco made late payments.  He offered no opinion on the state of any titles at issue in this case.

### D.  Fraud

Cline offered evidence to support his claim that Sunoco had committed fraud on owners to whom it owed interest.  Essentially, Cline showed that Sunoco did not tell owners either that it owed them interest on late payments, or that it would give them interest payments if they requested it.

Sunoco did, however, provide check stubs with royalty checks.  Although they generally do not mention interest, Sunoco's check stubs do contain the information required by § 570.12.  (See, e.g., Defs.' Ex. 8; see also Closing Arg. Tr. 195:21 to 196:6.)  The check stubs, however, do not indicate: (1) that Sunoco owes the owner interest and has withheld that interest; (2) how to calculate the interest Sunoco is withholding based on the data provided; or (3) that Sunoco will pay the interest if the owner requests it.  (Trial Tr. vol. 3, 589:19 to 592:2; Pl.'s Ex. 520.)  On the occasions when Sunoco pays interest, it notes the payment on the check stub with an "interest payment" code.  (Trial Tr. vol. 3, 514:16-20; see Pl.'s Ex. 24; Defs.' Ex. 45.)

### E.  Eric Krause

Sunoco called Eric Krause to rebut Ley's testimony regarding liability and damages.  For the reasons set forth below, the Court will strike Krause's testimony.

## V.  ANALYSIS

### A.  Preliminary Matters

Before turning to the merits of the case, the Court must address two preliminary matters raised by the parties at trial and in their briefs.

*1. Class Certification*

Sunoco continues to challenge the Court's decision to certify the class.  (*See, e.g.*, Dk. No. 274, at 58-60; Dk. No. 275, at 155-65.)  The Court has had multiple opportunities to consider the propriety of class certification.  (*See* Dk. Nos. 126, 149, 186.)  For the reasons set forth in its October 3, 2019 Opinion (Dk. No. 126), the Court continues to conclude that class certification is proper in this case.  The evidence and trial testimony do not change the Court's conclusions. Nevertheless, the Court will briefly address some of Sunoco's arguments.

First, although this case requires a degree of individualized inquiry, "questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3).  The Court has resolved most of the issues in this case by interpreting provisions of the PRSA and applying that interpretation to the class as a whole.  (*See, e.g.*, Dk. No. 231.)  The trial testimony established that Sunoco followed a practice of not paying interest until it received a request from an owner.  (*See, e.g.*, Trial Tr. vol. 1, 78:6-13, 82:20-23; Holland Dep. 102:5-19.)  Ley created a methodology through which she could calculate class-wide damages based on that conduct.  (Trial Tr. vol. 3, 491:21 to 594:25; Trial Tr. vol. 4, 605:10 to 683:7.)  Further, her computer calculations identify the precise damages for each late payment for each owner of each well.

Moreover, the trial confirmed that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).  For the reasons set forth below, Cline will prevail on his breach of statutory interest claim on behalf of the class, which comprises approximately 53,000 class members and more than 1.5 million late payments.  Cline has done this through a trial that lasted approximately one week.  That outcome represents a fair and efficient way of resolving the claims without requiring individual actions.

17

In essence, Sunoco wants to force all 53,000 victims of its scheme to file independent claims, just as it has tried to compel them to make individual requests for interests. No doubt, Sunoco hopes that the owners will abandon their claims, most of which are small, rather than incur the cost and effort to take on a behemoth. Class actions exist precisely for claims such as those presented here.

Second, to the extent that Sunoco complains that it could not possibly have presented all of its defenses at trial, Sunoco had the opportunity to at least try to do so. Instead, Sunoco did not object to finishing the trial on December 19, 2019—a day before trial was scheduled to end. (Trial Tr. vol. 4, 602:16 to 603:6.) Nor did it request any additional time to try this case. It did not even begin to analyze its own data until the eve of trial.

Sunoco continues to insist that its defenses are too individualized to present in a class action. At trial, Sunoco presented a light sampling of these defenses but failed to establish that such defenses would have overwhelmed the trial.[16] Unsurprisingly, Sunoco conflates doing what is impossible with doing what is hard. No doubt, figuring out what Sunoco owes to interest owners is difficult when it has failed to comply with the PRSA for years. Had Sunoco done its homework in the years before this suit, it would have known how much interest it owes, and could have presented a compilation or summary. *See* Fed. R. Evid. 1006. Sunoco's own evidence shows that it has the ability to determine what Sunoco owes interest owners; it just does not do so until asked. Thus, Sunoco's arguments fall far short.

The Court declines to decertify the class.

---

[16] Additionally, many of the defenses did not actually rebut Cline's claims or carry Sunoco's burden.

### 2. *Motion to Strike Krause*

On December 5, 2019, Cline moved to strike the testimony and opinions of Krause, Sunoco's expert witness on damages. (Dk. No. 207.) Cline argues that Sunoco disclosed Krause's opinions late in violation of the Court's pretrial order and the Federal Rules of Civil Procedure. At trial, the Court took the motion and related objections under advisement. For the following reasons, the Court will grant the motion and sustain Cline's objections.

### a. *Background*[17]

The parties began discovery in 2017. Sunoco disclosed Krause as an expert in March, 2019. Cline contends that Krause asked Sunoco for its suspense history data in 2018. Sunoco claims that it did not refuse to produce the historical suspense data. Rather, it asserts "that the data did not exist in [usable], accessible form in Sunoco's accounting system, and it was only through a massive effort appropriately undertaken after the Court certified the class on October 3 that Sunoco was able to come up with it at all." (Dk. No. 230, at 6.) It took Sunoco several weeks to compile the data in a usable format. This argument ignores the question of why Sunoco waited until after class certification to begin to think about its exposure to damages in this case.

The Court reassigned the case to the undersigned district judge on July 18, 2019. On August 5, 2019, the Court set the discovery deadline as October 18, 2019. (Dk. No. 102, at 1.) For expert disclosures, the Court set the following deadlines: initial disclosures for the party with burden of proof on an issue were due October 25, 2019; the opposing party's disclosures were due on November 1, 2019; and rebuttal expert disclosures were due on November 8, 2019. (*Id.* at 2.)

---

[17] Because Cline filed this motion before trial, the Court summarizes the relevant facts as set forth in the parties' briefs.

Sunoco served Krause's initial expert report on November 1, 2019.  In the report, Krause explained that Sunoco provided him with the data he needed to render certain opinions on October 31, 2019, and reserved the right to supplement his opinions "once [he was] able to complete a refined study" of the data.  (Dk. No. 207-5 ¶ 49.)  Based on his preliminary review of the data, however, he could not link millions of dollars of damages in Ley's model to any suspense codes.  (*Id.* ¶ 49 n.38.)  He also opined that, even with the data, he could not determine the reason for the untimely payments. (*Id.*)

On November 8, 2019, Ley served her rebuttal expert report.  She objected to Krause's use of the suspense code information but nevertheless asserted that, if Sunoco met its burden of showing unmarketable title, she could incorporate those conclusions into her model.  (*See* Dk. No. 230-7 ¶¶ 5-9.)  She also reserved the right to supplement her report because she understood Krause's work to be ongoing.  (*Id.* ¶ 11.)

