**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **PERRY CLINE, on behalf of** | ) | |
| **himself and all others** | ) | |
| **similarly situated,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 17-cv-313-JAG** |
| | ) | |
| **SUNOCO, INC. (R&M)** | ) | |
| **and SUNOCO PARTNERS** | ) | |
| **MARKETING & TERMINALS, L.P.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**PLAINTIFF'S MOTION FOR SANCTIONS
<u>AND COMBINED BRIEF IN SUPPORT</u>**

## TABLE OF CONTENTS

I.    INTRODUCTION ..................................................................................................1

II.    HISTORY OF SUNOCO'S LITIGATION ABUSE ..........................................2

    1.  Sunoco Misrepresented Its Proposed Discovery Schedule. ..........................3

    2.  Sunoco Tried to Bury Plaintiff with a Classic Late Document Dump. .........4

    3.  Sunoco Provided a Late and Deficient Privilege Log That Necessitated Discovery on Discovery ....................................................................................................4

    4.  Sunoco Improperly Tried to "Pick-off" Plaintiff.........................................5

    5.  Sunoco Withheld Substantial Data and Delayed Producing Its Expert Reports............6

    6.  Sunoco Filed a Baseless Motion to "Clarify" the Class Definition .............6

    7.  Sunoco Employed Ambush Tactics at Trial With Previously Undisclosed Exhibits and New Expert Opinions ...........................................................................7

    8.  Sunoco's Entire Legal Defense to the Interest Claims Was Frivolous .........................7

    9.  Sunoco Repeatedly Mispresented Facts In Its Post-Trial Motions to Attempt to Better Its Position ............................................................................................8

    10. Sunoco Continued Its Misrepresentations to the Tenth Circuit ...................9

    11. Sunoco Deployed a Frenetic String of Appeals Designed to Cause Unnecessary Delay and Needlessly Increase Costs ..........................................................9

    12. Sunoco Has Continued to Deploy Obvious Delay Tactics to Hold the Money...........10

III.   LEGAL AUTHORITY FOR SANCTIONS....................................................11

    A.  28 U.S.C. § 1927...........................................................................................11

    B.  Inherent Powers ...........................................................................................12

    C.  Calculating the Fee-Shift Sanction .............................................................14

    D.  Non-Monetary Sanctions .............................................................................16

IV.   SANCTIONS REQUESTED..........................................................................17

A.  Monetary Sanctions against Sunoco. ...........................................................................18

B.  Non-Monetary Sanctions Against Mr. McClure...........................................................20

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Biocore Med. Techs., Inc. v. Khosrowshahi*,
  1998 WL 919126 (D. Kan. Nov. 6, 1998) ................................................................. 17

*Braley v. Campbell*,
  832 F.2d 1504 (10th Cit. 1987) .............................................................................. 12

*Butler v. Biocore Med. Tech., Inc.*,
  348 F.3d 1163 (10th Cir. 2003) .......................................................................... 16, 17

*Chambers v. NASCO, Inc.*,
  501 U.S. 32 (1991) ............................................................................ 2, 13, 14, 16, 21

*Chung v. Lamb*,
  73 F.4th 824 (10th Cir. 2023) .................................................................. 12, 14, 15, 19

*Cline v. Sunoco, Inc.*,
  159 F.4th 1171 (10th Cir. 2025) ...................................................... 1, 6, 7, 9, 10, 19

*Cole v. Ruidoso Mun. Schools*,
  43 F.3d 1373 (10th Cirt. 1994) .............................................................................. 16

*Farmer v. Banco Popular N.A.*,
  791 F.3d 1246 (10th Cir. 2015) ............................................... 2, 11, 13, 14, 15, 17, 18

*Fox v. Vice*,
  563 U.S. 826 (2011) ............................................................................................ 12

*French v. American Airlines, Inc.*,
  427 Fed. App'x 666 (10th Cir. 2011; unpublished) ................................................. 17

*Frey v. Town of Jackson, Wyoming*,
  41 F.4th 1223 (10th Cir. 2022) .............................................................................. 14

*Hamilton v. Boise Cascade Exp.*,
  519 F.3d 1197 (10th Cir. 2008) .............................................................................. 15

*Obselo v. Empower Cap. Mgmt., LLC*,
  85 F.4th 991 (10th Cir. 2023) ................................................................................ 12

*Roadway Exp., Inc. v. Piper*,
  447 U.S. 752 (1980) ............................................................................................ 13

*Rubio v. BNSF Railway Co.*,
   548 F.Supp.2d 1220 (D.N.M. 2008) ................................................................ 16

*Taylor v. Nat'l Collegiate Student Loan Trust, 2007-1,*
   No. 21-4049, 2023 WL 2147332 (10th Cir. Feb. 22, 2023; unpublished)................................. 13

*Tripiati v. Beaman*,
   878 F.2d 351 (10th Cir. 1989).......................................................................... 17

*Wadsworth v. Walmart Inc.*,
   348 F.R.D. 489 (D. Wyo. 2025)..................................................................... 16, 17

*White v. Gen. Motors Corp.*,
   908 F.2d 675 (10th Cir.1990)........................................................................... 14

## Statutes

28 U.S.C. § 1927...................................................................... 1, 11, 12, 13, 14, 15

## Rules

Fed. R. Civ. P. 11(b) ....................................................................................... 8

Fed. R. Civ. P. 11(b)(4) .................................................................................... 5

## I.    INTRODUCTION

The Court's May 4th Order (Dkt. 708) directed the Class to submit a brief addressing the liability of Sunoco's counsel under 28 U.S.C. § 1927 for "defense counsel's unconscionable conduct in this case." Dkt. 707 at 9. The Court also instructed the Class to file a motion "against Sunoco" if the Class intended to seek sanctions. *Id.* The Class has elected to do both.

The "unconscionable conduct in this case" goes beyond a lawyer or party alone; it implicates both. It goes beyond the most recent tactics employed "in the effort to prevent the day of judgment." Dkt. 707 at 9. Unconscionable conduct has permeated the litigation from the start. As this Court found when it first announced the judgment *back in 2020*: "When it became clear that the case would move forward, Sunoco adopted a number of tactics to derail the litigation." Dkt. 298 at 4–5. Sunoco did not challenge that finding. *See Cline v. Sunoco, Inc.,* 159 F.4th 1171, 1183 (10th Cir. 2025) ("Also left unchallenged are the district court's findings that Sunoco and its counsel engaged in litigation obstruction."). And, as the Court well knows, Sunoco has continued its "litigation obstruction" ever since.

