# EXHIBIT 1

597

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF OKLAHOMA


PERRY CLINE, on behalf of himself  )
and all others similarly situated, )
                                   )
             Plaintiff,            )
                                   )
-vs-                               ) No. CIV-17-313-JAG
                                   )
SUNOCO INC. (R&M) and SUNOCO       )
PARTNERS MARKETING & TERMINALS,    )
L.P.,                              )
                                   )
             Defendant.            )


* * * * *

TRANSCRIPT OF NONJURY TRIAL PROCEEDINGS
VOLUME IV OF V
**BEFORE THE HONORABLE JOHN A. GIBNEY**
UNITED STATES DISTRICT JUDGE

DECEMBER 18, 2019

* * * * *

REPORTED BY:                    KEN SIDWELL, CSR-RPR
                                United States Court Reporter
                                P.O. Box 607
                                Muskogee, Oklahoma  74402

598

A P P E A R A N C E S

ON BEHALF OF THE PLAINTIFF:

MR. ANDREW G. PATE, Nix Patterson & Roach, 205 Linda Drive, Daingerfield, Texas, 75638,

MR. BRADLEY E. BECKWORTH, Nix Patterson, LLP, 3600 North Capital of Texas Highway, Suite B350, Austin, Texas, 78746,

MR. JASON A. RYAN and MR. PATRICK M. RYAN, Ryan Whaley Coldiron Jantzen Peters & Webber, PLLC, 119 North Robinson Avenue, Suite 900, Oklahoma City, Oklahoma, 73102,

MR. MICHAEL BURRAGE, Whitten Burrage, 512 North Broadway, Suite 300, Oklahoma City, Oklahoma, 73102,

ON BEHALF OF THE DEFENDANT:

MR. DANIEL M. MCCLURE, Norton Rose Fulbright US, LLP, 1301 McKinney, Suite 5100, Houston, Texas, 77010-3095,

MR. MARK D. CHRISTIANSEN, McAfee & Taft, 211 North Robinson, 10th Floor, Oklahoma City, Oklahoma, 73102-7103,

MR. R. PAUL YETTER, Yetter Coleman, LLP, 811 Main Street, Suite 4100, Houston, Texas, 77002.

PLAINTIFFS' WITNESS

| WITNESS | PAGE |
|---|---|
| **Barbara Ley** | |
| (Cross-Examination by Mr. Yetter) | 605 |
| (Redirect Examination by Mr. Pate) | 653 |
| | |
| Plaintiff Rests: | 685 |

DEFENDANT'S WITNESSES

| WITNESS | PAGE |
|---|---|
| **Kraettli Epperson** | |
| (Direct Examination by Mr. McClure) | 688 |
| (Cross-Examination by Mr. Patrick Ryan) | 745 |

**United States District Court**

599

DEFENDANT'S WITNESSES (Continued)

WITNESS                                                    PAGE

**Fred Buxton**
        (Direct Examination by Mr. McClure)               767
        (Cross-Examination by Mr. Beckworth)              789
        (Redirect Examination by Mr. McClure)             807

**Eric Krause**
        (Direct Examination by Mr. Yetter)                814

THE COURT:  Well --

MR. PATE:  -- information on which codes applied to owners, and when they changed and how they changed.  And so if you take --

THE COURT:  On which -- which of those 50 codes apply?

MR. PATE:  Yes, sir.

THE COURT:  Okay.

MR. PATE:  And then if you take Mr. Epperson's opinions at what he says, as far as which one of those codes, the only ones that defendant are gleaning are unmarketable title, that's what both Ms. Ley attempted to do and Mr. Krause attempted to do as far as matching up those codes to see where the six percent rate would potentially apply if you agree that that meets their burden on unmarketable title.

THE COURT:  So let me ask the defendants this.  Why was there this massive disclosure of information a month and a half before trial?

MR. YETTER:  That is a good question, Your Honor, and let me tell you exactly why it was.  Because in these cases, typically, and the way both sides operated is that there was initial discovery on class certification.  And we produced information that Ms. Ley took account of in her methodology and issued a report in January and gave a

deposition in March.  And until the Court decided class certification in early October, neither side started -- well, there was a lot of merits discovery that was not done because it's a very large amount of data.  We objected at the time they asked for it early in the case.

