IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA

PERRY CLINE, on behalf of himself
and all others similarly situated,
Plaintiff,

v. Civil Action No. 6:17cv313

SUNOCO, INC. (R&M), et al.,
Defendants.

# **OPINION**

This case began as a fight between a farmer and a fuel company. Over nine years ago, oil-well owner Perry Cline sued Sunoco, Inc. (R&M), and Sunoco Partners Marketing & Terminals, L.P. (collectively, "Sunoco"), in Oklahoma state court. Cline alleged that Sunoco had failed to pay him interest on late payments for oil from his well as required by Oklahoma's Production Revenue Standards Act ("PRSA"). *See* Okla. Stat. tit. 52, §§ 570.1–.15. Sunoco removed the suit to this Court, where Cline and a class of similarly situated well owners prevailed on their PRSA claim after a four-day bench trial.[1]

But Sunoco's "string of appeals"[2] and post-trial filings have spanned nearly six years since the Court entered its Judgment Order on August 17, 2020. (ECF No. 308.) Like *Jarndyce v. Jarndyce*, *Cline v. Sunoco* "drones on"—it "still drags its dreary length before the court, perennially hopeless." Charles Dickens, *Bleak House* ch.1 ¶ 8 (1853). The class suggests this droning and dragging is due to Sunoco's and defense counsel's bad faith, and the plaintiffs move for various sanctions as a result. Doubtlessly, Sunoco and its lawyers have strolled right up to the line of acceptable professional conduct in an attempt to delay paying what the company owes. But

---

[1] *Cline v. Sunoco, Inc. (R&M)*, 479 F. Supp. 3d 1148, 1168–72 (E.D. Okla. 2020).

[2] *Cline v. Sunoco, Inc. (R&M)*, 159 F.4th 1171, 1179 (10th Cir. 2025).

neither the applicable statute nor the Court's inherent powers permit the Court to impose the requested sanctions. The Court, therefore, will deny the class's motion, and this case will drone on.

## I. BACKGROUND[3]

Sunoco operates as a first purchaser of crude oil. Oklahoma law generally[4] obligates first purchasers to pay promptly for purchased oil. Okla. Stat. tit. 52, § 570.10(B)(1). Paying late triggers interest due to the owner of the oil well. *Id.* § 570.1–.15.

At some point in the now-distant past, Sunoco decided to not pay the statutory interest automatically; instead, it adopted a practice of withholding interest unless or until a late-paid owner made a demand for it.[5] Cline and other underpaid well owners eventually noticed their lighter wallets and sued Sunoco for breaching its statutory obligation to pay interest and for committing fraud. (ECF No. 2-2, at 9–11.)

Sunoco believed its nonpayment practice conformed with the PRSA. As the Court's summary judgment opinion described,

> Sunoco contend[ed] that it is liable for interest when it makes late payments, but that the PRSA does not require it to pay that interest at the same time it makes the late payments. . . . Sunoco argues that § 570.10(D) only requires proceeds to "earn interest" and that Sunoco "shall be liable" for the interest unless an exception provides otherwise. Because the PRSA does not expressly set forth a payment schedule or require "first purchasers or holders of proceeds" to pay interest absent a claim for that interest, Sunoco contends that the Court cannot "rewrite" the PRSA to require interest payments automatically with the late payment.

---

[3] This case has a long and convoluted history. Here, the Court recites only those facts necessary to resolve the instant motion. Further, the page number in any record citation refers to the page number assigned by the Court's electronic docket filing system.

[4] Exceptions to this obligation exist but do not apply to Sunoco. *See, e.g., id.* § 570.10(B)(3).

[5] (Trial Tr. vol. 1, 78:6-9, 82:20 to 85:19, 116:3-6; Pl.'s Ex. 339.)

(ECF No. 231, at 6.) Sunoco, however, was wrong. The plain language of § 570.10 requires Sunoco to pay interest at the same time it makes a late payment, and on August 17, 2020, the Court entered a post-trial Opinion and Order holding Sunoco liable for owed interest.[6] Years of procedural sparring and appeals have followed.[7]

It is this defense—that the PRSA held Sunoco liable for interest but did not require Sunoco to pay it sans demand—that the class now describes as an original sin from which all alleged litigation abuses followed. Because Sunoco's primary defense against the central PRSA claim "was frivolous," unconscionable conduct "has permeated the litigation" in service of that defense from the case's beginning. (ECF No. 711, at 6, 12.) Daniel McClure, Esq., the class claims, "was the principal architect behind" this litigation strategy. (*Id.* at 26.) As the class summarizes,

> [T]his entire litigation stemmed from Sunoco's and Mr. McClure's intentional choice to ignore the duties imposed by the PRSA and adopt a blatantly frivolous position that the Oklahoma Legislature wrote a statute that said Sunoco "shall be liable" for interest but never actually had to pay it. There would have been no lawsuit had Sunoco merely paid the money it knew it owed.