Less than three weeks before trial, Krause's expert report was not done, and his opinions were not complete.  Two weeks before trial, Krause served a supplemental report "[d]ue to the complex nature of the data and because [he] received the data one day prior to [his] report being due."  (Dk. No. 207-3 ¶ 5.)  He explained that he "did not have sufficient time by November 1 to perform a quantification of the effects to any damages resulting from a full analysis and evaluation of this data."  (*Id.*)  Nevertheless, "[i]t remain[ed] [his] opinion after a full review of the suspense history data" that Ley could not use that information to fully understand the reason for an untimely payment and whether a 6 percent or 12 percent interest rate would apply.  (*Id.*)  The report also responded to the Court's ruling on the motion to clarify.  (*Id.* ¶ 29.)  Krause's analysis reduced the damages amount by approximately $3.5 million.  (*Id.* ¶ 15.)  Krause further opined that his

damages figures would change based on work performed between completing the report and trial. (*See id.* ¶ 14.)

On December 3, 2019, Sunoco sent Cline a corrected version of Krause's supplemental report.  Sunoco served the materials supporting the report on December 4, 2019.  Cline deposed Krause on December 5, 2019, and filed the motion to strike later that day.  Sunoco contends that the "additional work [Krause] intends to do is a summary, for illustrative purposes only, of his already-disclosed opinions."  (Dk. No. 230, at 14.)

At trial, Krause testified about a number of topics, including issues related to unclaimed funds and the feasibility of using the suspense codes to determine marketable title.  (Trial Tr. vol. 4, 814:13 to 912:24; Trial Tr. vol. 5, 920:21 to 947:17.)  He also considered evidence from the Oklahoma Corporation Commission using information he downloaded from the Internet on December 15, 2019.  (Trial Tr. vol. 4, 854:19 to 858:7.)  Further, Krause testified to his own calculation of damages—a number significantly lower than Ley's calculations.  (*See, e.g.*, *id.* 885:15 to 888:22, 896:17 to 901:3.)  Cline objected to much of the testimony, including a continuing objection to the admissibility of Krause's testimony for the reasons set forth in the motion to strike.  (*See id.* 822:21 to 823:23, 839:23 to 840:13, 855:23 to 858:7, 870:11 to 872:5, 872:15 to 873:2,  875:11 to 876:4, 890:2-3, 890:18 to 891:5.)

### *b.  Legal Standard*

When a party discloses the identity of its expert witness, the party must provide a written report prepared and signed by the expert that contains "a complete statement of all opinions the witness will express and the basis and reasons for them."  Fed. R. Civ. P. 26(a)(2)(B)(i).  Parties must make these disclosures by the dates ordered by the court.  *See* Fed. R. Civ. P. 26(a)(2)(D).

A party has a duty to supplement its disclosures "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing." Fed. R. Civ. P. 26(e)(1)(A). For expert reports, the duty to supplement applies to information both included in the report and given in a deposition. *See* Fed. R. Civ. P. 26(e)(2). The disclosures, however, "must be [made] by the time the party's pretrial disclosures under Rule 26(a)(3) are due." *Id.*

Expert reports "are necessary to allow the opposing party a reasonable opportunity to prepare for effective cross examination and perhaps arrange for expert testimony from other witnesses." *Rodgers v. Beechcraft Corp.*, 759 F. App'x 646, 656 (10th Cir. 2018) (alterations and quotations omitted). A party who fails to disclose or supplement information may not use that information or witness "to supply evidence" at a trial "unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1).

"Substantial justification requires justification . . . that could satisfy a reasonable person that parties could differ as to whether the party was required to comply with the disclosure request. The proponent's position must have a reasonable basis in law and fact." *Nguyen v. IBP, Inc.*, 162 F.R.D. 675, 680 (D. Kan. 1995). A failure to disclose is harmless "when there is no prejudice to the party entitled to the disclosure." *Id.* The late-disclosing party bears the burden of establishing that the failure was substantially justified or harmless. *See id.*

A court need not make "explicit findings" about whether the failure was substantially justified or harmless. *Rodgers*, 759 F. App'x at 657. Rather, it must consider the following factors: (1) the prejudice or surprise to the party against whom the testimony is offered, (2) the ability of the party to cure the prejudice, (3) the extent to which introducing the testimony would disrupt the

trial, and (4) the moving party's bad faith or willfulness.  *See id.*  The late-disclosing party's conduct does not need to satisfy all factors to justify exclusion.  *See, e.g.*, *SFF-TIR, LLC v. Stephenson*, No. CIV 14-0369, 2020 WL 2922190, at *14 (N.D. Okla. June 3, 2020).

### c. Application

Here, Sunoco's disclosures were both late and incomplete.  Sunoco assumed that Cline had the burden of proof regarding marketability of title.  For the reasons set forth below, Sunoco bore that burden.  Thus, Sunoco should have disclosed Krause's opinions regarding marketable title on October 25, 2019.  (See Dk. No. 102.)  Even if Sunoco did not have the burden of proof, the final version of his report was over a month late.  In any event, Krause's disclosures gave Cline at best a high-level overview of Krause's opinions regarding marketable title and the reliability of Ley's methodology, but his opinions were essentially a moving target until trial.  Thus, Cline did not have "a complete statement of all opinions [Krause] [would] express and the basis and reasons for" the opinions until trial.  Fed. R. Civ. P. 26(a)(2)(B)(i).

Moreover, Sunoco had no reasonable justification to delay the production of its historical suspense data and the disclosure of Krause's opinions; it simply hoped that the case would not proceed to trial.  *See* Fed. R. Civ. P. 37(c)(1).  The Court cannot overstate the prejudice that Cline suffered and the incurable nature of that prejudice.  *See Rodgers*, 759 F. App'x at 657.  Sunoco lauds itself for transforming its suspense code data into a usable format within a few weeks of the Court's class certification decision.  But discovery had been going on for nearly two years.  To the extent that the reassignment of this case to the undersigned district judge changed the trial timeline, the parties knew a month and a half before discovery closed that this case would proceed to trial in December, 2019.  Instead of trying to complete discovery within the required timeline, Sunoco

waited to begin these efforts until the Court certified the class and rejected Sunoco's last-ditch effort to pick off the named plaintiff and moot this case.

When Sunoco finally produced key evidence, it did so after Ley's first report was due. Then, Sunoco blamed Ley for creating an allegedly unreliable model in large part because she tried to discern marketable title from Sunoco's late-produced data.   Sunoco, however, created an untenable situation for Cline—either scramble through "a big new slug of data" produced after discovery closed or risk failing to meet his burden regarding liability at trial.  (Trial Tr. vol. 4, 622:4-5.)  Cline, of course, chose the former option.  Ultimately, Ley created a well-reasoned and thorough model that she testified about at trial.

Krause continued to work with the data well past the discovery and expert deadlines, leaving Cline to guess about Krause's opinions—the exact scenario that Rule 26 and the Court's pretrial order meant to avoid.  Krause's late disclosures significantly limited the amount of time Cline's attorneys had to prepare for Krause's cross-examination and required Cline to take a deposition on the eve of trial.  Any argument that Cline knew the contours of Krause's opinions ignores the fact that Sunoco's conduct still limited class counsel's ability to fully prepare for trial and required them to expend resources completing depositions well past the discovery deadline. Much of this case now centers on the damages Sunoco owes.  Any change to the damages calculations bears on central questions in this case.  Regardless of whether Sunoco acted willfully or in bad faith, Sunoco's conduct justifies exclusion of Krause's testimony and opinions.

On a final note, even if the Court denied the motion, Krause's opinions would not tip this case in Sunoco's favor.  Most of the evidence presented through Krause's testimony rests on faulty assumptions—that Cline bore the burden to prove marketable title and that Ley created an unreliable model.  For the reasons set forth below, Sunoco, not Cline, bears the burden of proving

unmarketable title, and Ley created a reliable model that satisfies Cline's burden.   Moreover,

Krause's testimony mostly echoes what Sunoco's other witnesses have said all along—that

Sunoco's suspense codes are not reliable, and that it is too unfair to hold Sunoco liable for violating

the PRSA because it would be really hard for Sunoco to straighten it all out now.   These defenses

do not carry the day.