Sunoco's and its lawyer's—specifically, Dan McClure's—conduct also goes beyond the sort of "unreasonabl[e] and vexatious[]" behavior that § 1927 was designed to address. Sunoco and Mr. McClure did more than multiply the proceedings; they "obstruct[ed]" them, tried to "derail" them, and dug in on frivolous positions for no other reason than to allow Sunoco to continue holding money they knew did not belong to it. *See* Dkt. No. 298 at 43 ("Here, an industry (apparently supported by its lawyers) decided that it owes interest that it never has to pay. This myopic group-think does not excuse keeping millions of dollars of other people's money."). Sunoco and Mr. McClure litigated this case in bad faith and, as such, this is precisely one of the occasions when the Court must utilize its inherent power to issue sanctions that will restore the

1

sanctity of our judicial system and "vindicate[] the District Court's authority over a recalcitrant litigant." *See Chambers v. NASCO, Inc.*, 501 U.S. 32, 53 (1991); *see also id.* at 46 ("[I]f a court finds that fraud has been practiced upon it, or that the very temple of justice has been defiled, it may assess attorney's fees against the responsible party ***as it may when a party shows bad faith by delaying or disrupting the litigation or hampering enforcement of a court order***." (emphasis added); *Farmer v. Banco Popular N.A.*, 791 F.3d 1246, 1256 – 60 (10th Cir. 2015) ("A district court's inherent power to sanction reaches beyond the multiplication of court proceedings and authorizes sanctions for wide-ranging conduct constituting an abuse of process."; sanctioning a party who the court described as "us[ing] every trick up his sleeve to delay the inevitable").

The remainder of this brief will detail the repeated abuses Sunoco and Mr. McClure committed, the legal authority for imposing sanctions on each, and the specific sanctions the Class requests to both compensate the Class and—more importantly—"to ensure that such abuses [are] not repeated." *See id.* at 1259 (quoting *Chambers*, 501 U.S. at 56–57).

## II.    HISTORY OF SUNOCO'S LITIGATION ABUSE

Sunoco and its counsel's efforts to derail this litigation began from the moment discovery began.[1] The decisions and conduct below reveal a pattern of behavior that far exceeds the boundaries of zealous advocacy and repeatedly violates Rule 11 along with a number of the rules of professional conduct governing lawyers.[2]

---

[1] Regarding the timeline of Sunoco's Counsel, Dan McClure was lead counsel for Sunoco through much of the case until November of 2019, when Yetter Coleman entered appearances as trial counsel. *See* Dkt. No. 169. The litigation decisions, discovery strategy, and other gamesmanship that appeared throughout the case thus appear to have been driven by Mr. McClure before Yetter Coleman even appeared.

[2] This Court has adopted the Oklahoma Rules of Professional Conduct ("O.R.P.C.") "as the standard governing attorney conduct in this Court." LCvR 83.6(b). Those rules are published at *https://www.oscn.net/applications/oscn/Index.asp?ftdb=STOKRUBAPR&level=1*.

1.        <u>Sunoco Misrepresented Its Proposed Discovery Schedule</u>. During the parties' first discussions regarding the proposed schedule for this case, Sunoco and Mr. McClure planted the seeds for subsequent discovery abuse. The parties disagreed over the appropriate language for the schedule; the dispute centered around whether discovery could properly be "bifurcated" between merits and class discovery. *See* Dkt. No. 29 at 3-6. Plaintiff made clear that discovery should not be bifurcated while Defendants claimed their proposed schedule was not an effort to bifurcate at that time. *Compare id.* at 3 (Plaintiff arguing against bifurcation) *with* 5 (Sunoco claiming that "only because the Cline plaintiffs have without basis insisted that our proposed Scheduling Order would decide that discovery is to be bifurcated, we have added to our proposed Scheduling Order words stating that the Court is not now ruling on the issue of bifurcated discovery"). The Court ultimately entered a schedule with language proposed by Sunoco that stated:

> This deadline does not require any party to conduct merits discovery by this date, ***but does not preclude any party from taking merits discovery by this date***. A deadline for all merits discovery will be set after a court decision on class certification.

Dkt. No. 33 at 1 (emphasis added).

Despite telling the Court and Plaintiff that they did not intend to seek "bifurcation," history reveals it was Sunoco's and Mr. McClure's plan all along to withhold requested discovery based on their belief (gamble) that the case would never be certified. Even at trial, Sunoco was still claiming they withheld large data productions as they did because discovery *was* bifurcated under the original schedule; the opposite of what they told the Court and Plaintiff at the time the schedule was entered. *See* Ex. 1*,* Trial Transcript at 656:17-658:25; *see also* O.R.P.C. 3.4(d) ("A lawyer shall not: … in pretrial procedure, make a frivolous discovery request or fail to make reasonably diligent effort to comply with a legally proper discovery request by an opposing party.").

2.     <u>Sunoco Tried to Bury Plaintiff with a Classic Late Document Dump.</u> Before the delayed data productions on the eve of trial (addressed below), Sunoco and Mr. McClure intentionally withheld substantive documents (such as emails) until the end of the original discovery period to strategically prejudice Plaintiff. In a moment of foreshadowing, Plaintiff stated at the time:

> Defendants' litigation strategy in this case is now clear: withhold and delay production of substantial relevant documents for months—until the eve of the close of fact discovery—then refuse to give Plaintiff a meaningful opportunity to depose witnesses and to take further discovery on the documents produced.