THE COURT:  Did you move for a protective order?

MR. YETTER:  We objected and they never --

THE COURT:  Did you move for a protective --

MR. YETTER:  We did not, Your Honor.  But they never raised the issue at that point, or moved to compel or --

THE COURT:  Well, okay, but it's your job to file for protective order if you object to something and you don't want to produce it.

MR. YETTER:  Well, we -- actually, we don't agree with that, Your Honor.  That we could --

THE COURT:  Well, it is in Eastern District of Virginia.

MR. YETTER:  We objected that it was premature, that we were at certification and we hadn't gotten to merits, and the class counsel did not move the Court to compel or anything like that.

So we -- whatever the reasons were, Your Honor, we believe we were acting in good faith taking certification discovery first and then merits discovery.

Once the Court certified the class, we very much took an intensive effort to find the data.  We provided it to both experts and both sides at the same time on October 31st.

Now, admittedly, Your Honor, neither side had much time to use it.  But, frankly, the Court put us -- put both sides on a pretty expedited schedule.

THE COURT:  Well, that's because this case has been hanging around forever.

MR. YETTER:  It is, Your Honor.  But both sides approached it like a normal class certification case.  This is not meant to be critical.  But both sides did certification discovery and waited on doing merits discovery until after the case was certified.

MR. PATE:  Your Honor, that's not --

THE COURT:  I'll hear from you in a minute, all right?  You can go sit down right now.

MR. YETTER:  From our perspective, that's what we did, for lots of good reasons in the sense that if a case is not certified --

THE COURT:  Well, but the problem with whatever your good reasons were is that you wind up sandbagging.

MR. YETTER:  Your Honor, we were not trying to sandbag.

THE COURT:  Well, you may not have been trying to do it, but you did it.

wrong with the payment date on this?

THE WITNESS:  There is nothing wrong with the payment date.  The information is reflected accurately.

THE COURT:  Is there something wrong with determining whether it's late?

THE WITNESS:  There is.

THE COURT:  Well, let's let Mr. Yetter ask you that, because I have a feeling that's probably where he's going.

MR. YETTER:  There is -- there is a point to my questions, not always, Your Honor, but today there is a point.  Let's go to Tab 3.  Oh, yes.  Okay.  And, Your Honor, this demonstrative we are going to call Plaintiffs' Exhibit 454 excerpt, and it's a demonstrative because Mr. Krause has modified what is exactly or --

THE COURT:  Okay.

MR. YETTER:  -- what was underlined 454.

THE COURT:  All right.

Q.  (BY MR. YETTER)  So now we're going to our second demonstrative, which is Tab 3.  And, Mr. Krause, what is this and where did it come from?

A.  This is a screen print from the Oklahoma Corporation Commission website.

Q.  Is this something you get online?

A.  That's correct.

Q.   Is it a public database from the Oklahoma Corporation Commission?

A.   Yes, it is publicly available from the OCC, and this is the type of data Ms. Ley described as downloading herself to evaluate the date of first sale.

Q.   All right.  She said she used the data from SUNOCO on sales and payments, but she also supplemented it with data from the Oklahoma Corporation Commission which tells you when wells first produce and --

A.   That's correct.

         THE COURT:  So your point on this is that they have six months from the first date of production before it's late; is that right?

         THE WITNESS:  As long as they make the payment within six months, then it's not --

         THE COURT:  And if it was made in December, it's within six months of July.

         THE WITNESS:  And the date of first production from the -- from this document is July of 2013, and so December of 2013 is within six months, and since --

         THE COURT:  All right.  Now, objection?  There's an objection here?

         MR. PATE:  Yes, Your Honor.  My objection is, this is not a demonstrative.  This is being offered to prove what the date of first sale is on this well.  It's not marked as

an exhibit, wasn't produced by the defendants, it wasn't on their exhibit list.  I recognize it's from a publicly available source, but this is certainly nothing that's ever been disclosed by Mr. Krause in any of his reports.  I specifically asked him about this two weeks ago.  He said nothing about -- or one week ago.  He said nothing about it.  It's not a demonstrative.  They are trying to use this as substantive evidence of what the date of first sale is on this well.