(ECF No. 716, at 5.)

The class attributes eleven varieties of litigation abuse to this forbidden fruit.[8] First, the class alleges Sunoco "misrepresented" its proposed discovery schedule with respect to possible "bifurcated" discovery. (ECF No. 711, at 8–9.) Second, Sunoco "intentionally withheld substantive documents" until the end of discovery "to strategically prejudice" Cline. (*Id.* at 9.) Third, the class accuses Sunoco of "with[o]ld[ing]" a "deficient" privilege log until less than two

[6] (*Id.* at 9; ECF No. 298, at 25–28, 48.)

[7] *See supra* n.2.

[8] The Court cites to the class's motion and omits internal citations in that motion which refer to the underlying docket entries relevant to each accusation.

weeks before the anticipated close of discovery (though Sunoco ultimately provided an "amended" log). (*Id.* at 9–10.) Fourth, Sunoco sent directly to Cline "a check for unpaid interest" with "no prior discussion with his counsel" in an attempt to "pick off" the class representative. (*Id.* at 10–11.) Fifth, the class accuses Sunoco of "intentionally with[olding] its suspense data" and delaying its expert's report to "prejudice and burden[]" them. (*Id.* at 11.) Sixth, Sunoco filed a "baseless" motion to "clarify" the class, which reduced to "nothing more than 'an argument to cut down the size of the class.'" (*Id.* at 11–12.)

Seventh, the class says Sunoco deployed "ambush tactics" at trial by attempting to use "information not previously disclosed" disguised as "demonstrative" exhibits. (*Id.* at 12.) Eighth, after largely losing at trial, Sunoco and McClure "made multiple statements that were not true" simply to "seek a new trial." (*Id.* at 13–14.) Ninth, the class asserts Sunoco's dishonesty continued at the United States Court of Appeals for the Tenth Circuit by critiquing discovery deadlines and the case's underlying scheduling order—but Sunoco did so "knowing that it was not [] appealing the schedule and that it had never moved to continue the trial." (*Id.* at 14.) Tenth, Sunoco "create[ed] intentional delay and needless cost" by filing "a frenetic string of appeals." (*Id.* at 14–15.) Eleventh, and finally, the class faults Sunoco for "obvious delay tactics" in the form of a "circuitous route to the Supreme Court [of the United States]" to avoid paying what it owes to class. (*Id.* at 15–16.)

For this conduct, the class seeks monetary sanctions against Sunoco and non-monetary sanctions against McClure pursuant to 28 U.S.C. § 1927 and the Court's inherent powers. As to the oil giant, the class seeks an order "shifting *all* costs and fees incurred by . . . the [c]lass in this

case to Sunoco."[9] As to McClure, the class asks the Court to (1) revoke his *pro hac vice* status[10]; (2) require him to file a copy of any entered sanctions order in any ongoing or future case in which he appears in an Oklahoma federal court (for up to two years); and (3) direct him to author an article "on topics of the Court's choosing" for publication in the Oklahoma Bar Journal, including a disclaimer that McClure authored the piece as a court-ordered sanction. (*Id.* at 22–27.)

Sunoco, predictably, refutes the class's characterization of each listed grievance. "[Z]ealous advocacy, not sanctionable misconduct," Sunoco says, explains the defendants' "legitimate, good-faith legal argument and advocacy." (ECF No. 715, at 24, 29.) Even if the Court accepts the class's version of events, Sunoco claims the Court cannot sanction McClure as requested because the class "does [not] identify what part of [the] conduct is attributable to McClure," nor does the class offer a "lawful, workable sanction against him." (*Id.* at 28, 30.) More troubling still, Sunoco asserts the class fails to "make the causal showing required" to shift the entirety of litigation costs to the company: The class has not demonstrated "that *all* of [the] costs and fees were attributable *solely* to the alleged misconduct." (*Id.* at 6 (emphasis in original).)