For the foregoing reasons, the Court will grant the motion to strike and will sustain Cline's

objections to Krause's testimony.

### B.   Count One: Breach of Statutory Obligation to Pay Interest

#### 1.   _Liability_

Cline has met his burden of proving liability by a preponderance of the evidence for the

entire class.

For the reasons set forth in the Court's December 10, 2019 Opinion, "[t]he PRSA requires

Sunoco to pay interest on late payments at the same time it makes those payments, and Sunoco

cannot require an interest owner to make a demand for payment before paying that interest."   (Dk.

No. 231, at 13.)   Sunoco's representative at trial, Eric Koelling, acknowledged that Sunoco

sometimes pays proceeds late and does not automatically remit interest with the late proceeds.

(Trial Tr. vol. 1, 77:19 to 78:9.)   Koelling also acknowledged that Sunoco generally only pays

interest when owners ask for it.   (_Id._ 78:10-13.)   Koelling further agreed that Sunoco had already

sent every class member a check for proceeds and that "there is no issue about whether those

people have a right to be paid their principal proceeds."   (_Id._ 159:3-12.)

Ignoring the evidence at trial, Sunoco says that the Court must consider the file of every

single class member—that it must conduct thousands of mini-trials.   As the Court described above,

however, Ley conducted a thorough and individual assessment of more than 1.5 million late

25

payments. (*See* Trial Tr. vol. 3, 510:17 to 588:12; Pl.'s Ex. 454.) She determined the date payment was due, and the date it was made. She calculated interest. She identified payments that fell outside of the class and excluded those payments from her calculations. (Trial Tr. vol. 3, 561:9 to 570:4, 580:21 to 582:13, 587:14 to 588:12.) This methodology proves liability by a preponderance of the evidence.

Nevertheless, Sunoco attacks Ley's method as unreliable, mainly arguing that she cannot accurately determine marketable title issues. As discussed below, Sunoco, not Cline, bears the burden of proving that it withheld payments due to title issues. Thus, Sunoco's argument that its data is unreliable merely faults Ley for being unable to meet Sunoco's burden regarding the applicable interest rate. (*See, e.g.*, Trial Tr. vol. 4, 618:8 to 634:11, 710:12 to 744:22.)[18]

Sunoco also says that Ley cannot identify payments that fall outside the class definition. Again, Sunoco fails to sufficiently challenge Ley's methodology. Sunoco primarily relies on Krause to establish that Ley's conclusions are unreliable or incorrect. Because the Court has struck his testimony, Sunoco cannot rely on his opinions. Even so, Krause did not identify any payments Ley categorized as late because they were paid outside of the six-month and two-month time frames. (Trial Tr. vol. 5, 937:3 to 938:8, 943:3-10.) Krause did find a few small errors in Ley's

---

[18] Sunoco's focus on this point also underscores a separate flaw in its argument. The PRSA requires that interest accrue at 6 percent "until such time as the title to such interest becomes marketable." § 570.10(D)(2)(a). When title is not marketable, Sunoco "is not [ ] required to pay until the other party has cleared up his title." *In re Tulsa Energy, Inc.*, 111 F.3d 88, 90 (10th Cir. 1997). Interest, however, still accrues, albeit at 6 percent. At most, the defendant's argument would reduce the amount of interest it owes, a defense on which it has the burden of proof. This litigation only focuses on interest owed on payments Sunoco already made. Thus, when Sunoco paid an owner the proceeds, Sunoco essentially determined that it was liable for that payment in some capacity.

To the extent that Sunoco argues that it sometimes paid owners as a "business decision," it has provided little concrete evidence to rebut Ley's methodology and conclusions regarding class-wide liability. (Trial Tr. vol. 1, 158:3-14.)

methodology, and relied on them to conclude that the entire model was unreliable.  (*See* Trial Tr. vol. 3, 565:20 to 566:21; Trial Tr. vol. 4, 860:13 to 861:24; Trial Tr. vol. 5, 945:8-20.)  The Court cannot resolve this case based on a hypothetical challenge.  Thus, even if the Court considered Krause's opinions, a few examples of small errors in a document spanning millions of lines of data does not undermine the credibility of Ley's testimony or methodology.

Next, relying on *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011), Sunoco tries to characterize this litigation as a "trial by spreadsheet."  In *Dukes*, the Supreme Court determined that a class certified under Rule 23(b)(2) could not seek individualized money damages for violations of Title VII of the Civil Rights Act of 1964.  The Supreme Court distinguished the class certified under Rule 23(b)(2) from one certified under Rule 23(b)(3), which "allows class certification in a much wider set of circumstances but with greater procedural protections."  *Id.* at 362.  The Court disagreed with the approach to determining liability, in which "[a] sample set of the class members would be selected, as to whom liability for sex discrimination and the backpay owing as a result would be determined in depositions supervised by a [special] master."  *Id.* at 367.  Under this approach, the special master would determine "[t]he percentage of claims . . . to be valid . . . and then . . . appl[y] [that percentage] to the entire remaining class."  *Id.*  Each class member would receive an average back pay award.

Here, the Court certified this class under Rule 23(b)(3), thereby affording the class greater protections than enjoyed by the class in *Dukes*.  Further, the class members will not receive an average damages award based on representative claims.  As explained above, Ley has examined each payment and determined liability for each class member.  Essentially, Sunoco saw a spreadsheet and cried foul.  But for the above reasons, Sunoco has not endured a "trial by spreadsheet."

Finally, Sunoco argues that Cline failed to prove that Sunoco alone caused the harm.  Under the PRSA, "[w]here royalty proceeds are paid incorrectly as a result of an error or omission, the party whose error or omission caused the incorrect royalty payments shall be liable for the additional royalty proceeds on such production and all resulting costs or damages ***incurred by the party making the incorrect payment***."[19]  § 570.10(C)(4) (emphasis added).  Under that provision's plain language, the party causing the error or omission must pay Sunoco for costs associated with the incorrect payment.  That provision, however, does not change Sunoco's obligations to pay owners on time when it undertakes the responsibility to do so.  (*See* Trial Tr. vol. 1, 85:21 to 86:8.)[20]

Here, Sunoco was a first purchaser that paid owners late during the class period.  Thus, Sunoco owes interest on those late payments.  Accordingly, Cline has established liability under Count One.

## 2. Default Interest Rate

Next, the parties dispute whether the 12 percent interest rate or the 6 percent interest rate applies by default, and which party bears the burden of proving that the non-default rate applies.

"Legislative intent controls statutory interpretation."  *Krug*, 362 P.3d at 210.  "The obvious overriding purpose of the [PRSA] is to ensure that royalty owners are timely paid their share of the proceeds.  The [Oklahoma] Legislature has followed a path of strengthening mineral owners[']

---

[19] The Court assumes for the purposes of this argument that the PRSA considers a late payment an "incorrect payment."

[20] For the same reasons, the Court rejects Sunoco's arguments regarding liability issues related to indemnity agreements.  Whether Sunoco can later recover from another party for its liability in this lawsuit is not before the Court.

rights since the [PRSA's] inception." *Id.* at 214.  Against that background, the Court reaches the unremarkable conclusion that the PRSA sets forth a 12 percent default interest rate.