Dkt. No. 36 at 2. At the time (June 2018), Defendants had delayed production of documents that comprised more than 60% of Defendants' entire production until thirty days prior to the close of the discovery period—and with multiple depositions remaining. *See id.* at 13, 16. Then, when Plaintiff requested an extension to complete discovery, Defendants refused, which required further motion practice. *See generally id.*

3.     <u>Sunoco Provided a Late and Deficient Privilege Log That Necessitated Discovery on Discovery</u>. As part of Sunoco's and Mr. McClure's discovery strategy, they also withheld their privilege log until June 21, 2018—less than two weeks before the anticipated close of discovery. *See* Dkt. No. 38 at 4-5 (noting that discovery at the time was set to close on July 2, 2018). Ultimately, Defendants and Mr. McClure provided an amended privilege log because the original log was so deficient. However, their conduct and strategy in discovery necessitated multiple depositions for "discovery on discovery" to get to the root of what Defendants had and had not produced. *See* Dkt. No. 53. Once again, Plaintiff identified the same abusive and obstructionist pattern that became the cornerstone of Sunoco's and Mr. McClure's strategy:

> Defendants were willing, and, in fact, I think intended to have plaintiff bear the consequence of their late lackadaisical production of documents, and a late facially defective privilege log. They were willing to have plaintiff bear the consequences of their actions.

Ex. 2 (2018-07-10 Hearing Transcript) at 26:1-5. Thus, Sunoco's strategy necessitated motion practice and multiple depositions to address a simple privilege log.

4.      <u>Sunoco Improperly Tried to "Pick-off" Plaintiff</u>. As the Court is well-aware, shortly after the case was filed, in December 2017, Sunoco and Mr. McClure devised a strategy to try to escape a class action by picking off the class representative. *See* Dkt. No. 298 at 4. Sunoco, in consultation with Mr. McClure, sent a check directly to Plaintiff with no prior discussion with his counsel and simply cc'd Plaintiff's lawyers. *See* Dkt. Nos. 122–23. Months later, Sunoco then sent a letter to Plaintiff—without copying his lawyer—insisting that he deposit the check to avoid the money going to unclaimed property. *See* Dkt. No. 298 at 11. Sunoco proceeded to fight the case for two years before filing a delayed motion to dismiss based on this ill-conceived pick-off strategy. *See* Dkt. No. 122. Plaintiff then had to defend against this baseless motion, which, on its face, relies first on a *dissent* for its opening legal proposition. *See* Dkt. No. 103 at 1.

While sending Plaintiff a check for unpaid interest and knowing they employed a uniform policy that refused to pay interest without a demand, Sunoco denied Plaintiff's allegations to the same effect—*i.e.*, that it had paid Plaintiff late without paying interest, as it did anyone else who failed to submit a demand. *Compare* Dkt. No. 23 at ¶¶7, 35, 47-48 (denials), *with* Dkt. No. 105 at 13 ("When [Sunoco] learned of this lawsuit, Sunoco undertook to investigate whether Cline may be owed interest. Sunoco determined that Cline had in fact been paid later than the six months allowed by the PRSA for new wells."); *see* Fed. R. Civ. P. 11(b)(4) ("By presenting to the court a pleading, written motion, or other paper—whether by signing, filing, submitting, or later advocating it—an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed ***after an inquiry reasonable under the circumstances***: … the denials of factual contentions are warranted on the evidence or, if specifically so identified,

are reasonably based on belief or a lack of information."); *see also id.* at 1993 Advisory Committee Notes ("If, after further investigation or discovery, a denial is no longer warranted, the defendant should not continue to insist on that denial."). The Court admonished Mr. McClure at the final closing argument of this case regarding his conduct in sending the check directly to Plaintiff. Ex. 3 (2020-06-17 Hearing Transcript) at 101:10-105:01.

This Court previously found that this "pick off" move was one of "a number of tactics to derail the litigation," (Dkt. No. 298 at 4), and the Tenth Circuit included this tactic as one of the "unchallenged" efforts at "litigation obstruction" that Sunoco "and its counsel engaged in." *Cline*, 159 F.4th at 1183–84.

5.      Sunoco Withheld Substantial Data and Delayed Producing Its Expert Reports. Sunoco intentionally withheld its suspense data until after Plaintiff's expert report was due and after the discovery cutoff. *See* Dkt. No. 298 at 4–5; *see also* O.R.P.C. 3.4(d). The amount of prejudice and burden this created on the parties and the Court cannot be overstated. *Id.* at 23. Plaintiff's expert was forced to work after her report was due to attempt to make some use of this data, and Plaintiff's counsel was forced to fight the effects of this strategy and take late depositions of Sunoco's expert to undo as much of the prejudice to the Class as possible. *See id.* at 20-21.

Regarding Sunoco's expert, Eric Krause, the Court has already extensively documented the misconduct that resulted in Mr. Krause's opinions being stricken entirely. *Id.* at 19-25. Sunoco never appealed the Court's order striking Krause (at any point during its string of appeals). And, the Tenth Circuit noted that Sunoco also did not challenge those rulings. *Cline*, 159 F.4th at 1183.

6.      Sunoco Filed a Baseless Motion to "Clarify" the Class Definition. In yet another attempt to derail the litigation, Sunoco and Mr. McClure filed a motion to "clarify" the class definition, which was nothing more than "an argument to cut down the size of the class." Dkt. No.

6

298 at 5. In its Motion, Sunoco and Mr. McClure consistently misrepresented that the payments at issue were "escheat payments to the 50 states" and behaved as if this was a new issue. *See* Dkt. No. 172 at 1-2. In reality, the witnesses, including Sunoco's own expert, had already long considered issues related to unclaimed-property payments. *See* Dkt. No. 177 at 1. And, it was black-letter law that these payments had not "escheated." *See* Dkt. No. 186. Plaintiff and his counsel were forced to brief and argue this issue, while the Court similarly had to devote time the week of Thanksgiving in hearing and addressing it. This motion was another instance of documented "litigation obstruction" the Tenth Circuit noted Sunoco failed to challenge on appeal. *Cline*, 159 F.4th at 1183–84.

7.     Sunoco Employed Ambush Tactics at Trial With Previously Undisclosed Exhibits and New Expert Opinions. At several points during the trial, Sunoco and its counsel attempted to use information not previously disclosed in violation of the rules of evidence and procedure. For example, during the direct examination of Mr. Krause, Sunoco's counsel attempted to elicit information about why the data *both* experts used to identify the date of first sale on a particular well was incorrect. *See* Exhibit 1 (Trial Transcript) at 854:19-858:07. Counsel claimed this was a "demonstrative," but the intent was obvious; Sunoco was attempting to include a new opinion that a particular payment Ley identified as late was not in fact late—an opinion Mr. Krause had never before expressed, despite being deposed within two weeks of the trial. *See id.*; *id.* at 937:16-942:23. Cross-examination revealed that Mr. Krause discovered this "demonstrative" example the Sunday before trial began. *Id.*

8.     Sunoco's Entire Legal Defense to the Interest Claims Was Frivolous. From its first pleading, Sunoco denied that it owed Plaintiff interest. *See* Dkt. No. 23 at ¶¶7, 35, 47-48. After the Class was certified and Plaintiff moved for partial summary judgment, Defendants filed—and Mr.