THE COURT:  Response.

MR. YETTER:  Yes, I'm happy to respond, Your Honor.  Your Honor, this is exactly the same data that Ms. Ley relied upon.  And this expert doesn't have to introduce this data because it is the sort of reasonably reliable data that an expert can rely on.

THE COURT:  Well, so are you introducing this or not?

MR. YETTER:  As a demonstrative, not on the --

THE COURT:  When did you first get this?

THE WITNESS:  I -- it was generated on December 15, 2019.

THE COURT:  So it's generated Monday?

MR. YETTER:  Sunday.

THE COURT:  Sunday.

THE WITNESS:  That's when the screen capture was

857

printed.

THE COURT:  Well, this case is being tried by ambush.  I'll accept it as a demonstrative for right now, but I'm going to take the objection under consideration.  It just -- you know, I understand -- here's the thing, I mean, I understand that, in Richmond, our case -- our docket in the Eastern District of Virginia is called the rocket docket, so we do things quickly and people hop on discovery quickly, and apparently that's not how it works here.  And as a result, everybody is rushing around at the last minute to get ready to try the case.  So we have exhibits that nobody's ever seen that are suddenly popped out at trial.  It just -- I'll -- he can testify about it today, but I'm going to take the objection under advisement.

MR. YETTER:  We understand, Your Honor.

Q.  (BY MR. YETTER)  Bottom line of this issue is let's --

THE COURT:  Hold on.  Mr. Pate is standing up again.

MR. PATE:  I'm sorry.  Before he --

THE COURT:  That's all right.

MR. PATE:  Before he gets going again --

THE COURT:  I want you to get your exercise.

MR. PATE:  -- deal with this because we specifically requested all materials from Mr. Krause related to -- well, what any expert has to provide, the data that

they relied upon. That includes any schedule he created of all the dates of first sale just like Ms. Ley had to do. We never received that. And if this type of information would have been included in that, we might have known about this before, but we never even got that.

THE COURT: I understand. I understand your point. Go ahead.

Q. (BY MR. YETTER) Thank you, Your Honor. Going back to Demonstrative Exhibit 2, or actually 5 which is excerpt -- 454 excerpt, would all of these late payments in Ms. Ley's database for Husky Ventures with interest and interest on interest totaling about $18,000, would they actually be late, at least in your opinion, under the statute in terms of the time?

A. In my opinion, the 18,000 of principal interest, as well as the additional approximately 18,000 of interest on interest for a total of 36,000 related to this one payment, I do not believe it is late under my reading of the PRSA.

Q. Let's move to a new topic, and that is the issue of prior period adjustments. Do you know what I'm referring to?

A. Yes, sir.

Q. And, Your Honor, at the class counsel's suggestion, the class definition excludes prior period adjustments. Is that your understanding?

done a great job on this case, and you're welcome to come to Richmond any time.  Just get your discovery done a little earlier up there.  All right.  Thank you all very much. We're going to recess now.  You can go about your business. I've got to clean some stuff up up here.

*(Off the record at 5:24 p.m.)*

*     *     *     *     *

C E R T I F I C A T E

I, Ken Sidwell, Certified Shorthand Reporter for the Eastern District of Oklahoma, do hereby certify that the foregoing is a true and accurate transcription of my stenographic notes and is a true record of the proceedings held in the above-captioned case.

I further certify that I am not employed by nor related to any party to this action, and that I am in no way interested in the outcome of this matter.

In witness whereof, I have hereunto set my hand this 24th day of January, 2020.

s/Ken Sidwell
Ken Sidwell, CSR-RPR
United States Court Reporter

**United States District Court**

917

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF OKLAHOMA


PERRY CLINE, on behalf of himself  )
and all others similarly situated, )
                                   )
                Plaintiff,         )
                                   )
-vs-                               ) No. CIV-17-313-JAG
                                   )
SUNOCO INC. (R&M) and SUNOCO       )
PARTNERS MARKETING & TERMINALS,    )
L.P.,                              )
                                   )
                Defendant.         )


* * * * *

TRANSCRIPT OF NONJURY TRIAL PROCEEDINGS
VOLUME V OF V
**BEFORE THE HONORABLE JOHN A. GIBNEY**
UNITED STATES DISTRICT JUDGE