---

[9] (ECF No. 711, at 23 (emphasis added).) The class defines this sanction as "an amount of attorneys' fees equal to 25% of the Judgment Common Fund," "$1.5 million in litigation and distribution expenses," and "$500,000 as a case contribution award" for Cline—together, the "same fee award class counsel received." (*Id.* at 25; *see also* ECF No. 715, at 17 (Sunoco's definition of the class's request).)

[10] Sunoco notes that McClure "is n[o]t participating *pro hac vice*—and has n[o]t since being admitted to practice before this Court in late 2018." (ECF No. 715, at 29 (cleaned up).) In response, the class acknowledges that McClure "has been admitted to practice" in this district "since originally appearing via *pro hac vice* status." (ECF No. 716, at 7.) So, instead of seeking revocation of McClure's *pro hac vice* status, the class clarifies that the Court "should revoke his admission to the Eastern District of Oklahoma . . . for a period of less than two years." (*Id.*)

## II. ANALYSIS[11]

Courts deter bad behavior in the courtroom by sanctioning the badly behaved. The law provides three avenues for sanctions in a case like this: Federal Rule of Civil Procedure 11, 28 U.S.C. § 1927, and the Court's inherent powers. Despite Sunoco's extensive efforts to avoid judgment (or payment) day, none of these authorities support the sanctions sought by the class. The Court, therefore, cannot impose them.

### *A. 28 U.S.C. § 1927*

Section 1927[12] empowers the Court to impose on "[a]ny attorney" who "multiplies [] proceedings in any case unreasonably and vexatiously" the "excess costs, expenses, and attorneys' fees reasonably incurred" because of such conduct. 28 U.S.C. § 1927. A court need not find subjective bad faith to impose § 1927 sanctions; rather, the Court may sanction any conduct that,

---

[11] On July 2, 2026, the Court received notice that Sunoco filed a petition for a writ of certiorari at the Supreme Court of the United States. (ECF No. 717.) The "filing of a notice of appeal is an event of jurisdictional significance" that "divests the district court of its control over those aspects of the case involved in the appeal." *Griggs v. Provident Cons. Discount Co.*, 459 U.S. 56, 58 (1982). But the mere filing of a petition for certiorari with the Supreme Court, by contrast, does not divest a district court of jurisdiction after an appellate circuit has ruled. Rather, a litigant must obtain a stay of the appellate court's mandate. *See* Fed. R. App. P. 41(d); *see, e.g.*, *United States v. Sears*, 411 F.3d 1240, 1242 (11th Cir. 2005) ("[T]he mere filing of a petition for certiorari with the Supreme Court neither stops the mandate from issuing nor stops the case from proceeding in the district court. A litigant desiring such cessation must seek and obtain a stay."). Because neither party has sought a stay of the Tenth Circuit's recent mandate, (*see* ECF No. 705), the Court may substantively consider the class's motion.

[12] The class seeks sanctions pursuant to 28 U.S.C. § 1927 and the Court's inherent powers only. (*See* ECF No. 711, at 16.) The Court, therefore, will forego an analysis of Rule 11. *See* Fed. R. Civ. P. 11(b) ("By presenting to the court a pleading, written motion, or other paper, . . . an attorney . . . certifies that to the best of [their] knowledge, . . . formed after an inquiry reasonable under the circumstances," that the paper "is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation," and that the "claims, defenses, and other legal contentions" contained in the paper "are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law"). Rule 11(c) authorizes sanctions for violations of Rule 11(b). *See* Fed. R. Civ. P. 11(c)(1).

"viewed objectively, manifests either intentional or reckless disregard of the attorney's duties to the court."[13] Section 1927 thus "represents 'an extreme standard, and fees should be awarded [pursuant to it] only in instances evidencing a serious and standard disregard for the orderly process of justice,' lest the court 'dampen the legitimate zeal of an attorney in representing his client.'" *Obeslo v. Empower Cap. Mgmt., LLC*, 85 F.4th 991, 1005 (10th Cir. 2023) (quoting *Baca v. Berry*, 806 F.3d 1262, 1268 (10th Cir. 2015)).

The statute's text sets obvious qualitative and quantitative limits. First, § 1927 permits a court to sanction only attorneys;[14] parties cannot be touched. Second, a court may impose only monetary sanctions, leaving more creative options unavailable. Finally, the Court may impose as sanctions only the "excess" costs "reasonably incurred because of" the bad conduct. *See* 28 U.S.C. § 1927.