Under the PRSA,

> *[e]xcept as otherwise provided in paragraph 2 of this subsection*, where proceeds from the sale of oil or gas production or some portion of such proceeds are not paid prior to the end of the applicable time periods provided in this section, *that portion not timely paid shall earn interest at the rate of twelve percent (12%) per annum* to be compounded annually"

§ 570.10(D)(1) (emphasis added).  The "paragraph 2" referred to in that provision describes when a 6 percent interest rate applies for unmarketable title.  Thus, the statute defines the 6 percent interest rate as an exception, not a rule.  *See Roberts Ranch Co. v. Exxon Corp.*, 43 F. Supp. 2d 1252, 1275 (W.D. Okla. 1997) ("[T]he only exception to the twelve percent interest provision is where the proceeds are not paid because the title to the royalties is not marketable, in which case the unpaid royalties bear interest at the annual rate of six percent (6%).")  The only question that remains, therefore, is who bears the burden of proving which interest rate applies in this case?

Sunoco argues that *Tulsa Energy* should inform the Court's analysis.  111 F.3d 88.  In *Tulsa Energy*, the Tenth Circuit considered whether the parties could waive the interest provision in a division order.  In its analysis, the Tenth Circuit explained that "[i]t is the interest owner's responsibility to establish marketable title so that he can receive proceeds."  *Id.* at 90.  The court then concluded that parties may waive the 6 percent interest rate because that rate "merely compensates the party entitled to payment for the use of his money until he can establish marketable title."  *Id.* at 91 (quotations omitted).

Here, the Court has limited the class definition to those whom Sunoco has paid proceeds but failed to pay interest.  (*See* Dk. No. 127, at 1.)  Thus, whether the class members bore the

burden of proving marketable title to receive the proceeds in the first place makes no difference. Sunoco has already remitted payments to the class in some fashion. Now, it must pay the interest.

Instead, the Court considers *Quinlan v. Koch Oil Co.*, 25 F.3d 936 (10th Cir. 1994), instructive. In *Quinlan*, the Tenth Circuit rejected the argument that the plaintiff "was not entitled to twelve percent interest because he was not legally entitled to the proceeds as he failed to show either marketable title or sign a division order." *Id.* at 939 (quotations omitted). Because no question as to marketability of title existed with regard to the plaintiff's oil interest, the Tenth Circuit explained that the PRSA "did not require [the plaintiff] to make an affirmative showing of marketable title at that time in order to be deemed 'legally entitled to the proceeds.'" *Id.* at 939-40. Further, the Tenth Circuit declined to impose a burden on the interest owner to prove marketable title for every royalty payment.

Unmarketability is, in essence, an affirmative defense. In making its argument, Sunoco agrees it owes some interest under the statute, but says that those payments falls into an exception to the general rule. The burden of proving an affirmative defense rests with the defendant. *Meacham v. Knolls Atomic Power Lab.*, 554 U.S. 84, 92 (2008); *NLRB v. Transp. Mgmt. Corp.*, 462 U.S. 393, 400 (1983); *Roberts v. Barreras*, 484 F.3d 1236, 1241 (10th Cir. 2007) ("[T]he burden of proving all affirmative defenses rests on the defendant."). The burden is not only to put the defense in issue, but also to ultimately prove it. *See Roberts*, 484 F.3d at 1241.

Sunoco's entire argument rests on its suspense codes. But its own witness called them a "crude surrogate" for issues of marketability. (*See* Trial Tr. vol. 4, 715:5.) Sunoco did not identify a single case in which an owner did not have marketable title. In fact, Sunoco has already paid owners their proceeds and has not raised any legitimate questions about marketability. Thus,

30

applying *Quinlan*'s holding more broadly, the Court concludes that the PRSA imposes the burden on Sunoco—not Cline—to prove that it withheld the payments at issue due to unmarketable title.[21]

In sum, the PRSA requires first purchasers and holders of proceeds, such as Sunoco, to pay 12 percent interest on late payments by default. The first purchaser and holder of proceeds bears the burden of proving that it withheld payment due to unmarketable title such that it only owes 6 percent interest on the late payment. Accordingly, Sunoco bore the burden of establishing that a 6 percent interest rate applied to any of the late payments at issue in this case.

### 3. *Unclaimed Funds*

The parties dispute whether (and when) Sunoco is liable for interest on unclaimed funds. Sunoco contends that it does not owe interest on these funds when it pays the funds to the state. (*See, e.g.*, Trial Tr. vol. 1, 139:9-15.)

### a. *Standing*

The class members entitled to unclaimed funds have standing to seek damages. To have standing, a plaintiff must prove (1) that he suffered an injury in fact that is "concrete and particularized and . . . actual or imminent, not conjectural or hypothetical;" (2) that the injury is "fairly traceable to the challenged action of the defendant;" and (3) that it is "likely, as opposed to merely speculative, that the injury will be redressed by the relief requested." *Tandy v. City of Wichita*, 380 F.3d 1277, 1283 (10th Cir. 2004); *see Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992).

---

[21] Sunoco has vigorously argued that its own records are too unreliable to explain why it made a late payment. If the Court interpreted the PRSA to impose on the owners the burden to prove why Sunoco withheld payment, the Court would effectively allow Sunoco to hide behind a mess of its own making, claiming innocence. Moreover, Sunoco, not the owner, is in the best position to know the reasons Sunoco made a late payment. Thus, placing the burden on the owner to prove why Sunoco made a late payment would undermine the purpose of the PRSA.

Cline has proven that all class members suffered an injury, including those entitled to unclaimed funds.  For most payments to unclaimed property funds, Sunoco knew the identity of the owner.  Even where Cline has not provided the precise identities for some class members, Ley's methodology identified late payments—payments Sunoco determined it owed to someone—on which Sunoco did not pay interest.  Moreover, Sunoco admitted that it does not pay interest when it sends proceeds to a state.  (Trial Tr. vol. 1, 132:22-25.)  As the Court explained on November 26, 2019, "the owners' right to the funds in question . . . exists, whether the owners take possession of the funds themselves or a state holds the money for them."  (Dk. No. 186, at 1.) Once the state receives the money on behalf of the individual, the owner can claim the money. *See, e.g.*, Okla. Stat. tit. 60, §§ 661, 663-64, 674-75; Tex. Prop. Code Ann. §§ 74.304, 74.501. Paying the state amounts to paying the owner or an agent or trustee on behalf of the owner.  Thus, each class member has suffered an injury because Sunoco has withheld interest it owes to the owner.

Sunoco creatively argues that those entitled to unclaimed funds do not have a concrete injury because the owners have not asked for the proceeds, and therefore, are not aggrieved by a lack of interest.  (*See* Dk. No. 274, at 22.)  This argument implies that an owner suffers no injury if the owner never realizes that Sunoco owes the owner proceeds.  No matter how one looks at it, Sunoco has kept someone else's money, a classic example of a concrete injury.  The failure to pay interest on late proceed payments—regardless of whether Sunoco has identified or located the owner—"affect[s] the [owner] in a personal and individual way," creating an injury that "actually exist[s]."  *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548 (2016), *as revised* (May 24, 2016).

Essentially, the owners of unclaimed funds suffer an injury at the moment Sunoco fails to pay interest on the late payment.  Requesting the proceeds or interest, therefore, cannot be a

precondition to suffering an injury for Sunoco's violation of the PRSA for failing to pay interest on late payments without a request.

Next, Sunoco argues that it has not caused the unidentified class members' injuries because those class members have not claimed their proceeds. (Dk. No. 274, at 23.) This argument is a thinly veiled effort to shift the blame to those who had a right to the money in the first place. The PRSA requires Sunoco to pay interest on proceeds, which Sunoco did not pay. Thus, Sunoco caused the class members' injuries. *See Nova Health Sys. v. Gandy*, 416 F.3d 1149, 1156 (10th Cir. 2005) ("Article III . . . require[s] proof of a substantial likelihood that the defendant's conduct caused plaintiff's injury in fact.").