7

McClure signed—a response stating: "With respect to interest, however, the PRSA states only that proceeds not timely paid 'shall earn interest' and that a first purchaser like Sunoco 'shall be liable' for such interest unless an exception applies. Nothing in the PRSA requires the interest to be paid on any particular time schedule or to be volunteered without the payee making a claim for it." Dkt. No. 160 at 10.

Sunoco and Mr. McClure fought this case for years pressing the idea that the Oklahoma legislature was so inept that it enacted a statute to compel prompt payment of royalties that says interest on late payments accrues, but the company never actually has to pay it. That is the very definition of a frivolous argument. *See* O.R.P.C. 3.1 ("A lawyer shall not bring or defend a proceeding, or assert or controvert an issue therein, unless there is a basis in law and fact for doing so that is not frivolous, which includes a good faith argument for an extension, modification or reversal of existing law."); *accord* Fed. R. Civ. P. 11(b). That argument stems from the "myopic group think" this Court found Sunoco and its industry brethren—"supported by its lawyers"— cooked up to withhold "millions of dollars of other people's money." *See* Dkt. No. 298 at 43. This defense was so frivolous that Sunoco did not even appeal the Court's rejection of it. Instead, Sunoco has used whatever legal options are theoretically available—no matter how vexatious—to continue delaying paying the money for as long as possible.

9.    Sunoco Repeatedly Misrepresented Facts In Its Post-Trial Motions to Attempt to Better Its Position. When Sunoco lost the trial, it made multiple statements that were not true to seek a new trial, all of which were submitted in briefing signed by Mr. McClure. *See* O.R.P.C. 3.3(a)(1) ("A lawyer shall not knowingly: (1) make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer …"); *accord* Fed. R. Civ. P. 11(b). First, Sunoco claimed it "had no realistic notice that it would

8

bear the burden of proof on the marketable-title issue at trial." Dkt. No. 349 at 3. This is plainly false, as this was a disputed issue for much of the case, and the Court even provided its initial view of the issue before trial. The Court noted that Sunoco's claimed "surprise" was "insincere." *Id.*

Second, Sunoco and Mr. McClure falsely represented that they were "cut off" from presenting certain evidence. *Id.* at 4. In making this claim, Sunoco and Mr. McClure "boldly mischaracterize[d] the record." *Id.*

Third, Sunoco and Mr. McClure falsely stated that Sunoco had "no realistic opportunity" to carry its burdens at trial. Dkt. No. 322 at 15. They made this statement knowing that Sunoco never asked to continue the trial and finished trial early. *See* Dkt. No. 349 at 4.

10.    Sunoco Continued Its Misrepresentations to the Tenth Circuit. As part of its appeal, "Sunoco criticize[d] at length the district court's change of the trial date and the discovery cutoff. Sunoco, however, [did] not actually appeal any of the discovery deadlines, the case scheduling order, or the trial date." *Cline*, 159 F.4th at 1183. Sunoco did this knowing that it was not even appealing the schedule and that it had never moved to continue the trial. The Tenth Circuit noted that the trial court "dismantle[ed]" Sunoco's critique of the scheduling order. *Id.*

11.    Sunoco Deployed a Frenetic String of Appeals Designed to Cause Unnecessary Delay and Needlessly Increase Costs. Sunoco's and its counsel's strategy for creating intentional delay and needless cost only continued during the appellate phase(s) and simultaneous briefing at the trial court. Sunoco began by filing multiple notices of appeal prior to this Court's entry of a plan of allocation order and when all agreed there was more to be done in the trial court before any appeal. *See, e.g.*, Dkt. No. 324 at 1-3. As part of the then-ongoing allocation briefing, Sunoco also misrepresented data that had been presented at trial. *Id.* at 7. While claiming the judgment was not final, Sunoco and its counsel continued filing premature notices of appeal. In its most recent

9

opinion, the Tenth Circuit noted that Sunoco had "filed a string of appeals that [the Court] dismissed for lack of jurisdiction." *Cline*, 159 F.4th at 1179.

12.    Sunoco Has Continued to Deploy Obvious Delay Tactics to Hold the Money. In the most recent example of intentionally dilatory conduct, Sunoco and its counsel plotted the most circuitous route to the Supreme Court fathomable. Then, they denied that was the plan.

It is undisputed that Sunoco could have filed its petition for certiorari from the Tenth Circuit's November 2025 decision. *See* Dkt. No. 708 at 1-2. Instead, Sunoco and its counsel chose to intentionally delay until after this Court amended its judgment (doing nothing more than removing the punitive damage award) and after asking the Tenth Circuit to summarily affirm it— an utter waste of judicial resources if there ever was one. *Id.*

There is no explanation for this tactic other than to cause unnecessary delay. Sunoco's attempts to explain away this conduct ring hollow. First, counsel argued: "It was going to take just as long whether we sought certiorari on the prior reversed judgment and on this judgment. We are -- Sunoco is going to move promptly through the Tenth Circuit, and promptly file its cert petition." Ex. 4 (3/16/26 Hearing Transcript) at 15:2-9. That is simply false. Had Sunoco filed its petition for certiorari based on the November judgment, the petition would have been due in February of 2026. *See* Sup. Ct. R. 13. Had that happened, a decision likely would have come out by the end of this term (June of 2026). By Sunoco's reasoning, its cert petition is now not due until June, which likely will delay any decision until after the Court begins its next term in October of 2026. The representation to the Court that "it was going to take just as long" is simply not true.