DECEMBER 19, 2019

* * * * *

REPORTED BY:                    KEN SIDWELL, CSR-RPR
                                United States Court Reporter
                                P.O. Box 607
                                Muskogee, Oklahoma  74402

**United States District Court**

918

A P P E A R A N C E S

ON BEHALF OF THE PLAINTIFF:

MR. ANDREW G. PATE, Nix Patterson & Roach, 205 Linda Drive, Daingerfield, Texas, 75638,

MR. BRADLEY E. BECKWORTH, Nix Patterson, LLP, 3600 North Capital of Texas Highway, Suite B350, Austin, Texas, 78746,

MR. JASON A. RYAN and MR. PATRICK M. RYAN, Ryan Whaley Coldiron Jantzen Peters & Webber, PLLC, 119 North Robinson Avenue, Suite 900, Oklahoma City, Oklahoma, 73102,

MR. MICHAEL BURRAGE, Whitten Burrage, 512 North Broadway, Suite 300, Oklahoma City, Oklahoma, 73102,

ON BEHALF OF THE DEFENDANT:

MR. DANIEL M. MCCLURE, Norton Rose Fulbright US, LLP, 1301 McKinney, Suite 5100, Houston, Texas, 77010-3095,

MR. MARK D. CHRISTIANSEN, McAfee & Taft, 211 North Robinson, 10th Floor, Oklahoma City, Oklahoma, 73102-7103,

MR. R. PAUL YETTER, Yetter Coleman, LLP, 811 Main Street, Suite 4100, Houston, Texas, 77002.

DEFENDANT'S WITNESS

| WITNESS | PAGE |
| --- | --- |
| **Eric Krause** | |
| (Cross-Examination by Mr. Pate) | 920 |
| (Redirect Examination by Mr. Yetter) | 944 |
| Defendant Rests: | 948 |

**United States District Court**

937

A.  I disagree with that.  I did.  In my report, I provided exemplars like the PPA exemplar.

Q.  Okay.  Let me rephrase.  You did not identify any instances where Ms. Ley said this one is outside of six months, and you said, no, she's wrong, it's not actually outside of six months?

A.  That's correct.

Q.  You did not identify any late payments where Ms. Ley says this is outside the two month time frame, and you thought she was wrong; correct?

A.  That, I did.

Q.  That appears nowhere in either of your reports; correct?

A.  No, it does.  As I said, the PPA exemplar would be an example of that.

Q.  Let me make sure my question is clear, okay?  You did not identify a single payment where Ms. Ley said the payment is more than two months, and you said she's wrong, it was made within two months; correct?

A.  I see.  No -- yes, that's correct.

Q.  In your reports, you did not identify any instance where Ms. Ley said the payment was more than six months from the date of first sale, and you said she's wrong, it was within the six months; correct?

A.  That's correct.

Q.   You didn't do that in any of your reports or your deposition?

A.   That's correct.

Q.   The first time you said anything about any of that was one example you brought in something you all called a demonstrative yesterday during your direct testimony, and you pointed to one example; correct?

A.   I did.

Q.   All right.  Let's -- Mr. Medina, can we put up Plaintiffs' Exhibit 508, please.

When you made this demonstration to the Court, you didn't point to any actual document produced in the case; correct?

A.   Other than Ms. Ley's damages.

Q.   You didn't produce -- for example, you didn't show the SUNOCO data that SUNOCO produced about well API numbers, did you?

A.   I don't think that was referred to, no.

Q.   You didn't rely on your own data for a sale schedule that you say you provided that I've still never seen, did you?

A.   That's correct.

Q.   Okay.  So Mike -- or, excuse me -- Mr. Medina, can we please put up the demonstratives -- what were called demonstratives that were used yesterday.  And so --

Demonstrative 6.

It was an excerpt from Ms. Ley's damages that we see right here in the middle, plus a printout from the OCC website showing a date of first sale for the well at issue here; correct?

A.   That's correct.

Q.   The point you were trying to make was that, if I understood you, that the date of first sale based on the OCC website is different than what Ms. Ley is showing the date of first sale, and so you were trying to show that these may not actually be linked; is that right?