Again, the class seeks monetary sanctions against Sunoco and non-monetary sanctions against McClure. But Sunoco is not a lawyer, and forced article writing is not money.[15] Because the class seeks sanctions outside the scope of § 1927, the Court will not (and cannot) grant the class's motion pursuant to this authority.

---

[13] *Braley v. Campbell*, 832 F.2d 1504, 1512 (10th Cir. 1987). An attorney also risks § 1927 sanctions by "acting in the teeth of what he knows to be the law," *id.* at 1511, or "continuing to pursue claims after a reasonable attorney would realize they lacked merit," *Frey v. Town of Jackson*, 41 F.4th 1223, 1245 (10th Cir. 2022).

[14] Or "other person[s] admitted to conduct cases in any court of the United States." 28 U.S.C. § 1927.

[15] And neither revoking McClure's admission to this Court nor forcing him to disclose these proceedings constitutes money.

### *B. Inherent Powers*

Federal courts "possess certain 'inherent powers,' not conferred by rule or statute, 'to manage their own affairs so as to achieve the orderly and expeditious disposition of cases.'" *Goodyear Tire & Rubber Co. v. Haeger*, 581 U.S. 101, 107 (2017) (quoting *Link v. Wabash R.R. Co.*, 370 U.S. 626, 630–31 (1962)). This authority includes "the ability to fashion an appropriate sanction for conduct which abuses the judicial process." *Id.* (citation omitted). A court may rely on its inherent powers "when express laws provided by Congress such as § 1927 do not reach the entirety of a litigant's bad-faith conduct." *Farmer v. Banco Popular of N. Am.*, 791 F.3d 1246, 1258 (10th Cir. 2015) (first citing *Chambers v. NASCO, Inc.*, 501 U.S. 32, 57 (1991); and then citing *id.* at 62–63 (Kennedy, J., dissenting)).

Inherent powers, too, have their limits. Any sanction imposed "pursuant to civil procedures," as here, "must be compensatory rather than punitive in nature." *Goodyear*, 581 U.S. at 108 (citation omitted). Courts may not "impose an additional amount as punishment for the sanctioned party's misbehavior" absent the "procedural guarantees applicable in criminal cases, such as a 'beyond a reasonable doubt' standard of proof." *Id.* (citation omitted). When a party seeks fee-shifting and "those criminal-type protections are missing," a court may only shift fees "to reimburs[e] the victim." *Id.* "[B]y definition," then, the Court "can shift *only* those attorney's fees incurred because of the misconduct at issue." *Id.* (emphasis added).

The sanctioning court must therefore "determine which fees were incurred because of, and *solely* because of, the misconduct at issue." *Id.* at 113 (emphasis added). This "causal connection" "is appropriately framed as a but-for test": The movant "may recover 'only the portion of his fees that he would not have paid but for' the misconduct." *Id.* at 109 (first quoting *Fox v. Vice*, 563 U.S. 826, 836 (2014); and then citing *Paroline v. United States*, 572 U.S. 434, 450–51 (2014)).

But when calculating the appropriate sanction, a court "need not, and indeed should not, become [a] green-eyeshade accountant[] . . . [because t]he essential goal in shifting fees is to do rough justice, not to achieve auditing perfection." *Id.* at 110. The Court may, therefore, "take into account its overall sense of a suit, and may use estimates in calculating and allocating an attorney's time." *Id.* (citation omitted).

In "exceptional" cases, this standard permits a court "to shift *all* of a party's fees, from [] the start . . . , in one fell swoop." *Id.* *Chambers* presents one such exceptional case.[16] There, the petitioner, the sole shareholder and director of a television station company, "agreed to sell the station's facilities and broadcast license" to the respondent, NASCO. *Chambers*, 501 U.S. at 32. But Chambers "soon changed his mind" and "engaged in a series of actions" in the courts and before the Federal Communications Commission "to frustrate the sale's consummation." *Id.*

---

[16] The class also relies on *Farmer*, 791 F.3d at 1246. In that case, the plaintiff, an attorney appearing *pro se*, sued Banco Popular to challenge the bank's "by-all-appearances legitimate demand" that Farmer pay off a home equity line of credit. *Id.* at 1250. Shortly after the litigation began, Farmer represented to the court that the parties had reached a settlement agreement to resolve the dispute. *Id.* at 1250–51. But rather than "adher[e] to the terms of the settlement agreement," Farmer "multiplied the proceedings, causing the court to expend considerable effort[] . . . and delaying the ultimate resolution" for over a year. *Id.* at 1253 (citation omitted) (emphasis removed). The district court determined Farmer engaged in "bad-faith conduct [by] refusing to sign the settlement agreement and [by] unreasonably prolonging [the] litigation"—indeed, he "his arguments were 'nonsensical'" from the start. *Id.* at 1253–54.