Finally, Sunoco argues that Cline has not established redressability because "a judgment awarding interest to the owners of unclaimed proceeds likely would be of no practical benefit to them." (Dk. No. 274, at 23.) As with the injury analysis, Sunoco asks the Court to relieve it of its legal obligations because a royalty interest owner has not yet claimed the funds. This argument "misconstrue[s] the nature of [the] redressability inquiry." *Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 286 (2008). The Court must consider "whether the *injury* that a plaintiff alleges is likely to be redressed through the litigation." *Id.* at 287. The Court's judgment must "redress[ ] the plaintiff's injury . . . directly or indirectly." *Nova Health Sys.*, 416 F.3d at 1159. "[T]he requirement of redressability ensures that the injury can likely be ameliorated by a favorable decision." *S. Utah Wilderness All. v. Office of Surface Mining Reclamation & Enf't*, 620 F.3d 1227, 1233 (10th Cir. 2010).

Here, the class members' injuries occurred when Sunoco made a late payment without the required interest. An award of damages will compensate the unidentified or unlocated owners for the interest owed on those late payments. Once the relevant state receives the damages award on

33

behalf of the owner, the owner may claim that interest at any time.  At a minimum, this provides indirect relief for the injury.  *See Nova Health Sys.*, 416 F.3d at 1159.  Thus, a damages award will redress the injury that each class member suffered as a result of Sunoco's violations of the PRSA, regardless of whether the owner is identified.[22]  Accordingly, owners entitled to unclaimed funds have standing.

### b.  PRSA Language

The Court has already concluded that paying the state unclaimed property fund amounts to paying the owner or a trustee on behalf of the owner.  (Dk. No. 186.)  If Sunoco could hold proceeds without interest until it sends the proceeds to unclaimed funds, that would "contradict[ ] the purpose of the PRSA, which Oklahoma adopted to prevent exactly this kind of windfall."  (*Id.* at 4.)

Indeed, the Court's analysis regarding the interest owed on unclaimed funds begins and ends with the language of the PRSA.  Section 570.10 provides,

> ***Except as otherwise provided in this section***:
>
> 1. Proceeds from the sale of oil or gas production from an oil or gas well ***shall be paid to persons legally entitled thereto***:
>
> a. commencing not later than six (6) months after the date of first sale, and
>
> b. thereafter not later than the last day of the second succeeding month after the end of the month within which such production is sold.

§ 570.10(B)(1) (emphasis added).  The PRSA, therefore, sets forth the precise timeframes by which Sunoco must pay proceeds.  The PRSA further excepts certain payments from its timing

---

[22] Because the injuries to the unidentified or unlocated owners of unclaimed funds have already occurred, their claims are ripe for adjudication.  *See Texas v. United States*, 523 U.S. 296, 300 (1998) ("A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." (quotations omitted)).

requirements.  *See, e.g.*, § 570.10(B)(3).  Those exceptions do not include unclaimed funds.  *See World Pub'g Co. v. Miller*, 32 P.3d 829, 833 (Okla. 2001) ("Th[e] [Oklahoma Supreme] Court does not read exceptions into a statute not made by the Legislature.").  The PRSA's timing requirements, therefore, apply to unclaimed funds.

Moreover, because interest accrues "until the date paid," interest accrues until the proceeds—including interest on late payments—are paid to the relevant state.[23]  *See, e.g.*, Okla. Stat. tit. 60, §§ 661, 663-64, 674-75; Tex. Prop. Code Ann. §§ 74.304, 74.501; *see also Cockerell Oil Props., Ltd v. Unit Petroleum Co.*, No. CIV-16-135, 2020 WL 2110904, at *2 (E.D. Okla. May 4, 2020) ("The term as used in the PRSA is, therefore, found to be unambiguous and providing for the annual accrual of interest on the accumulated interest on any unpaid proceeds not paid timely under the provisions of that statute.").

Accordingly, Sunoco must pay interest on unclaimed funds from the date the interest payment is late under the PRSA through the date it remits those funds as unclaimed property to the relevant state.[24]

---

[23] Sunoco lodges a bevy of challenges related to unclaimed funds, including that unclaimed funds involve numerous individual questions and that the unclaimed funds statutes of each state conflict with the PRSA and implicate constitutional concerns.  The Court rejects those arguments. Sunoco has previously sent payments to unclaimed funds, so it can identify the state to which the payment is due.  (*See, e.g.*, 131:8 to 139:25.)  Sunoco has also summarized the period of time that must elapse before a state considers property abandoned.  (Dk. No. 275, at 98-99.)  Further, the PRSA requires Sunoco to pay proceeds on time and creates a consequence for not doing so; the unclaimed funds statutes set timelines for remitting the funds *only if Sunoco's efforts to locate owners do not work*.  Thus, despite the deadline in the unclaimed funds statutes, Sunoco remains free to try to locate and identify the owners.  Sunoco, therefore, has failed to show that (1) individual questions predominate in this regard; (2) the various states' unclaimed funds statutes conflict with the PRSA's interest payment requirements or otherwise control in this case; or (3) any purported conflicts between the PRSA timing requirements and the unclaimed funds statutes raise due process concerns.

[24] The Court rejects Sunoco's argument that it should be excused from complying with the PRSA because it relied on industry custom and could not possibly determine the applicable interest

#### 4. *Compound Interest*

Sunoco argues that once it makes the late payment to the interest owner, statutory interest stops accruing.  Cline contends that Sunoco owes compound interest until Sunoco pays the statutory interest.  Sunoco refers to this as "interest on interest," in an attempt to make it sound like something exotic or unusual.  In fact, compound interest is a common feature in investments and means simply that interest becomes part of the principal and therefore earns interest.  *See* Kate Ashford, *What is Compound Interest?*, Forbes (Aug. 12, 2020, 1:18 p.m.), https://www.forbes.com/advisor/investing/compound-interest/.

Under the PRSA,

> where proceeds from the sale of oil or gas production or some portion of such proceeds are not paid prior to the end of the applicable time periods provided in this section, that portion not timely paid shall earn interest at the rate of twelve percent (12%) per annum to be compounded annually, calculated from the end of the month in which such production is sold until the day paid.

§ 570.10(D)(1).  Essentially, Sunoco interprets "until the day paid" to mean "until the day Sunoco paid the proceeds."  Thus, Sunoco argues that it does not owe compound interest.

---

rate at the same time it makes a late payment.  Moreover, Sunoco's repeated proclamations that it simply misinterpreted the law falls short.  If Sunoco could escape liability because it misinterpreted the statute or because it believed its actions were legal because everyone else was doing it, that would undermine the remedy enacted by the Oklahoma Legislature to address the precise conduct that Sunoco has engaged in.  *Cf. Creekmore v. Pomeroy IT Sols., Inc.*, No. 10-cv-0091, 2010 WL 3702543, at *2 (N.D. Okla. Sept. 16, 2010) ("Permitting a defendant to plead ignorance of the requirements of the Testing Act would have virtually eliminated the civil remedy created by the Testing Act, and would have reserved a civil remedy only for the most extreme violations." (quotations omitted)).  Further, Sunoco presented testimony that shows that compliance may have been difficult, but it failed to establish that compliance was impossible.  Indeed, Sunoco could calculate interest when someone requested interest.  (*See, e.g.*, Trial Tr. vol. 1, 90:8-20, 99:8-15; Holland Dep. 34:8-24.)  To the extent that Sunoco argues that the PRSA is void for vagueness, the fact that Sunoco misunderstood the PRSA's requirements does not make the PRSA "so vague and indefinite as really to be no rule or standard at all."  *A.B. Small Co. v. Am. Sugar Ref. Co.*, 267 U.S. 233, 239 (1925).