Second, the Court asked: "So I expect then that as you promised, you will file with your appellate papers, a request for *immediate* summary affirmance. Is that correct, Mr. Yetter?" Ex. 4 (3/16/26 Hearing Transcript) at 15:10-13. Counsel then proceeded to claim "we have" and then

went on to explain the ways in which, in reality, Sunoco *had not* done anything of the sort. In fact, Sunoco did the opposite and sought a way to further delay its own petition for certiorari by asking the Tenth Circuit to hold its latest appeal "in abeyance." *Id.* at 15:14-16:02. The Court obviously does not need further explanation on how this evasive and inconsistent answer revealed the underlying, obvious delay strategy. *See id.* at 16:18-17:08; *see also* O.R.P.C 3.2 ("A lawyer shall make reasonable efforts to expedite litigation consistent with the interests of the client."); *id.* at Comment 1 ("[A] failure to expedite [will not] be reasonable if done for the purpose of frustrating an opposing party's attempt to obtain rightful redress or repose. It is not a justification that similar conduct is often tolerated by the bench and bar. The question is whether a competent lawyer acting in good faith would regard the course of action as having some substantial purpose other than delay. Realizing financial or other benefit from otherwise improper delay in litigation is not a legitimate interest of the client.").

III.     LEGAL AUTHORITY FOR SANCTIONS

There are two sources of authority available to the Court to impose sanctions here: 28 U.S.C. § 1927 and the Court's inherent powers. Sanctions are appropriate under both.

A.  28 U.S.C. § 1927

Under § 1927, the Court can shift certain fees and costs to attorneys for "unreasonably and vexatiously" "multipl[ying]  the proceedings." 28 U.S.C. § 1927. But this statute's reach is limited, both in terms of who it targets and the extent of the sanctions it authorizes.

It applies only to the attorneys ("or other person admitted to conduct cases" in the court). *Id; see Farmer*, 791 F.3d at 1257 (distinguishing a district court's "inherent authority to sanction a party for bad-faith conduct … and its more limited power to assess fees and costs against an attorney for unreasonable and vexatious multiplication of proceedings as authorized by 28 U.S.C.

11

§ 1927"). And it authorizes the court to shift only those "excess" costs and fees "reasonably incurred because of" the offending attorneys' multiplicative conduct. 28 U.S.C. § 1927. In other words, "there must be a causal connection between the objectionable conduct of counsel and the multiplication of the proceedings, such that the conduct resulted in proceedings that would not have been conducted otherwise." *Chung v. Lamb*, 73 F.4th 824, 832 (10th Cir. 2023).

That said, as with other judicial inquiries into attorneys' fees, the "[d]etermination of attorney-fee awards" under § 1927 "'should not result in a second major litigation,' and in calculating such awards district courts 'need not, and indeed should not, become green-eye shade accountants. The essential goal is to do rough justice, not to achieve auditing perfection.'" *Id.* at 831 (quoting *Fox v. Vice*, 563 U.S. 826, 838 (2011)). The district court is "not require[d] … to identify and justify every hour allowed or disallowed:" rather, its determination need "only … appear reasonable in light of the complexity of the case, the number of strategies pursued, and the responses necessitated by the other party's maneuvering." *Id.* (cleaned up).

Importantly, sanctions under § 1927 do not require a finding of subjective bad faith; rather any conduct that, "viewed objectively, manifests either intentional or reckless disregard of the attorney's duties to the court" is sanctionable. *Braley v. Campbell*, 832 F.2d 1504, 1512 (10th Cit. 1987); *see also id.* at 511–12. "An attorney becomes subject to § 1927 sanctions by acting recklessly or with indifference to the law, as well as by acting in the teeth of what he knows to be the law." *Id.* at 1511 (marks omitted). "[W]e are entitled to demand that an attorney exhibit some judgment." *Id.* at 1512.

**B. Inherent Powers**

"When express laws provided by Congress such as § 1927 do not reach the entirety of a litigant's bad-faith conduct, a court may rely instead on its inherent power to impose punitive

12

sanctions." *Farmer*, 791 F. 3d at 1258 (citing *Chambers*, 501 U.S. at 57); *accord Chambers*, 501 U.S. at 50 ("[I]f in the informed discretion of the court, neither the statute nor the Rules are up to the task, the court may safely rely on its inherent power."). Indeed, "[a] court may … sanction parties under its inherent authority even when 'that conduct could also be sanctioned under the statute or the Rules.'" *Taylor v. Nat'l Collegiate Student Loan Trust, 2007-1,* No. 21-4049, 2023 WL 2147332, at *6 (10th Cir. Feb. 22, 2023; unpublished) (quoting *Chambers*, 501 U.S. at 50)).

Unlike § 1927, a court's inherent power to sanction is not limited to a specific category of actors or misconduct; rather, "the inherent power extends to a full range of litigation abuses," so long as the court finds the sanctioned actor engaged in bad faith. *Chambers*, 501 U.S. at 46, 50, 55 (discussing "requisite bad faith" and affirming assessment of "entire amount" of opposing party's costs and fees against party acting in bad faith); *accord Farmer*, 791 F.3d at 1257 ("A district court's inherent power to sanction reaches beyond the multiplication of court proceedings and authorizes sanctions for wide-ranging conduct constituting an abuse of process."); *see also Farmer*, 791 F.3d at 1258 ("Farmer's contemptuous conduct extended far beyond frivolous court pleadings or filings reachable by way of §1927. After all, Defendant Banco, nor Farmer, was the party initiating the filings because Banco was the party seeking to enforce the settlement agreement which Farmer obstinately refused to execute."); *Roadway Exp., Inc. v. Piper*, 447 U.S. 752, 764–67 (1980) ("The power of a court over members of its bar is at least as great as its authority over litigants. If a court may tax counsel fees against a party who has litigated in bad faith, it certainly may assess those expenses against counsel who willfully abuse judicial process.").