A.   Correct.  Though what Ms. Ley's damages, that sheet doesn't show --

THE COURT:  Again, please, yes -- when he says correct, that's a yes or no answer.  And I'm telling you, sir, I know that you have just a lot of things you want to say, but when you have a yes or no question, you'll answer it yes or no.  And the next time, we'll have a contempt citation.  Is that clear to you, Mr. Krause?

THE WITNESS:  Yes, sir.

THE COURT:  Thank you.

Q.   (BY MR. PATE)  What we have at the top here is an excerpt from Plaintiff's Exhibit 508 showing the same Boeckman 1-14H Well that you used in your example.  Do you see that?

940

A.   Yes.

Q.   Plaintiff's Exhibit 508 is the actual data produced by SUNOCO in this case for all the well API numbers that they have.  Do you see that?

A.   Yes, I do.

Q.   Do you see the API number that's listed here by SUNOCO in the data they produced?

A.   Yes, I do.

Q.   Do you see that it's different than the API number that's listed here on the left side that you looked up?

A.   It does appear different, yes.

Q.   So Ms. Ley was relying on this data produced by SUNOCO in this case to look up these wells and identify dates of first sale.  Do you see that?

A.   Yes.

Q.   Did you rely on that same data when you did your dates of first sale?

A.   I did.

Q.   So you relied on this same data, too, meaning you would have had this wrong also?

A.   That's correct.

Q.   Who then, sir, pointed this out to you, and when did they do it for the first time?

A.   I pulled that on Sunday.

Q.   Sunday before this trial was the first time you looked

for somewhere in SUNOCO's own data that they were wrong, and pulled out this demonstrative about what the date of first sale on this well is?

A.   That's correct.

Q.   Wasn't in any of your reports?

A.   That's correct.

Q.   It wasn't in the original data that you even relied on when you did this?

A.   That's correct.

Q.   You relied on the same thing Ms. Ley did?

A.   Yes, sir, I did.

Q.   Did someone instruct you to look for this?

A.   I did that based on Husky -- no.  No one instructed me to look for it.

Q.   So this isn't what -- what we're seeing here is not some flaw in Ms. Ley's methodology.  This is an error in SUNOCO's own data; correct?

A.   No.

Q.   That's not correct?

A.   I disagree with the characterization.

Q.   Is this an error in the SUNOCO data, the API number that was produced by SUNOCO, is that an error?

A.   I don't know.  I'd have to investigate whether there was more information.

Q.   Well, sir, yesterday you came in here and you testified

and said this is the right number and this is what the date of first sale is, so Ms. Ley must be wrong.  Which is it?

A.  I believe that Ms. Ley is wrong.  But it is possible that the API number may have related to a vertical well associated with the same name.  But I agree that the API number listed there does not match the API number listed on the OCC website.

Q.  And at least when you were doing your own analysis, sir, you felt there was nothing wrong with the line on SUNOCO's data and SUNOCO's API numbers that they provided for doing this analysis?

A.  I did utilize that information, that's correct.

Q.  To be clear, this is the one instance, one that you have identified now where you think Ms. Ley -- or you claim Ms. Ley incorrectly measured the six month time frame; is that right?

A.  Correct.

Q.  Out of one and a half -- over one and a half million late payments, your two reports, one before the deadline, one after the deadline, and your trial testimony, the only one you found is this one that you brought to the Court that you identified on Sunday of this week?

A.  That's correct.

Q.  Can you identify a single payment under the two month time frame where you you say, no, that was actually within

1021

you.

                    *(Off the record at 11:11 a.m.)*

                         *   *   *   *   *

                    C E R T I F I C A T E

          I, Ken Sidwell, Certified Shorthand Reporter for

the Eastern District of Oklahoma, do hereby certify that the

foregoing is a true and accurate transcription of my

stenographic notes and is a true record of the proceedings

held in the above-captioned case.

          I further certify that I am not employed by nor

related to any party to this action, and that I am in no way

interested in the outcome of this matter.

          In witness whereof, I have hereunto set my hand

this 17th day of January, 2020.


                              s/Ken Sidwell
                              Ken Sidwell, CSR-RPR
                              United States Court Reporter


**United States District Court**