The district court awarded the bank "fees and costs incurred from July 2, 2012," onward, pursuant to its authority under 28 U.S.C. § 1927 and its inherent powers. *Id.* at 1254. The district court assessed the reasonableness of fees owed by using a lodestar calculation and reduced the bank's request according to that method's output. *See id.* at 1259–60. The United States Court of Appeals for the Tenth Circuit largely approved this award, noting the district court "shifted a portion of [the fees] . . . not as a matter of substantive remedy . . . but primarily to vindicate its authority." *Id.* at 1258.

Factually and procedurally, *Chambers* proves the more apt analogy here. The Court will not discuss *Farmer* further.

On a Friday evening, NASCO provided notice of its intent to seek a temporary restraining order ("TRO") and to file a complaint for specific performance. *Id.* at 36. Chambers immediately "acted to place the properties at issue beyond the reach of the [d]istrict [c]ourt" by mischievous maneuvering under Louisiana's public records doctrine. *Id.* Neither side recorded the purchase agreement between Chambers and NASCO. Chambers reasoned if he sold the properties (again) to a new party, and if he recorded *those* deeds before issuance of a TRO, the district court "would lack jurisdiction over the properties" and, therefore, could not enforce the sale. *Id.* at 36–37.

He did just that. On Sunday afternoon, forty-eight hours after NASCO's notice of intent to seek a TRO, Chambers and a collaborator "created a trust, with [his] sister as trustee and [his] three adult children as beneficiaries." *Id.* at 37. Chambers then directed the president of the television company—later his wife—to "execute warranty deeds conveying [the property] at issue to the trust." *Id.* Early Monday morning, Chambers recorded the deeds. *Id.* His collaborator withheld this information in a call with the court later that day, and from there, Chambers "continued to abuse the judicial process" through a series of "meritless motions and pleadings and delaying actions." *Id.* at 38. The district court imposed, and appellate proceedings upheld, a sanction of the entire amount of fees "because literally everything the defendant did—'his entire course of conduct' throughout, and indeed preceding, the litigation—was 'part of a sordid scheme to defeat a valid claim.'" *Goodyear*, 581 U.S. at 110 (quoting *Chambers*, 501 U.S. at 51, 57)).

The class insists this case is *Chambers v. NASCO* masquerading under a different name. Just like Chambers, Cline reasons, "Sunoco's 'entire course of conduct throughout . . . was part of a sordid scheme to defeat a valid claim.'" (ECF No. 716, at 5 (quoting *Chambers*, 501 U.S. at 51, 57)). After all, this "entire litigation stemmed from Sunoco's *and* [] McClure's intentional choice to . . . adopt a blatantly frivolous position" as a defense. (*Id.* (emphasis in original).) Consistent

with "the teachings" of *Chambers*, then, the class implores the Court to "enter an order shifting all costs and fees incurred by . . . the [c]lass in this case to Sunoco." (ECF No. 711, at 23.)

*Cline* does not equal *Chambers*. Chambers tried in vain to keep an otherwise justiciable controversy out of court entirely.[17] By contrast, Sunoco mounted a cognizable, albeit ultimately unsuccessful, defense against the PRSA claim in open court.[18] A meaningful difference exists between withholding a dispute from a court through deceit and presenting a contested legal question for the Court to resolve—the bread and butter of courts' work.

The Court also disagrees that Sunoco's "entire legal defense to the [PRSA] interest claims was frivolous." (ECF No. 711, at 12.) The class's argument on this point sounds somewhat circular: Because Sunoco lost on the legal question of whether it had to pay interest due under the PRSA without a demand from the well owner, and because Sunoco did not appeal that legal conclusion, its defense must have been frivolous all along. (*Id.* at 12–13.) But Sunoco's "losing argument[], though meritless, [was] nonetheless complex and not 'completely frivolous.'"[19] Sunoco supported its defense with principles of statutory interpretation, relevant case law, and a review of legislative intent.[20] And, notably, at no point during the litigation did the class or the Court initiate sanctions proceedings under Federal Rule of Civil Procedure 11 in response to

---

[17] *See Chambers*, 501 U.S. at 32 ("Chambers . . . had . . . attempted to deprive the court of jurisdiction by acts of fraud, nearly all of which were performed outside the confines of the court.") (citation omitted).