The Court recently resolved this question in a different case, concluding that the plain language of the PRSA "provides for compounding of interest until the full amount—the proceeds due *and the accrued interest*—are paid in accordance with the terms of the statute," *Cockerell Oil Props.*, 2020 WL 2110904, at *1-2 (emphasis added). The Court finds *Cockerell Oil* persuasive and adopts the reasoning set forth therein. *Id.* Further, Ley's model adequately compounds interest on the payments at issue in this case. (*See, e.g.*, Trial Tr. vol. 3, 526:23 to 527:25.) Accordingly, the PRSA requires Sunoco to pay interest on interest, and Ley's model adequately calculates compound interest for the payments at issue in this case.

### C.  Count Two: Fraud

Cline has not proven fraud. Oklahoma recognizes two types of fraud—actual and constructive. "To be actionable, both actual fraud and constructive fraud require detrimental reliance by the person complaining." *Howell v. Texaco Inc.*, 112 P.3d 1154, 1161 (Okla. 2004). "Fraud is never presumed, but must be proven by clear and convincing evidence."[25] *Tice v. Tice*, 672 P.2d 1168, 1171 (Okla. 1983).

As explained above, the PRSA sets forth the information Sunoco must include when it remits payment. *See* § 570.12. "The PRSA . . . give[s] the royalty owners a right to be accurately informed of the facts and place[s] a legal duty on the [first purchasers and holders of proceeds] to accurately inform the plaintiffs of the facts on which the royalty payments are based." *Howell*, 112 P.3d at 1161. The plain language of the PRSA creates a legal duty for Sunoco to provide the information set forth in § 570.12. *See id.*

---

[25] "[C]lear and convincing evidence is the measure or degree of proof which will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegation sought to be established." *In re C.D.P.F.*, 243 P.3d 21, 23 (Okla. 2010).

Cline does not argue that Sunoco failed to comply with the PRSA's explicit requirements under § 570.12.  (Closing Arg. Tr. 196:2-6); *cf. Howell*, 112 P.3d at 1161 ("The respondents failed to include any statements or evidentiary materials in their motions for partial summary judgment showing that they complied with the PRSA.").  *Compare* § 570.12, *with* (Pl.'s Ex. 520).  Rather, Cline contends the class relied on Sunoco's "material misrepresentations and omissions to their detriment" because "[t]hey cashed the checks they received from Sunoco believing that Sunoco paid them all the monies they were owed."  (Dk. No. 272, at 43.)

The Court doubts that an additional duty exists for Sunoco to inform interest owners that it withheld interest from a late payment.  *See Wylie v. Chesser*, 173 P.3d 64, 71 (Okla. 2007) ("If a statute is plain and unambiguous and its meaning clear and no occasion exists for the application of rules of construction a statute will be accorded the meaning expressed by the language used.").  In any event, Cline has failed to establish class-wide detrimental reliance based on Sunoco's check stubs.  For instance, owners entitled to interest on unclaimed funds did not cash—and likely, did not see—the checks.  Thus, Cline has not shown that those class members have relied on the information contained on the check stubs.  *See Buford White Lumber Co. Profit Sharing & Sav. Plan & Tr. v. Octagon Props., Ltd.*, 740 F. Supp. 1553, 1570 (W.D. Okla. 1989) ("The alleged misrepresentations need not be the sole inducement which causes a party to take action, but they must be that *without which the party would not have acted*." (emphasis added)).  Moreover, the information on the check stubs allowed an owner to determine whether she had received interest and, if so, in what amount.  Accordingly, Cline has not proven class-wide detrimental reliance by clear and convincing evidence sufficient to prove fraud.

### D. Relief[26]

#### 1. Actual Damages[27]

##### a. Damages Award

For the reasons set forth above, Cline has established class-wide liability, and Sunoco must pay compound interest. Further, the Court has concluded that the PRSA applies a 12 percent interest rate to unpaid proceeds by default, and that Sunoco bears the burden of proving when a 6 percent interest rate applies. Unfortunately for Sunoco, it has failed to meet its burden of proving that 6 percent interest applies to any of the late payments.

Sunoco repeatedly emphasized that its own data cannot reliably establish why a payment was late. (See, e.g., Trial Tr. vol. 1, 222:2-7, 223:17-25.) Epperson opined that the codes were "simply a crude surrogate" for identifying payments made due to unmarketable title. (Trial Tr. vol. 4, 715:5.) He also agreed that none "of [Sunoco's] codes provide a definitively accurate determination of marketability or unmarketability without doing a more elaborate search of Sunoco's records and potentially even public records." (Id. 718:9-14.) Further, at trial, Koelling explained that the ability to locate an interest owner does not mean that the owner has marketable title. (Trial Tr. vol 1, 133:23-25.) Under that reasoning, the inverse is also true—being unable to

---

[26] Based on the post-trial briefs and closing arguments, Cline no longer seeks equitable relief if the Court awards actual and punitive damages. (See, e.g., Dk. No. 272, at 53.) Because the Court will award those damages, it will not award an accounting, disgorgement, or an injunction.

[27] Sunoco argues that "Cline . . . concedes that the actual class damages claimed at trial ($74,763,113) should be reduced by $8,033,00.60 for the 'undivided' category of unclaimed funds paid to the states and by $5,790,028 based on the Krause identification of payments associated with Epperson's 'unmarketable' suspense codes." (Dk. No. 279, at 28.) Cline, however, only agrees to reduce the damages award by those amounts if the Court concludes that Sunoco met its burden of proving unmarketable title at trial. (See Closing Arg. Tr. 16:23 to 17:2; see also Dk. No. 272, at 20.) Accordingly, the Court will consider whether Sunoco has met its burden of proving marketable title as to those two figures.

locate an interest owner does not mean that that owner has unmarketable title. Indeed, Sunoco has not proffered—nor could the Court find—any authority holding that a company's inability to locate or identify an owner makes the title to that owner's interest unmarketable per se.

In sum, Sunoco has failed to establish by a preponderance of the evidence that Sunoco withheld any of the late payments at issue due to unmarketable title. Accordingly, 12 percent interest applies to all late payments in this case.[28]

### b. Fluid Damages

Relying primarily on *Eisen v. Carlisle & Jacquelin*,[29] Sunoco contends that the presence of unidentified class members deprives Sunoco of its due process rights, making a damages award unconstitutional. (Dk. No. 274, at 49-50.) As noted above, Cline has offered evidence that questions whether many of these individuals truly cannot be located. In any event, Sunoco has misplaced its reliance on *Eisen*.

---

[28] The Court construes Sunoco's argument that the class did not mitigate its damages because owners failed to provide Sunoco with updated contact information as a challenge to the Court's class certification decision. To the extent that Sunoco also raises this argument as a challenge to liability and damages, that argument ignores that the PRSA requires Sunoco to pay interest regardless of the reason for the late payment. *See* § 570.10(D). For that same reason, the argument that a class member has waived interest by preventing payment also fails. Further, the Court rejects Sunoco's argument that some class members may have waived interest by contract. First, Sunoco did not prove by a preponderance of the evidence that the class members were parties to contracts waiving the interest requirement. Second, as explained above, the Court concludes that a 12 percent interest rate applies to all late payments in this case. In *Tulsa Energy*, the Tenth Circuit held that parties cannot waive the 12 percent interest rate for public policy reasons. 111 F.3d at 90. Although Sunoco argues that the Oklahoma Supreme Court later concluded that PRSA claims are contractual, *see Purcell v. Santa Fe Minerals*, 961 P.2d 188, 193 (Okla. 1998)— implying that a party can now waive that interest—neither the Oklahoma Supreme Court nor the Tenth Circuit have cast doubt on the holding in *Tulsa Energy*. Thus, pursuant to *Tulsa Energy*, the parties cannot waive the 12 percent interest rate requirement.