Like § 1927, however, fee shifting under a court's inherent powers should not convert the court into billing auditor. *See Farmer*, 791 F.3d at 1257–59. Because the Court's inherent sanction authority is <u>not</u> limited to any specific type of litigation conduct, there is even less need to parse

13

"every moment" and "every dollar" incurred—*i.e.*, less need to "tailor the sanction to the particular wrong." *See id.* at 1258 ("Because the district court relied on its inherent authority to sanction Farmer for his bad faith, we discern no abuse of discretion in the court's failure to address every moment Banco spent and every dollar Banco incurred in seeking to induce Farmer to live up to his end of a bargain. Given Farmer's tendencies, such might 'serve only to foster extensive and needless satellite litigation.'" (quoting *Chambers*, 501 U.S. at 51)). "The underlying rationale of fee shifting is, of course, punitive. … That the award has a compensatory effect does not in any event distinguish it from a fine for civil contempt, which also compensates a private party for the consequences of a contemnor's disobedience." *Id.* at 1258–59 (cleaned up; quoting *Chambers*, 501 U.S. at 53–54)). Accordingly, the following principles govern a court's fee-shift analysis when sanctioning "a recalcitrant party for his abuse of process":

> First, the amount of fees and costs awarded must be reasonable. Second, the award must be the minimum amount reasonably necessary to deter the undesirable behavior. And third, because the principal purpose of punitive sanctions is deterrence, the offender's ability to pay must be considered. Depending on the circumstances, the court may consider other factors as well, including the extent to which bad faith, if any, contributed to the abusive conduct.

*Id.* at 1259 (citing *White v. Gen. Motors Corp.*, 908 F.2d 675, 683–85 (10th Cir.1990)).

## C. Calculating the Fee-Shift Sanction

Regardless of the source of the court's authority, the District Court has considerable discretion in determining whether to impose sanctions. *See Farmer*, 791 F.3d at 1256 ("We review the imposition of an attorney-fee sanction, whether rooted in statute, rule, or a court's inherent authority, only for an abuse of discretion."); *accord Chung v. Lamb*, 73 F.4th 824, 829 (10th Cir. 2023) ("We will not disturb a district court's factual findings about an attorney's conduct unless they lack a reasonable basis."); *Frey v. Town of Jackson, Wyoming*, 41 F.4th 1223, 1245 (10th Cir. 2022) ("[W]e will not reverse an award of sanctions under § 1927 simply because we might have

14

acted differently in the district court's position—our review is limited to whether the district court abused its discretion."); *Hamilton v. Boise Cascade Exp.*, 519 F.3d 1197, 1207 (10th Cir. 2008) (acknowledging "the district court's wide discretion in matters of sanctions"). This discretion also extends to the methodology used to calculate the fee-shift sanction. *See Farmer*, 791 F.3d at 1259 & n.9; *Hamilton*, 519 F.3d at 1206–07.

The Tenth Circuit has approved the use of a lodestar methodology for calculating sanctions awarded under both § 1927 and a court's inherent authority. *See id.* But it has also endorsed the use of other methods, including the "actual-fee method" under which the court awards a "straight fee recovery" of the amount of fees the victimized party actually "incurred." *See Hamilton*, 519 F.3d at 1207; *see also Farmer*, 791 F.3d at 1259, n.9 (citing *Hamilton*'s actual-fee methodology as an example of "alternative means of calculation" that "might be available to courts shifting fees and costs as a punitive sanction for conduct undertaken in bad-faith").

The rationale behind the "actual-fee method" is consistent with the other guiding principles behind procedural fee shifting—namely, that the imposition of sanctions should not result in a "second major litigation" that further burdens the court (and the victimized party) and rewards a proven recalcitrant and vexatious litigant with further opportunities to "stretch things out" with "needles satellite litigation." *Chung*, 73 F.4th at 832; Dkt. No. 707 at 9; *Farmer*, 791 F.3d at 1258. The Tenth Circuit described the rationale behind the "actual-fee method" as follows:

> [A] party who has already been the victim of vexatious and dilatory tactics should not heedlessly be revictimized by requiring him to introduce evidence to establish the prevailing local rate for a certain type of litigation. … A § 1927 movant has already chosen his counsel—at what he ordinarily anticipates will be his own expense—and one who chose what he considered appropriate counsel should not be obliged to procure new, cheaper lawyers just to deal with a filing that is, after all, sanctionable.

*Hamilton*, 519 F.3d at 1207.

15

### D. Non-Monetary Sanctions

This Court is also empowered to impose non-monetary sanctions for abusive, vexatious litigation conduct, including attorney conduct that violates governing ethical rules. *See Chambers*, 501 U.S. at 44–45 (discussing non-monetary sanctions a court may issue under its inherent authority, including up to "outright dismissal of a lawsuit"; describing assessment of fees as a "less severe sanction"); *Butler v. Biocore Med. Tech., Inc.*, 343 F.3d 1163, 1169, 1175 (10th Cir. 2003) ("We review for abuse of discretion all aspects of a trial court's imposition of sanctions for rules violations."); *Cole v. Ruidoso Mun. Schools*, 43 F.3d 1373, 1383 (10th Cirt. 1994) ("It is well-established that ordinarily the control of attorneys' conduct in trial litigation is within the supervisory powers of the trial judge and is thus a matter of judicial discretion. We will not disturb the trial court's factual findings regarding attorney conduct unless there is no reasonable basis to support those conclusions."); LCvR 83.6(c) ("Nothing contained in this Local Rule shall limit the right of an individual judge to manage the cases assigned to that judge, which shall include, without limitation, the authority to impose sanctions, penalties or other restrictions which may be appropriate in a particular case ….").

Examples of non-monetary sanctions imposed on parties and attorneys include:

- Public reprimands; *e.g., Chambers*, 501 U.S. at 40, n.5;

- Disbarment; *id.*;

- Suspension from practice; *id.*;

- Disqualification / revocation of *pro hac vice* admission; *e.g.*, *Rubio v. BNSF Railway Co.*, 548 F.Supp.2d 1220, 1222–27 (D.N.M. 2008); *Wadsworth v. Walmart Inc.*, 348 F.R.D. 489, 496–98 (D. Wyo. 2025) (sanctions under Rule 11);

- Directing the clerk to mail a copy of the order containing the district court's findings that the attorney had violated rules of professional conduct to every court where the attorney was admitted to practice; *e.g., Butler*, 348 F.3d at

16

1166;[3] *see also Wadsworth*, 348 F.R.D. at 497 (collecting cases imposing similar sanctions requiring the offending attorneys to serve copies of the court's sanctions orders on other courts, clients, etc.);

- Requiring the offending attorney to write and submit an article for publication in the local bar journal and to include in the article "why he is writing article" and submit a copy of the same to the court; *Johnson v. GEICO*, Case No. CIV-07-868-M, Dkt. No. 74 (W.D. Okla. April 8, 2008) (attached here as Exhibit 5); and

- Limiting a party's ability to file matters in federal court; *e.g.*, *French v. American Airlines, Inc.,* 427 Fed. App'x 666, 668–70 (10th Cir. 2011; unpublished); *see generally Tripiati v. Beaman*, 878 F.2d 351 (10th Cir. 1989).