[18] (*See, e.g.*, ECF No. 231, at 9–13 (discussing Sunoco's defense and the Court's interpretation of the PRSA).)

[19] *DMA Int'l, Inc. v. Qwest Commc'ns Int'l, Inc.*, 585 F.3d 1341, 1346 (10th Cir. 2009) (quoting *Lewis v. Circuit City Stores, Inc.*, 500 F.3d 1140, 1154 (10th Cir. 2007)).

[20] (*See, e.g.*, ECF No. 160, at 12–19 (Sunoco's response in opposition to the class's motion for summary judgment on the PRSA claim).)

Sunoco's PRSA argument.[21] That Sunoco ultimately lost on the statutory claim does not render its core defense frivolous nine years into the litigation.

Even if the Court assumes that Sunoco's PRSA defense poisoned the (oil) well from the start just like Chambers's devious deeds, the class fails to make the required causal showing that all of the fees "were incurred because of, and solely because of, [this] misconduct." *See Goodyear*, 581 U.S. at 113. The argument fails twice over. First, the class forgets that it lodged a second, separate claim for fraud—and that Cline failed to prove it. (*See* ECF No. 298, at 37–38.) The Court, therefore, cannot attribute to the failed PRSA defense *all* of the incurred fees; the parties undoubtedly spent *some* amount of money litigating solely the fraud claim.[22] Second, the class simply fails to demonstrate that the PRSA defense "was a factual cause" of all litigation expenses incurred, particularly those racked up after the Court's December 10, 2019, partial grant of summary judgment. *See Goodyear*, 581 U.S. at 109. Sunoco did not appeal the summary

---

[21] *See* Fed. R. Civ. P. 11(b) ("By presenting to the court a . . . paper, . . . an attorney . . . certifies that . . . the [] defenses[] and other legal contentions are warranted by existing law or by a nonfrivolous argument for" changing the law.); *id.* 11(c) (authorizing the imposition of sanctions for violations of Rule 11(b)).

[22] *See e.g.*, *Fox v. Vice*, 563 U.S. 826, 836 (2011). In *Fox*, a prevailing party sought reimbursement for legal expenses incurred in "defending against several frivolous claims." *Goodyear*, 581 U.S. at 109 (quoting *Fox*, 563 U.S. at 830). The trial court "granted fees for all legal work relating to those claims," "regardless of whether the same work would have been done . . . to contest the *non*-frivolous claims in the suit." *Id.* (emphasis in original). The Supreme Court "made clear that was wrong": When a party "would have incurred an expense in any event, he has suffered no incremental harm from the frivolous claim." *Id.* (citing *Fox*, 563 U.S. at 836). So too here: Even if the Court construed Sunoco's statutory defense as a frivolous one, the Court would still "lack[] a basis for shifting [all] expenses" because some of "the same work would have been done . . . to contest the *non*-frivolous" fraud claim. *See id.* (emphasis in original).

judgment decision on class-wide PRSA liability—in other words, after December 2019, the company no longer pressed the defense the class now faults.[23]

Whatever Sunoco's transgressions, the PRSA defense does not support a wholescale fee-shift on analogy to *Chambers*. Because neither 28 U.S.C. § 1927 nor the Court's inherent powers permit the Court to shift entirely the fees in this case from the class to Sunoco, the Court cannot grant Cline's motion for sanctions.

## III. CONCLUSION

Courts expect good faith from the parties and advocates before it. Too often in this case—from attempting to pick off the named plaintiff in December 2017 to misleading the Court about its appellate timeline in March 2026—Sunoco and its attorneys needlessly pushed the envelope. That Sunoco calls its trickery nothing more than zealous advocacy does not make it so.

The bar demands better. But because the law does not support the sanctions requested, the Court must deny the class's motion. (ECF No. 711.)

The Court will issue an appropriate Order.

Let the Clerk send a copy of this Opinion to all counsel of record.

Date: 18 August 2026
Richmond, VA

/s/
John A. Gibney, Jr.
Senior United States District Judge

[23] *See Cline*, 159 F.4th at 1188 ("The [c]lass [] demonstrated that Sunoco engaged in an ongoing scheme to. . . only pay[] interest when specifically requested. . . . [T]he district court [] grant[ed] partial summary judgment on liability to the [c]lass . . . that Sunoco does not appeal. To be clear, Sunoco does not appeal the ruling of class-wide liability, only the amount of interest.")