[29] 479 F.2d 1005 (2d Cir. 1973), *vacated on other grounds*, 417 U.S. 156 (1974).

*Eisen* involved a six-million-member class of individuals throughout the world who bought or sold odd lots on the New York Stock Exchange from 1962 through 1966. Millions of unidentified class members would receive notice by publication through extensive efforts. After several appeals, the district judge substituted individual claimants for "the class as a whole." *Eisen*, 479 F.2d at 1010. Under the district court's plan, after the defendants distributed the damages award to the court, counsel would continue to publish notices soliciting claims. Importantly, the U.S. Court of Appeals for the Second Circuit suspected that few individuals would ever be identified or file claims, and the court could not discern how the district court expected to disburse the remainder of the "huge residue." *Id.* at 1010-11. The Court further noted that "the expenses of giving the notices required by . . . Rule 23 and the general costs of administration of the action would exceed the amount due to the few members of the class who filed claims and the individual members of the class would get nothing." *Id.* at 1018.

This case does not present the same manageability problems at issue in *Eisen*. The Court has not substituted individual claimants with the class as a whole. Nor has Ley's methodology simply aggregated damages into one lump payment without considering Sunoco's liability to every class member. Rather, Ley has calculated individual damages through a standard methodology, and Sunoco has had the opportunity to rebut those calculations. *See McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215, 232 (2d Cir. 2008), *abrogated on other grounds by Bridge v. Phx. Bond & Indem. Co.*, 553 U.S. 639 (2008) (explaining the right to raise individual defenses against the class members "does not mean that defendants are constitutionally entitled to compel a parade of individual plaintiffs to establish damages" (quotations omitted)). Moreover, this action is far from "hopelessly unmanageable" due to the unidentified class members. *Eisen*, 479 F.2d at 1010. To

41

the extent that Cline cannot identify the owner owed the funds, Cline need only send that member's portion of the damages to the same place Sunoco remitted the underlying unclaimed funds.

Accordingly, recovery in this case does not "mask the prevalence of individual issues [such that] it is an impermissible affront to defendants' due process rights." *McLaughlin*, 522 F.3d at 232.

### 2. *Punitive Damages*[30]

Cline must clear two hurdles to receive punitive damages: first, Cline must show that Sunoco's conduct meets the standard set forth in the Energy Litigation Reform Act ("ELRA"), Okla. Stat. tit. 52, § 903; and second, Cline must show that Sunoco's conduct meets the requirements set forth in Oklahoma's punitive damages statute, Okla. Stat. tit. 23, § 9.1.

#### a. ELRA

Under the ELRA, the PRSA "provide[s] the exclusive remedy to a person entitled to proceeds from production for failure of a holder to pay the proceeds within the time periods required for payment." § 903. A plaintiff may recover punitive damages, however, if the Court determines

> upon clear and convincing evidence that the holder who failed to pay such proceeds did so with the actual, knowing[,] and willful intent: (a) to deceive the person to whom the proceeds were due, or (b) to deprive proceeds from the person the holder knows, or is aware, is legally entitled thereto.

*Id.* Cline, therefore, must first show that Sunoco's conduct overcomes the ELRA's bar to punitive damages.

---

[30] In its motion to dismiss, Sunoco argued that Cline waived his claim to punitive damages by failing to include those damages in his initial disclosures. (Dk. No. 117, at 3, 11-12.) Sunoco never moved to strike that request.

As an initial matter, Sunoco argues that the ELRA only applies to claims for "proceeds," not "interest." But "it is the failure to timely pay 'proceeds' that leads to the recovery of 'interest.'" *Cockerell Oil Props., Ltd v. Unit Petroleum Co.*, No. CIV-16-135, 2020 WL 974875, at *6 (E.D. Okla. Feb. 28, 2020), *modified on other grounds on reconsideration*, 2020 WL 2110904. Thus, the ELRA does not bar Cline's claim in that respect.

Next, the Court concludes that Sunoco acted with "the actual, knowing[,] and willful intent: . . . to deprive proceeds from the person the holder knows, or is aware, is legally entitled thereto." § 903. Sunoco says that it had a good faith belief that it did not have to pay interest automatically based in large part on industry practice. (*See* Dk. No. 274, at 46.)

As thousands of mothers have told their children, the fact that everyone does something does not make it right. Here, an industry (apparently supported by its lawyers) decided that it owes interest that it never has to pay. This myopic group-think does not excuse keeping millions of dollars of other people's money.

At trial, Koelling confirmed that Sunoco knew that it owed interest to royalty owners for the late payments. (Trial Tr. vol. 1, 82:20 to 85:19.) Sunoco also admitted that it generally waited for owners to ask for that interest rather than pay the interest automatically. (*Id.* 78:6-9, 82:20 to 83:23.) Further, Cline introduced other evidence, such as emails, that established that Sunoco is aware of its legal obligation to pay interest and its intent to keep the interest absent a request, thereby depriving owners of the interest Sunoco owed them. (*See, e.g.*, Pl.'s Ex. 38.)

Thus, Cline proved by clear and convincing evidence that Sunoco knew it owed interest payments and intentionally withheld that interest until—and unless—the owner finally asked for the interest. Accordingly, the ELRA allows punitive damages in this case.

43

b. *Oklahoma's Punitive Damages Statute*[31]

Cline seeks an award of punitive damages equal to twice the class' actual damages, or in the alternative, to the amount of the class' actual damages.

When the factfinder finds by clear and convincing evidence that the defendant acted with *reckless disregard* for the rights of others, the Court may award punitive damages equal to the amount of actual damages awarded. Okla. Stat. tit. 23, § 9.1(B). Reckless disregard requires the plaintiff to prove that the defendant "was either aware, or did not care, that there was a substantial and unnecessary risk that [its] conduct would cause serious injury to others." *Beavers v. Victorian*, 38 F. Supp. 3d 1260, 1273-74 (W.D. Okla. 2014) (quoting Okla. Unif. Civil Jury Instr. 5.6).

When the factfinder finds by clear and convincing evidence that the defendant acted intentionally with *malice* towards others, the Court may award twice the amount of actual damages. *Id.* § 9.1(C). Malice "requires that the action complained of be actuated by ill will or hatred and may be inferred from a willful action in reckless or wanton disregard for the rights of another." *Chavez v. Sears, Roebuck & Co.*, 525 F.2d 827, 830 (10th Cir. 1975).[32]

---

[31] Sunoco argues that Cline cannot recover for punitive damages pursuant to Oklahoma's punitive damages statute because the punitive damages statute only applies to actions "for the breach of an obligation not arising from contract." § 9.1(A). Sunoco says that PRSA claims are contractual in nature. The cases Sunoco relies on considered PRSA claims as contractual for the purposes of determining (1) the statute of limitations, *Purcell*, 961 P.2d at 193, and (2) whether a party owed owners interest on a settlement payment, *see Krug*, 362 P.3d at 210-13 (concluding that the PRSA was inapplicable to that case). Neither case considered whether punitive damages are available for the type of claim at issue here, and the ELRA specifically contemplates an award of punitive damages if the defendant's conduct meets its threshold requirements. *See* § 903. "Clearly, an exception exists under the [ELRA] for the availability of a punitive damage claim, should [the plaintiff] make the appropriate showing," *Cockerell Oil Props.*, 2020 WL 974875, at *6. Accordingly, § 9.1 does not bar recovery for punitive damages.