*See also* LCvR 86.3(e) ("Discipline by this Court may include disbarment, suspension from practice for a definite time, reprimand, or other discipline which the Court deems proper."); *but see* LCvR 86.3(d) ("This Court shall not impose any disciplinary action affecting an attorney's right to practice before the Court for two (2) years or more until after a hearing on the matter has been held before a judge or panel of judges.").

## IV.    SANCTIONS REQUESTED

Sunoco's and Mr. McClure's conduct in this case—especially when compared to the conduct in the cases cited above, like *Farmer* and *Chambers*—plainly warrants severe sanctions. Like the Defendant in *Chambers,* Sunoco and Mr. McClure did everything they could to prevent this case from being litigated on the merits. And, like the Defendant in *Farmer*, after Plaintiff and the Court finally overcame Sunoco's pre-trial delinquency and got this case to judgment, Sunoco

---

[3] The trial court in *Butler* later issued an order disqualifying the offending attorney and "reprimanding him for continued ethical violations." 348 F.3d at 1166; *see also Biocore Med. Techs., Inc. v. Khosrowshahi,* 1998 WL 919126, at *3, *4 (D. Kan. Nov. 6, 1998) ("The Court has the inherent power to disqualify counsel at its discretion for violations of professional standards of ethics. … This case has become a textbook example of how major litigation should not be conducted, and Butler's inability or unwillingness to comply with simple rules has made the entire process more time-consuming, expensive, contentious and protracted than it has needed to be. Butler's violations have continued for far too long.").

and Mr. McClure did everything they could think of to avoid paying it—they "used every trick up [their] sleeve to delay the inevitable." 791 F.3d at 1258. Their conduct has been beyond dilatory and vexatious. It was "unconscionable." Dkt. No. 708 at 9.

Accordingly, and considering the principles behind the imposition of punitive sanctions, Plaintiff asks that the Court impose sanctions on both Sunoco and its lead attorney, Dan McClure. As to Sunoco, Plaintiff asks that the Court, pursuant to its inherent authority and consistent with the teachings of cases like *Farmer* and *Chambers*, enter an order shifting all costs and fees incurred by the Plaintiff and the Class in this case to Sunoco.

As to Sunoco's lead lawyer, Mr. McClure, Plaintiff asks that the Court impose non-monetary sanctions in the form of (1) revoking his *pro hac vice* status; (2) requiring him to file a notice of the Court's sanctions order (attaching a copy of the order/opinion) in any ongoing case in an Oklahoma federal court in which he has appeared; (3) requiring him to attach a copy of this Court's sanctions order/opinion any time he seeks to appear in another matter litigated in an Oklahoma federal Court for the next 2 years; and (4) requiring him to write an article on topics of the Court's choosing to be submitted for publication in the Oklahoma Bar Journal. The following provides additional detail and rationales for each.

### A.  Monetary Sanctions against Sunoco

This Court's authority to shift fees against a party for bad faith litigation conduct is well established, as set forth above. The primary purpose of such a sanction is to deter similar bad faith conduct and, as such, in addition to the overall reasonableness of the fee, the Court must take into account things like the offending party's ability to pay as well as the extent of its recalcitrance. *See Farmer*, 791 F.3d at 1259. The Court must also be weary of providing a known-to-be-vexatious

18

litigant with an opportunity to turn the fee-shift process into a second major litigation in which the Court is forced to become a "green-eye shade accountant." *Chung*, 73 F.4th at 831 (10th Cir. 2023).

For these reasons, Plaintiff proposes that the Court simply order Sunoco to pay an amount of fees and costs equal to what it previously ordered the Class to incur. *See* Dkt. Nos. 626–27. The Court has already found those amounts to be "fair and reasonable." *See* Dkt. No. 626 at 9–11. Given the extent of Sunoco's bad faith and its flaunted ability to pay (*see* Dkt. 298 at 46–47), these amounts are neither overly burdensome on Sunoco's finances nor are they beyond what is necessary to send a message to Sunoco—and other companies similarly engaged in the "myopic group think"—that such litigation tactics will not be tolerated. Indeed, this amount is *less* than the amount of punitive *damages* the Court previously awarded in an effort to achieve a similar deterrent effect. *See* Dkt. No. 298 at 46–47. And while that award may have been vacated, it was so on the law. S*ee Cline*, 159 F.4th at 1203–05. The Tenth Circuit said nothing about this Court's findings regarding Sunoco's ability to pay or the deterrent impact of the amount awarded, which—like the "the district court's findings that Sunoco and its counsel engaged in litigation obstruction"—went unchallenged on appeal. *See id.* at 1183–84. Those findings likewise support the punitive *sanction* requested here.

Such an award also has the benefit of minimizing the extent to which Sunoco can use it to further delay the Class's recovery. First, it eliminates Sunoco's ability to bog down the Court and the Class in a moment-by moment, dollar-by-dollar accounting fight. Second, it can proceed entirely divorced from the judgment and distribution thereon.

The Class addresses this second point to ensure there is no confusion or risk in further delaying any distribution of the underlying judgment in the event Sunoco's petition for certiorari is denied. If the Court is inclined to award some or all of the requested sanction, the Court would

19

enter a sanctions order requiring Sunoco to pay, for the benefit of the Class: (1) an amount of attorneys' fees equal to 25% of the Judgment Common Fund; (2) $1.5 million in litigation and distribution expenses; and (3) $500,000 as a case contribution award for Mr. Cline. Sunoco would receive credit on these amounts for the $5 million it has already paid as the stipulated amount of the statutory, "substantive" fee shift.

Meanwhile, once Sunoco's forthcoming gambit with the Supreme Court is resolved, the Court can authorize distribution of the amounts currently sitting in the judgment fund according to the orders the court has already entered. The Class would finally receive their portion of the judgment, Class Counsel would take their fees and litigation expenses, Mr. Cline would take his case contribution award, and the common fund would bear the costs of distribution pursuant to Dkt. No. 627. Nothing about those amounts would be dependent on any sanction. If Sunoco appeals the sanction order, nothing in that appeal could upset the underlying judgment.