[32] *See Hamilton v. Amwar Petroleum Co.*, 769 P.2d 146, 149 (Okla. 1989) ("Showings necessary for a punitive damage award require a higher standard of culpability, i.e., fraud[,] oppression[,] or malice which is accompanied with some evil intent or recklessly wanton conduct as is deemed its equivalent in the law.").

To determine the amount of punitive damages to award, the Court must consider:

1. The seriousness of the hazard to the public arising from the defendant's misconduct;
2. The profitability of the misconduct to the defendant;
3. The duration of the misconduct and any concealment of it;
4. The degree of the defendant's awareness of the hazard and of its excessiveness;
5. The attitude and conduct of the defendant upon discovery of the misconduct or hazard;
6. In the case of a defendant which is a corporation or other entity, the number and level of employees involved in causing or concealing the misconduct; and
7. The financial condition of the defendant.

§ 9.1(A).

*Seriousness and profitability of the misconduct.* The public has suffered an enormous loss in this case. Sunoco urges the Court to consider that it pays almost all proceeds either early or on time. But as of December 16, 2019, Sunoco had withheld more than $74 million on more than 1.5 million late payments. (Trial Tr. vol. 3, 554:2-12, 572:5; Pl.'s Ex. 454.) Moreover, Sunoco withheld payments from over 50,000 class members. (Trial Tr. vol. 3, 568:21 to 569:1.) Despite that large number of class members and late payments, Sunoco does not get many requests for interest each year. (*See, e.g.*, Trial Tr. vol. 1, 83:21-24; Holland. Dep. 33:5-15; Pl.'s Ex. 62.) Thus, Sunoco has enjoyed an enormous benefit by paying owners late and then withholding interest on those late payments—particularly significant in light of the purpose of § 570.10(D). *See Krug*, 362 P.3d at 214.

*Duration of the misconduct, concealment, and awareness.* Sunoco has withheld interest until an owner asks for it for the entire class period. (*See, e.g.*, Trial Tr. vol. 1, 78:10-13, 82:20-23; Pl.'s Ex. 43.) For the reasons set forth above, the Court concludes that Sunoco did not actively conceal that it failed to pay interest to interest owners. But Sunoco knew that it owed interest on late proceeds and failed to make any effort to identify the late payments and pay the interest owed.

(Trial Tr. vol. 1, 79:4-20.)  Instead, Sunoco generally waited for a demand for payment before

paying interest.  (Trial Tr. vol. 1, 84:15 to 85:19, 116:3-6; Pl.'s Ex. 339.)

*Attitude and conduct of Sunoco after discovery.*  Outside of litigation, Sunoco still has not

tried to calculate the interest it owes on late payments or identify every late payment it has made

in Oklahoma.  (Trial Tr. vol. 1, 79:4-20.)  Further, when this Court ruled that interest was due at

the same time as the late payment, Sunoco decided to "get out of the business" of paying royalty

proceeds altogether.  (*Id.* 74:10-17.)

*Number and level of employees involved.*  Sunoco did not formally train its employees on

the PRSA requirements; they all received on-the-job training.  (*Id.* 97:19 to 98:12; Holland Dep.

67:1-11.)  Company-wide, Sunoco generally does not pay interest unless someone asks for it.

(Trial Tr. vol. 1, 82:20-23.)  In limited or "unusual" circumstances, Sunoco will pay interest

without a request.  (*Id.* 83:8-11.)

*Financial Condition.*  Sunoco's parent company is worth approximately $30 billion.[33]

(Pl.'s Ex. 440, at 169.)  In Sunoco's view, the unpaid interest "was never a significant dollar

amount to [Sunoco].  It was never something where [Sunoco was] going to make a fortune not

paying the interest."  (Trial Tr. vol. 1, 121:9-11.)

Sunoco's conduct probably reflects malice required for a punitive damages award of

double the amount of compensatory damages under § 9.1(C).  Malice here is demonstrated by a

willful action in reckless and wanton disregard of the rights of others—specifically keeping other

people's money.  Nevertheless, the Court is reluctant to impose $150 million dollars in punitive

damages.  Generally, Sunoco does a good job of paying proceeds to owners on time, at a better

---

[33] During discovery, Sunoco told Cline to look at the net worth of ETP to determine Sunoco's net worth.  (Trial Tr. vol. 5, 948:25 to 951:6.)

rate than the petroleum industry as a whole. While it bungled its system for paying interest on late payments, an award of double the amount of compensatory damages goes a bit too far.

Sunoco's conduct, however, certainly amounts to a reckless disregard of the class members' rights. *See* § 9.1(B). Sunoco knew that it owed interest on late payments, but it made no effort to identify those payments to determine the interest it owed—much less pay that interest. (Trial Tr. vol. 1, 79:4-20.) Absent this litigation, Sunoco would have deprived the class members of millions of dollars of interest indefinitely. Thus, Sunoco acted with a reckless disregard to a risk of serious harm to the class that supports an award of punitive damages. *See* § 9.1(B).

Furthermore, this award advances "the primary purpose of punitive damages"—punishing the wrongdoer and deterring similar conduct in the future. *Thiry v. Armstrong World Indus.*, 661 P.2d 515, 517 (Okla. 1983). Sunoco has had these business practices in place for decades yet is only being held accountable for late payments made on or after July 7, 2012. Nevertheless, although Sunoco may have assumed that "people didn't care that much about" more than seventy million dollars in withheld interest payments (Trial Tr. vol. 1, 93:14-19), this punitive damages award will adequately punish Sunoco for failing to comply with § 570.10(D) during the class period. Further, such an award will deter Sunoco—and companies like it—from adopting "[p]erverse and absurd statutory interpretations . . . in the name of literalism" that perpetuate the abuse that the PRSA was designed to correct. *Twisdale v. Snow*, 325 F. 3d 950, 953 (7th Cir. 2003).

Thus, pursuant to § 9.1(B), the Court will award punitive damages of $75 million dollars, an amount approximately equal to the class' actual damages.[34]

---

[34] At this time, the plaintiff has proved damages of just under $75 million. With interest added until the date of this Opinion, the Court expects the actual damages amount will exceed $75 million.

## VI.  **CONCLUSION**

For the foregoing reasons, the Court will grant the motion to strike Krause as an expert and will sustain Cline's objections to Krause's testimony at trial.  The Court will enter judgment against Sunoco as to Count One and will award the class: (1) actual damages in the amount of the interest owed on the late payments identified by Ley, amounting to $74,763,113.00 as of December 16, 2019, plus any additional interest that has accrued on each payment at a rate of 12 percent, compounding annually, from December 17, 2019, to the date of this Opinion and Order, subject to modification based on the updated exclusion requests[35]; and (2) punitive damages in the amount of $75,000,000.  The Court will not enter judgment against Sunoco as to Count Two and will not award any equitable relief.  The Court will overrule the remaining objections to the exhibits, witnesses, depositions, and other evidence.

The Court will issue an appropriate Order.

Let the Clerk send a copy of this Opinion to all counsel of record.

Date: 17 August 2020
Richmond, VA

/s/
John A. Gibney, Jr.
United States District Judge

---

[35] As explained earlier, the Court will withhold entering judgment pursuant to Federal Rule of Civil Procedure 58 until counsel provides the updated damages calculations to the Court.  This Opinion and Order, however, will serve as the judgment for the purposes of calculating the final interest due.