Once Sunoco pays the sanction, there would be a second distribution to the Class, allocated *pro rata* to each Class Member according to the same decimal interests set forth in the Court's plan of allocation for distributing the judgment. The net effect of this sanction would be that Sunoco bears the full cost of this litigation, including the amounts necessary to distribute the funds Sunoco wrongfully withheld. It would not increase the amount of fees to Class Counsel. It would merely shift the burden from the Class to Sunoco. Every dollar paid in the sanction goes back to the Class.

### B.  Non-Monetary Sanctions against Mr. McClure

The Court's authority to sanction the attorneys who practice before it is also well established. So too is the "unconscionable" behavior of Mr. McClure in this case. In light of the monetary sanction requested of Sunoco, Plaintiff requests only non-monetary sanctions against Mr. McClure. While these sanctions are far less than the maximum this court could impose for the

sort of repeated abusive, unethical behavior Mr. McClure displayed here, the requested sanctions are nonetheless substantial, commensurate with the conduct at issue, and balanced to encourage ethical conduct while not disrupting the remaining judicial process. *See Chambers*, 501 U.S. at 40, n.5 ("Although these sanctions did not affect the bank accounts of these individuals, they were nevertheless substantial sanctions and were as proportionate to the conduct at issue as was the monetary sanction imposed on Chambers. Indeed, in the case of the disbarment of attorney Gray, the court recognized that the penalty was among the harshest possible sanctions and one which derived from its authority to supervise those admitted to practice before it.").

*First*, Plaintiff requests the Court revoke the *pro hac vice* status of Mr. McClure. As detailed above, Mr. McClure was the principal architect behind Sunoco's recalcitrant litigation strategy. He was the one who engineered the pick-off play and the obstructive discovery tactics in aid of Sunoco's overall goal to avoid litigating this case on its merits. Mr. McClure's obstructive strategy has ultimately resulted in nearly 6 years (and counting) of delay in distributing money that Sunoco and its attorneys always knew belonged to the Class. His conduct, as set forth above, violated Oklahoma Rules of Professional Conduct 3.1, 3.2, 3.3, and 3.4.

Sunoco will continue to have several lawyers to represent it, including its appellate counsel for any forthcoming *certiorari* endeavor. Likewise, given that this case is already in a post-judgment posture, there is little if any hardship to Sunoco or the judicial process caused by Mr. McClure's absence. On the other hand, society's interest in eliminating the sort of bad faith litigation tactics on display here is high. The Court's sanction should send a message that conduct like Mr. McClure's will not be tolerated in the interest of zealous advocacy.

*Second,* because misconduct like the kind shown here should not be tolerated in any District, the Court should also require publication of its sanctions order beyond merely this case.

21

Plaintiff requests that publication consist of (1) requiring Mr. McClure to file a notice of the Court's sanctions order (attaching a copy of the order/opinion) in any ongoing case in an Oklahoma federal court in which he has appeared; and (2) that he be required to attach a copy of this Court's sanctions order/opinion any time he seeks to appear in another matter litigated in an Oklahoma federal Court for the next 2 years. Again, this proposed sanction, which is limited in both temporal and geographic scope, is balanced to adequately deter and punish while still permitting the sanctioned attorney to engage in his profession.

*Third*, consistent with precedent in Oklahoma federal courts, Plaintiff requests the Court require Mr. McClure to write an article to be submitted for publication in the Oklahoma Bar Journal addressing topics related to his abusive litigation tactics. Like the Order from Judge Miles LaGrange, this article should note that the author wrote it as a court-imposed sanction, and it should be written as a teaching tool for young attorneys regarding what *not* to do in representing a client. Mr. McClure should be required to attest that he wrote it himself, without the use of A.I. or assistance from others (*e.g.*, associates or paralegals). And he should be required to submit a proposed draft of the article to the Court for review and approval prior to publication. This sanction serves not only to deter future misconduct from the sanctioned attorney, but also from the next generation of court officers.

Respectfully submitted,

/s/Drew Pate
Bradley E. Beckworth, OBA No. 19982
Jeffrey Angelovich, OBA No. 19981
Drew Pate, OBA No. 34600
Trey Duck, OBA No. 33347
**NIX PATTERSON, LLP**
8701 Bee Cave Road
Building 1, Suite 500

22

Austin, TX 78746
Telephone: (512) 328-5333
Facsimile: (512) 328-5335
*bbeckworth@nixlaw.com*
*jangelovich@nixlaw.com*
*dpate@nixlaw.com*
*tduck@nixlaw.com*

Susan Whatley, OBA No. 30960
**NIX PATTERSON, LLP**
P.O. Box 178
Linden, Texas 75563
Telephone: (903) 215-8310
*swhatley@nixlaw.com*

Phillip G. Whaley, OBA No. 13371
Jason A. Ryan, OBA No. 18824
Paula M. Jantzen, OBA No. 20464
**RYAN WHALEY**
400 N. Walnut Ave.
Oklahoma City, OK  73104
Telephone:  405-239-6040
Facsimile:  405-239-6766
*pwhaley@ryanwhaley.com*
*jryan@ryanwhaley.com*
*pjantzen@ryanwhaley.com*

Michael Burrage, OBA No. 1350
**WHITTEN BURRAGE**
512 N. Broadway Ave., Suite 300
Oklahoma City, OK 73103
Telephone: (405) 516-7800
Facsímile: (405) 516-7859
*mburrage@whittenburragelaw.com*

Robert N. Barnes, OBA No. 537
Patranell Lewis, OBA No. 12279
Emily Nash Kitch, OBA No. 22244
**BARNES & LEWIS, LLP**
208 N.W. 60th Street
Oklahoma City, OK  73118
Telephone: (405) 843-0363
Facsimile: (405) 843-0790

23

*rbarnes@barneslewis.com*
*plewis@barneslewis.com*
*ekitch@barneslewis.com*

Lawrence R. Murphy, Jr., OBA No. 17681
**SMOLEN LAW, PLLC**
611 South Detroit Avenue
Tulsa, Oklahoma 74120
Telephone: (918) 777-4529
*larry@smolen.law*

**CLASS COUNSEL**

## CERTIFICATE OF SERVICE

I hereby certify that I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system, which will send email notification of such filing to all registered parties.

*/s/Drew Pate*

24